892 F.2d 851
 57 Ed. Law Rep. 1167
 Oliver BROWN, et al., Plaintiffs,
and
Charles Smith and Kimberly Smith, Minor Children, By Their
Mother And Next Friend, Linda Brown Smith, et al.,
Intervening Plaintiffs-Appellants,
v.
BOARD OF EDUCATION OF TOPEKA, SHAWNEE COUNTY, KANSAS, et
al., Defendants-Appellees.
 No. 87-1668.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 11, 1989.
Rehearing and Rehearing En Banc Denied Jan. 29, 1990.
 
 Christopher A. Hansen (Richard Jones, Wichita, Kan., Charles Scott, Sr., Charles Scott, Jr., Kansas City, Mo., and Joseph Johnson, Topeka, Kan., with him on the brief), American Civil Liberties Union Foundation, for plaintiffs-appellants.
 Dan Biles, of Gates & Clyde, Overland Park, Kan., Carl Gallagher, Asst. Atty. Gen. (Robert T. Stephan, Atty. Gen. with him on the brief), and K. Gary Sebelius (Ann L. Baker, Charles D. McAtee and Charles N. Henson with him on the brief) of Eidson, Lewis, Porter & Haynes, Topeka, Kan., for defendants-appellees.
 Before McKAY, SEYMOUR and BALDOCK, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 "[O]nce you begin the process of segregation, it has its own inertia. It continues on without enforcement."[1] This comment by one expert on segregation in schools succinctly summarizes the state of affairs in Topeka. As a former de jure segregated school system, Topeka has long labored under the duty to eliminate the consequences of its prior state-imposed separation of races. Brown v. Board of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). The district court concluded that Topeka has fulfilled that duty, and that the school system is now unitary. Because we are convinced that Topeka has not sufficiently countered the effects of both the momentum of its pre-Brown segregation and its subsequent segregative acts in the 1960s, we reverse. Specifically, we hold that the district court erred in placing the burden on plaintiffs to prove intentional discriminatory conduct rather than according plaintiffs the presumption that current disparities are causally related to past intentional conduct. We are convinced that defendants failed to meet their burden of proving that the effects of this past intentional discrimination have been dissipated. We also reverse the district court's holding that the Topeka school district has not violated Title VI. However, we affirm the court's dismissal of the Governor of the State of Kansas and its ruling that the State Board of Education bears no liability for segregation in Topeka's schools.
 
 I.
 LEGAL HISTORY
 
 2
 Prior to 1954, a Kansas statute permitted certain cities to maintain separate schools for white and black children below the high school level. In 1941, however, the Kansas Supreme Court held segregation in Topeka's junior high schools to be unconstitutional. See Graham v. Board of Educ., 153 Kan. 840, 114 P.2d 313 (1941) (separate facilities not equal). Topeka was thus legally permitted to operate segregated schools only at the elementary level. The Topeka Board of Education operated such a system. In 1951, black citizens of Topeka filed a class action challenging the constitutionality of the Kansas law authorizing school segregation. Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), followed, beginning a new era of American jurisprudence by bringing an end to the doctrine of "separate but equal" and declaring segregation unconstitutional.
 
 
 3
 The Topeka Board of Education did not wait for the decision in Brown I before taking steps towards desegregating Topeka's elementary schools. It began that process in 1953 by permitting black students to attend two formerly all-white schools. It then gradually increased the number of schools black students might attend. Accordingly, when the Supreme Court considered the question of the relief appropriate in school desegregation cases, it noted that "substantial progress" had already been made in Topeka. Brown v. Board of Educ., 349 U.S. 294, 299, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (Brown II ). On remand, the district court criticized one aspect of the Board's desegregation plan but described it overall as "a good faith effort to bring about full desegregation in the Topeka Schools in full compliance with the mandate of the Supreme Court." Brown v. Board of Educ., 139 F.Supp. 468, 470 (D.Kan.1955). The court retained jurisdiction of the case, and the decision was not appealed.
 
 
 4
 Nineteen years later, in 1974, the Office of Civil Rights (OCR) of the Department of Health, Education, and Welfare (HEW) notified the Topeka school district that it was not in compliance with section 601 of Title VI of the Civil Rights Act of 1964.[2] After the Topeka Board of Education failed to adopt a plan designed to remedy the noncomplying conditions identified by OCR, HEW began administrative enforcement proceedings against the Topeka school district. The Board filed suit in federal court and obtained a preliminary injunction against the administrative proceeding on the ground that the district court's 1955 decision was a final order, and that the school district was still operating under that court order and still subject to the court's jurisdiction. HEW was thereby precluded from taking administrative action. See generally Brown v. Board of Educ., 84 F.R.D. 383, 390-91 (D.Kan.1979). In 1976, the Board submitted a plan acceptable to HEW, and both the administrative proceeding and the suit in federal court were dismissed. The Board implemented the plan over the next five years.
 
 
 5
 In 1979, a group of black parents and children sought to intervene in Brown as additional named plaintiffs on the ground that they were members of the original class and that the original named plaintiffs no longer had a sufficient interest in the matter to represent their interests. The intervenors asserted that Topeka has failed to desegregate its schools in compliance with the Supreme Court's mandate, and that the Topeka school district currently maintains and operates a racially segregated school system. Their request to intervene was granted.[3] See Brown, 84 F.R.D. 383. A long discovery and motion stage followed the granting of the intervenors' motion.
 
 
 6
 Trial took place in October 1986. The court found the Topeka school district to be an integrated, unitary school system. Brown v. Board of Educ., 671 F.Supp. 1290 (D.Kan.1987). The court also held that the Topeka school district had not violated Title VI of the Civil Rights Act of 1964, dismissed the Governor of Kansas from the case, and found that the State Board of Education bore no liability for racial conditions in the school district. This appeal followed.
 
 II.
 BRIEF FACTUAL HISTORY
 A. Population Change
 
 7
 In 1950, Topeka's population was approximately 10% black. While Topeka's population grew significantly until 1970 and then dropped, the black percentage of the population remained approximately the same. The Hispanic population of Topeka has been slightly less than 5% since 1970. Other minorities make up less than 1.5% of the population.
 
 
 8
 The distribution of Topeka's population has changed more significantly than its composition. In general, the outer parts of Topeka, particularly on the western side, have grown considerably in population, while the inner city has declined. Until recently, the western side of Topeka was almost exclusively white. The black population of Topeka was concentrated in a few areas in the center of the city in the 1950s; it has since spread widely throughout the eastern part of the city and has gradually begun to move into the western side of Topeka.
 
 
 9
 The percentage of black and minority children in the Topeka schools has long been higher than the percentage of blacks and minorities in the Topeka population as a whole and has risen over time. In 1952, black students constituted 8.4% of the total number of students in Topeka. By 1966, the percentage of black students in the Topeka school district was 11.6% and the percentage of minority students was 16.0%. In 1975, black students constituted 14.7%, and minority students 20.9%, of the school population. The latest figures used at trial, those for the 1985 school year, showed 18.4% black and 25.95% minority children in the system.
 
 B. Elementary Schools
 
 10
 In 1951, four Topeka elementary schools were reserved for black children, Buchanan, McKinley, Monroe, and Washington. Eighteen elementary schools educated white children. Black children were bused to their schools; white children attended neighborhood schools. 671 F.Supp. at 1291. Under the four-step plan approved by the district court in 1955, all elementary schools were to be opened by September of 1956 to black and white children under a neighborhood school policy. Id. at 1293. As a result of the new neighborhood school policy, three schools remained all- or virtually all-black (Buchanan (100%), Monroe (100%), Washington (99.4%)), and two others became more than 20% black in a school district with a black elementary student population of less than 10%.[4] McKinley was closed.
 
 
 11
 During the late 1950s, the school district acquired by annexation the Avondale (outer Topeka, south) and Highland Park (middle and outer Topeka, east) school districts as well as other territory on the edges of the district. Existing schools within the acquired area were either primarily white or primarily black. As school enrollments grew and the population began to shift, the school district began to close elementary schools in the inner part of the city and open them in the rapidly growing outer part of the city. Two of the closed schools were former de jure black schools (Buchanan, and Washington); another de jure school (McKinley) had already been closed. The new schools were built in the newly acquired white areas and opened with all or virtually all white students.
 
 
 12
 Racial statistics were not kept in an organized fashion from 1956 to 1966. In 1966, the school district operated thirty-five elementary schools. There were some white students in every school. Minority students were present in thirty-two schools. Nineteen of the schools were 90 + % white. An additional seven schools were 80-90% white. Four schools were more than 50% minority, and a fifth was almost 50%. The highest percentage of minority students was 93.1% (Parkdale), and the lowest was 0% (Lyman, McEachron, and Potwin). Sixty-five percent of white students attended 90 + % white schools and an additional 18.7% attended 80-90% white schools. Close to half of all minority students attended 50 + % minority schools.[5]
 
 
 13
 A second major reorganization of the elementary schools took place in the late 1970s, after the HEW complaint was filed. Eight elementary schools closed over a six-year period, including the last of the four former de jure black schools (Monroe). In September 1982, when the reorganization had ended, minority and white students were present in each of the district's twenty-six elementary schools.[6] Five schools were 90 + % white, and another seven were 80-90% white. Four schools were 50 + % minority, two of them were schools that had been 50 + % minority since 1966. The highest percentage of minority students was 60.6% (Highland Park North), and the lowest was 3.4% (McClure). Close to one-quarter of all white students attended the 90 + % white schools, and another third attended 80-90% white schools, totalling 58% overall. The percentage of minority students in 50 + % minority schools was 35.5%.[7] This was the status of the elementary schools three years after plaintiffs moved to intervene in this lawsuit on the grounds that the school system had not met its mandate to desegregate.
 
 
 14
 With one or two exceptions, the relative percentages of white and minority students in the elementary schools have changed only by two or three percentage points since that time. The most significant change is that the schools with the highest white percentages have gained some minority students. Thus, in 1985, the lowest percentage of minority students in any school was 7.2% (McClure).[8]
 
 C. Secondary Schools
 
 15
 In 1954, the Topeka school district operated six junior highs and one high school. Two schools were 90 + % white, and three were 80 + % white. The estimated percentage of black students at the junior high schools ranged from 1.7% (Roosevelt) to 30% (East Topeka).[9] While the dissent emphasizes that segregation was not mandated by law for the secondary schools when Brown I was decided, and the student bodies were racially mixed, Linda Brown Smith testified that the junior high school she attended in 1955 (Curtis) had an all-white faculty.[10] When she entered Topeka High school, she recalls that it had one black faculty member.[11]
 
 
 16
 During the late 1950s-early 1960s period of annexations and building, two junior high schools joined the school system, and three junior highs were built. At the high school level, Highland Park high school was annexed, and Topeka West high school was built. All of these schools were in the newly acquired white outer part of the school district and opened as white or primarily white schools. 671 F.Supp. at 1299.
 
 
 17
 In 1966, there were thus eleven junior high and three high schools. At that time, the average minority percentage for the junior high and high schools was 15.3% and 14.9%, respectively.[12] Of the junior highs, five had 90 + % white students and another three had 80-90% white students; one had 50 + % minority students. The highest percentage of minority students at one school was 61.8% (East Topeka), and the lowest percentage was 0% (Capper). Of the high schools, Topeka High was nearly one-quarter minority, Highland Park High had close to 15% minority students, and Topeka West had .4% minority students. French junior high school opened in 1970 in the southwestern part of the school district as a primarily white school. 671 F.Supp. at 1299.
 
 
 18
 The reorganization of the late 1970s in response to the HEW complaint included the junior high schools. Two junior highs closed in 1975. In 1980, five more junior highs closed and two schools were opened as the district shifted from a junior high (6-3-3) to a middle school (6-2-4) format. In 1981, after the end of the reorganization, there were six middle schools in the Topeka school district. Two were 90 + % white and one was 80-90% white. The highest percentage of minority students was 45.7% (Eisenhower) and the lowest 5.5% (French). By 1985, the relative percentages at some schools had altered by approximately 5%, but the pattern across the district had not changed.[13] The percentage of minority students at the three high schools was 39.8% (Highland Park), 32.5% (Topeka High), and 5.25% (Topeka West) in 1981, and 33.6% (Highland Park), 30.9% (Topeka High), and 7.9% (Topeka West) in 1985.
 
 III.
 THE PARTIES
 
 19
 All of the parties to this case have changed. The original plaintiff children have long since left the Topeka school system. The school district has been reorganized, and the State Board of Education came into existence in 1969. These changes have affected the posture of the litigation to some extent. The original named plaintiffs represented black elementary school children and their parents. Current named plaintiffs represent black children throughout the school system and their parents. The school district grew considerably in size as the city of Topeka annexed territory, although the school district's boundaries were fixed about 1960 while the city continued to grow. The district was also renamed Unified School District # 501 as part of a state-wide reorganization of school districts in 1965. 671 F.Supp. at 1292. The State Board of Education is the product of a 1966 state constitutional amendment. Its powers differ considerably from those of its predecessor. Id.; Brief for Individually-Named Defendants Associated with the State Board of Education at 1, 3-4.
 
 IV.
 GENERAL PRINCIPLES OF UNITARINESS
 
 20
 Unitariness is a finding of fact reviewed under the clearly erroneous standard.[14] Before we assess the status of school desegregation in Topeka, we set forth the principles that guide our consideration of the unitariness issue.
 
 
 21
 The district court defined a unitary school system as "one in which the characteristics of the 1954 dual system either do not exist or, if they exist, are not the result of past or present intentional segregative conduct of" the school district. 671 F.Supp. at 1293.[15] These are necessary ingredients in a unitariness determination because once a violation is found, "[t]he Board has ... an affirmative responsibility to see that pupil [and faculty] assignment policies and school construction and abandonment practices 'are not used and do not serve to perpetuate or re-establish the dual school system.' " Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (Dayton II ) (quoting Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 460, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979). An additional essential requirement of unitariness, however, is whether "school authorities [have made] every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." Davis v. Bd. of School Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971); see also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971).
 
 
 22
 To determine whether a school district has become unitary, therefore, a court must consider what the school district has done or not done to fulfill its affirmative duty to desegregate, the current effects of those actions or inactions, and the extent to which further desegregation is feasible.[16] After a plaintiff establishes intentional segregation at some point in the past and a current condition of segregation, a defendant then bears the burden of proving that its past acts have eliminated all traces of past intentional segregation to the maximum feasible extent.
 
 A. Current Condition of Segregation
 
 23
 The actual condition of the school district at the time of trial is perhaps the most crucial consideration in a unitariness determination. The plaintiff bears the burden of showing the existence of a current condition of segregation. The case law is decidedly unclear as to the precise meaning of that term.[17] In our view, a plaintiff must prove the existence of racially identifiable schools, broadly defined, to satisfy the burden of showing a current condition of segregation. Racially identifiable schools may be identifiable by student assignment alone, in the case of highly one-race schools, or by a combination of factors where the school is not highly one-race in student assignment.
 
 
 24
 "What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff and the community and administration attitudes toward the school, must be taken into consideration."
 
 
 25
 Keyes v. School Dist. No. 1, 413 U.S. 189, 196, 93 S.Ct. 2686, 2691, 37 L.Ed.2d 548 (1973).
 
 
 26
 Although virtual one-race schools "require close scrutiny," they are not always unconstitutional.[18] Swann, 402 U.S. at 26, 91 S.Ct. at 1281. Their existence in a system with a history of de jure segregation, however, establishes a presumption that they exist as the result of discrimination and shifts the burden of proof to the school system. Id. The presence of essentially one-race schools is thus sufficient to satisfy a plaintiff's initial burden of showing a current condition of segregation.
 
 
 27
 Courts have used various standards to define "one-race schools."[19] Standards may appropriately differ from school district to school district because the percentage of minority students may likewise vary.[20] Whatever the minority percentage district-wide, however, it is clear that a school with 90 + % students of one race is a predominantly one-race school.[21] Moreover, this is true whether the students at the school in question are white or minority.[22]
 
 
 28
 Where racial imbalance in student assignment is still extreme in a system that formerly mandated segregation, appellate courts have reversed findings of unitariness without looking to other factors.[23] However, no particular degree of racial balance is required by the Constitution.[24] A degree of imbalance is likely to be found in any heterogeneous school system. Therefore, the existence of some racial imbalance in schools will often not be conclusive in itself.
 
 
 29
 Where numbers alone are insufficient to define racially identifiable schools, courts look to demography, geography, and the individual history of particular schools and areas of the city.[25] While a multi-race school cannot be classified as racially identifiable merely by tallying up the race of the students who attend it, such a school may be racially identifiable "simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities," among other factors. Swann, 402 U.S. at 18, 91 S.Ct. at 1277.[26] These factors alone can establish a prima facia case of a constitutional violation. Id. Therefore, a plaintiff may prove a school to be racially identifiable by factors that may, but need not, include student assignment.
 
 B. The Parties' Burdens
 
 30
 Once a plaintiff has proven the existence of a current condition of segregation, the school district bears the substantial burden of showing that that condition is not the result of its prior de jure segregation. Under the relevant Supreme Court decisions, mere absence of invidious intent on the part of the school district is not sufficient to satisfy its "heavy burden" of proof; the district's duty is to act affirmatively, not merely to act neutrally.
 
 
 31
 "[T]he measure of the post-Brown I conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system. As was clearly established in Keyes and Swann, the Board had to do more than abandon its prior discriminatory purpose. The Board has had an affirmative responsibility to see that pupil assignment policies and school construction and abandonment practices 'are not used and do not serve to perpetuate or re-establish the dual school system.' "
 
 
 32
 Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979 (emphasis added) (citations omitted). See also Swann, 402 U.S. at 26, 91 S.Ct. at 1281 (burden on school board to establish current racial composition of schools not the result of their present or past actions). The school district must show that no causal connection exists between past and present segregation, not merely that it did not intend to cause current segregation. The causal link between prior and current segregation is not snapped by the absence of discriminatory intent alone, or even by a firm commitment to desegregation, where it is not accompanied by action that in fact produces a unified school district. Id.
 
 
 33
 The dissent clearly has misconstrued the parties' burdens. The emphasis throughout the dissent is on the necessity of plaintiffs proving a current condition of intentional segregation before any burden shifts to the school district. Although the revised dissent has removed a number of its prior references to "intentional" when discussing "current condition of segregation," and contends that it has not misapplied the burden, the tenor of the current version of the dissent belies this assertion. See Dissent at 892 ("In a former de jure system, plaintiffs may establish the prima facie case by proving that there is a current condition of intentional segregation") (emphasis added); id. at 904 ("a plaintiff may satisfy his initial burden of proof by relying upon evidence of 'recent and remote intentionally segregative actions' of the school board") (emphasis added); id. at 917 ("This court misses the mark if it is implying that intent is not relevant in this case."); id. at 920 ("intent, whether proven by direct or circumstantial evidence, remains an essential element."); id. at 920-921 ("It is clear that to sustain the presumption, the plaintiffs were required to prove 'a current condition of segregation from intentional state action.' ") (emphasis added); id. at 952 ("The requirement of a current condition of segregation resulting from past or present segregative intent (as opposed to segregation resulting from voluntary demographic change), prior to the operation of the presumption, allows a school system to redeem itself.") See also Dowell v. Board of Educ., 890 F.2d 1483, 1519 (10th Cir. 1989) (Baldock, J., dissenting) ("To understand the problems with this court's approach, it is necessary to understand how the burden of proof is allocated before a school district becomes unitary. In a system that was statutorily or officially dual, plaintiffs may establish the prima facie case by proving that there is a current condition of intentional segregation; that the de jure system or its vestiges remain or were reestablished in part of the school system.") (emphasis added).
 
 
 34
 On the contrary, however, once a school system has been declared unconstitutional because of the existence of de jure segregation, "[u]ntil the ... School System achieves unitary status, official action that has the effect of perpetuating or reestablishing a dual school system violates the defendants' duty to desegregate." Pitts v. Freeman, 755 F.2d 1423, 1427 (11th Cir.1985) (emphasis in original); see also, e.g., Morgan v. Nucci, 831 F.2d 313, 329 (1st Cir.1987) ("[T]he fact that a particular school policy or program may be 'racially neutral,' in that it no longer reflects discriminatory animus, does not prove that the effects of prior discrimination have been purged"). Even the dissent in Dayton II recognized that "the affirmative duty renders any discussion of segregative intent after 1954 gratuitous." 443 U.S. at 542-43, 99 S.Ct. at 2982-83.
 
 
 35
 The dissent falls into this error by viewing this case as one of initial liability. The cases the dissent relies on for its statements about plaintiffs' need to prove intentional segregation are all cases describing a plaintiff's duty to establish de jure segregation in the first instance. See, e.g., Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) (dissent at 892, 903-904, 911, 917); Keyes (dissent at 892, 903-904, 919, 920-21). This is not such a case. As in Swann, plaintiffs here are alleging that a school system which has already been declared unconstitutional in earlier years has never fulfilled its affirmative duty to eradicate the effects of that segregation. Under these circumstances, plaintiffs need only show that current racial disparities exist, not that such disparities are the result of current intentional segregation on the part of the school board. See Swann, 402 U.S. at 26, 91 S.Ct. at 1281. This is not a liability case in which plaintiffs must prove that the school board has committed unconstitutional acts; that was established in 1954.
 
 
 36
 Where a plaintiff has established segregation in the past and the present, it is "entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants."[27] School Board of the City of Richmond v. Baliles, 829 F.2d 1308, 1311 (4th Cir.1987); see also Dayton II, 443 U.S. at 536, 99 S.Ct. at 2978 (systemwide nature of de jure schools in 1954 "furnished prima facie proof that current segregation ... was caused at least in part by prior intentionally segregative official acts [and] judgment for the plaintiffs was authorized and required absent sufficient countervailing evidence by the defendant school officials."); Keyes, 413 U.S. at 211 n. 17, 93 S.Ct. at 2699 n. 17 (after de jure segregation is established, "the burden becomes the school authorities' to show that the current segregation is in no way the result of those past segregative actions."); Vaughns v. Board of Educ., 758 F.2d 983, 991 (4th Cir.1985) (same). This presumption ensures that subconscious racial discrimination does not perpetuate the denial of equal protection to our nation's school children.[28] A focus on provable intent alone would deny a remedy to too many Americans.
 
 
 37
 The dissent asserts that under this view of the law, liability in this case would be frozen as of 1954 and "we merely would decree a remedy based upon the failure of the school board to have absolute racial balance at every school and much of this court's opinion ... would be superfluous." Dissent at ----. Of course, liability is not frozen; it just remains until the school board, not the plaintiffs, bears the burden of proving that current racial disparities in the school system are not the result of the prior segregated school system.
 
 
 38
 Contrary to the district court's apparent conclusion, see 671 F.Supp. at 1297, remoteness in time does not make past intentional acts less intentional. See Dayton II, 443 U.S. at 535-36, 99 S.Ct. at 2977-78; Keyes v. School Dist. No. 1, 413 U.S. 189, 210-11, 93 S.Ct. 2686, 2698-99, 37 L.Ed.2d 548 (1973). The passage of time merely presents an opportunity for a school district to show that the presumptive relationship between the de jure system and the current system is so attenuated that there is no causal connection. See id. at 211, 93 S.Ct. at 2699.
 
 
 39
 What the school district has done to integrate is crucial in determining whether the causal link between the prior segregation and the current disparities has been severed. The district may carry its burden by showing that it has acted affirmatively to desegregate. Absent such proof, the court must presume that current segregation is the result of prior intentional state action. A showing that the school district has not promoted segregation and has allowed desegregation to take place where natural forces worked to that end is insufficient.
 
 
 40
 The ultimate test of what the school district has done is its effectiveness, most significantly its effectiveness in eliminating the separation of white and minority children.[29] While a district is not always required to choose the most desegregative alternative when it selects a particular option,[30] the result of the sum of the choices made by the district must be to desegregate the system to the maximum possible extent.[31] Furthermore, the school district may "not ... take any action that would impede the process of disestablishing the dual system and its effects." Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979.
 
 
 41
 One choice frequently made by school districts, and the one made in Topeka, is to use a neighborhood school plan as the basis for student assignment. Neighborhood schools are a deeply rooted and valuable part of American education.[32] To the extent that neighborhoods are themselves segregated, however, such plans tend to prolong the existence of segregation in schools.[33] Thus, they must be carefully scrutinized. They are not "per se adequate to meet the remedial responsibilities of local boards." Davis, 402 U.S. at 37, 91 S.Ct. at 1292; see United States v. Board of Educ., Indep. School Dist. No. 1, Tulsa County, 429 F.2d 1253 (10th Cir.1970).[34]
 
 
 42
 Neighborhood school plans must be both neutrally administered and effective. A plan that is administered in a scrupulously neutral manner but is not effective in producing greater racial balance does not fulfill the affirmative duty to desegregate.[35] It is equally important that a plan's neutrality be more than surface-deep. We have specifically held that when minorities are concentrated in certain areas of the city, neighborhood school plans may be wholly insufficient to fulfill the district's affirmative duty to eliminate the vestiges of segregation. Tulsa County, 429 F.2d at 1258-59. Even when neighborhood school plans hold the promise of being effective, courts must recognize that the school district's choices on such questions as where to locate new schools, which schools to close, how to react to overcrowding or underutilization, and what transfer policy to offer, all have obvious impact on the school attendance boundaries the district can draw under a neighborhood school plan.[36] If these choices are not made with an eye toward desegregation, a neighborhood school plan may "further lock the school system into a mold of separation of races." Swann, 402 U.S. at 21, 91 S.Ct. at 1278. Ultimately, whether the use of a neighborhood school plan in a particular case is consistent with a school district's duty to desegregate turns on whether the "school authorities [have made] every effort to achieve the greatest possible degree of actual desegregation taking into account the practicalities of the situation." Davis, 402 U.S. at 33, 91 S.Ct. at 1290. Contrary to the dissent's suggestion, dissent at 897, a school district which chose a neighborhood school system in 1954 is not insulated from a later contention that neighborhood schools did not result in desegregation.[37] "A school system is not ... automatically desegregated when a constitutionally acceptable plan is adopted and implemented, for the remnants of discrimination are not readily eradicated." Ross v. Houston Indep. Sch. Dist., 699 F.2d 218, 225 (5th Cir.1983).[38]
 
 
 43
 Actions the school district has not taken are also relevant in considering what the district has done. A school district which has not made use of such classic segregative techniques as gerrymandering, discriminatory transfer policies, and optional attendance zones is more likely to have fulfilled its duty to desegregate than a district that has done so.[39] Similarly, a school district that has made use of the various techniques available to encourage voluntary desegregation is more likely to have fulfilled its duty than one that has not.[40] Such techniques may include, for example, the establishment of magnet schools and vigorous official encouragement of desegregative transfers.
 
 
 44
 Finally, objective proof of the school district's intent must be considered. How a district lobbies its patrons and government agencies on issues that affect desegregation, whether it seeks and then heeds the desegregation recommendations of others, and the cooperativeness of the district in complying with court orders, for example, bear on the manner in which the district has shaped the current conditions in the school district.[41]
 
 C. Maximum Practicable Desegregation
 
 45
 What more can and should be done, if anything, is the final component in a determination of unitary status.[42] Essentially, a defendant must demonstrate that it has done everything feasible. Courts must assess the school district's achievements with an eye to the possible and practical, but they must not let longstanding racism blur their ultimate focus on the ideal.[43]
 
 
 46
 In most unitariness cases, the school district has been implementing a court-approved desegregation plan under active court supervision. The question is usually whether closer adherence to the plan is practical or whether the plan has achieved its objectives.[44] The district court in such cases has been intimately involved with the process of desegregation and is well aware of the obstacles it faces. The court can thus make an informed judgment on the possibilities of further desegregation. Where the school district has complied with the desegregation plan to the best of its ability, and has done what can be done in spite of the obstacles in its way, it is reasonable to conclude that no further desegregation is feasible.[45]
 
 
 47
 The present case is one of those rare ones in which the unitariness determination is not directly tied to the execution of a particular desegregation plan. In such a case, the consideration of whether further desegregation is practicable must include the obstacles that are likely to stand in its way, and whether they may be circumvented without imperiling students' health or the educational process. See Swann, 402 U.S. at 30-31, 91 S.Ct. at 1282-83. Where there are no significant barriers to desegregation, or such barriers as exist may be overcome without undue hardship, further desegregation is practicable. See id. at 28, 91 S.Ct. at 1282 (mere awkwardness or inconvenience is no barrier to carrying out desegregation plan).
 
 
 48
 In sum, when a school system was previously de jure, a plaintiff bears the burden of showing that there is a current condition of segregation. It may do so by proving the existence of racially identifiable schools. The school district must then show that such segregation has no causal connection with the prior de jure segregation, and that the district has in fact carried out the maximum desegregation practicable for that district. We now apply these legal principles to Topeka.
 
 V.
 THE FINDING OF UNITARINESS
 
 49
 Because Topeka's schools formerly operated under a system of de jure segregation, "[t]he board's continuing obligation ... [has been] 'to come forward with a plan that promises realistically to work ... now, ... until it is clear that state-imposed segregation has been completely removed.' " Columbus Board of Educ. v. Penick, 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979). Prior to this case, no court had pronounced the Topeka school system unitary; hence, this duty never dissipated. The district court concluded, however, that the effects of de jure segregation have been eliminated in Topeka. On appeal, plaintiffs attack this determination.
 
 A. Burden of Proof
 
 50
 Plaintiffs argue initially that the district court improperly required them to prove intentional discriminatory conduct on the part of the school district over the course of the decades instead of according them the benefit of a presumption that current segregation stems from the prior de jure system. Plaintiffs quote a number of sentences from the district court's opinion as support for their argument that the court placed on them the burden of proof on intent. Brief for Plaintiffs-Appellants at 27.[46] The court itself expressed some confusion as to the proper burden of proof. 671 F.Supp. at 1295. We have considered both these citations and the tenor of the district court's opinion as a whole, and we are convinced that the court focused too greatly on the school district's lack of discriminatory intent. Although the percentage of minority students in Topeka is lower than in other cities involved in desegregation cases and consequently the statistics alone do not appear as egregious, we are persuaded that this overemphasis on the school district's intent led the court to make the same errors as did the district court in Dayton II. It failed "to apply the appropriate presumption and burden-shifting principles of law." Brinkman v. Gilligan, 583 F.2d 243, 251 (6th Cir.1978), aff'd sub nom. Dayton Board of Education v. Brinkman, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).[47]
 
 
 51
 The district court made the following findings: that the neighborhood school attendance boundaries drawn in 1955 had the effect of maintaining segregation; that the construction of new schools since that time had the effect of "promot[ing] racial separation"; that the reassignment of students from previous de jure schools to adjacent schools with higher-than-average percentages of minority students had the effect of increasing those percentages; and that the assignment of faculty had the effect of placing minority faculty disproportionately at schools with higher-than-average minority student percentages. 671 F.Supp. at 1300, 1301, 1304-05. It is clear from the court's other findings that the school district's use of space additions, its siting of Topeka West high school, its drawing of attendance boundaries, and its failure to adopt various reorganization plans did not further the process of desegregation. Id. at 1298-1301, 1308-09. Nevertheless, the court's discussion of most of these aspects of Topeka's history ends with the conclusion that because these actions were not taken with the intent to discriminate and were consistent with a "race-neutral" neighborhood school plan, they did not promote segregation.[48] The court evidently believed that if these two criteria, i.e., no intent to discriminate and consistency with a race-neutral neighborhood school plan, were met, the school district's actions would pass constitutional muster. The Supreme Court has made clear, however, that a "race-neutral" neighborhood school policy is not sufficient where it fails to remedy de jure segregation:
 
 
 52
 "Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.
 
 
 53
 "... 'Racially neutral' assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a 'loaded game board,' affirmative action in the form of remedial altering of attendance zones is proper to achieve truly non-discriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral."
 
 
 54
 Swann, 402 U.S. at 28, 91 S.Ct. at 1282 (emphasis added).[49]
 
 
 55
 While we agree with the district court's findings that the current school administration is not presently acting with discriminatory intent--indeed, there is evidence that the present school board has some commitment to desegregation--we are persuaded that the court failed adequately to weigh the conduct of the school district for the past thirty years, and the current effects of that conduct. The court erred by limiting the school district's burden merely to showing that it had nondiscriminatory reasons for acting as it did. As thirty years of desegregation law have made clear, the Constitution requires more than ceasing to promote segregation. See part IV supra. "[T]he measure of the post-Brown I conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979. A lack of intent to discriminate is therefore insufficient. "In short, [a student] assignment plan is not acceptable simply because it appears to be neutral." Swann, 402 U.S. at 28, 91 S.Ct. at 1282. Mere adherence to a race-neutral but ineffective neighborhood school plan is insufficient. In general, any course of action that fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is unacceptable. Wright v. Council of City of Emporia, 407 U.S. 451, 460, 92 S.Ct. 2196, 2202, 33 L.Ed.2d 51 (1972). The district court did not heed this mandate. While it did find that the school district had taken some actively desegregative actions, we are convinced that the court's overall conclusion as to unitariness was fatally infected by the inadequacy of the burden of proof standard to which it held the school district.
 
 B. The Evidence
 
 56
 In order to assess the district court's finding of unitariness under the appropriate burden of proof and the general principles we have outlined, we turn to a more specific review of the record. As a general matter, it is important to note that much of the record evidence consists of statistics and other undisputed facts.[50] Our differences with the district court lie mainly in how the essentially undisputed facts are assessed in light of the school district's mandate to dismantle the segregated school system. We believe that the district court's finding of unitariness is flawed by the undue deference it gave to the school district's neighborhood school policy and by the court's failure to give proper weight to its own findings that certain actions and omissions by the school district had a segregative effect.[51] Cf. Diaz v. San Jose Unified School Dist., 733 F.2d 660, 674 (9th Cir.1984) (en banc) ("In making its determination in respect to the Board's intent, the district court erred in failing to give weight to the cumulative impact of the evidence"; district court's findings that defendants acted without segregative intent held clearly erroneous).
 
 
 57
 1. Current Condition of Segregation in Topeka
 
 
 58
 The district court found that "there are disparities in the racial makeup of various schools' enrollments," and that "[p]laintiffs have demonstrated that in general there are a greater than average number of minority faculty and staff in schools with a greater than average number of minority students." 671 F.Supp. at 1295, 1304. Like most courts, however, the district court did not discuss separately the issues of current segregation and the causal connection between that segregation and the prior de jure segregation.
 
 
 59
 As we have pointed out, the simplest and most compelling evidence of segregation is the presence of predominantly one-race schools. In a system such as Topeka's, however, in which the minority student population is relatively small, there may be a number of primarily white schools even though minority students are spread through a significant number of other schools. In such a system, it is the concentration of minority students that is usually the hallmark of discrimination.[52] Because the significance of mostly white schools is therefore not necessarily as great in a mostly white system as it would be in a system with a heavy minority population, we focus on the broader form of racial identifiability discussed in part IV A above. In support of their argument that there is currently segregation in Topeka, plaintiffs point primarily to student assignment, and faculty and staff assignment.[53] We consider each in turn, and then together.
 
 
 60
 a. Student Assignment
 
 
 61
 Each of the experts who testified at trial used a different standard for determining whether a school was racially identifiable in student assignment. Plaintiffs' main experts, Mr. Lamson and Dr. Foster, each used standards that took the percentage of black or minority students actually enrolled in the elementary or secondary schools (26% in 1985), and then added and subtracted some number to obtain a range within which they did not consider schools to be racially identifiable on the basis of student assignment alone. Their methods differ to some extent, but for 1985 either method leads to a range of 11-41% (26% plus or minus 15%).[54] The school district's primary expert on this issue, Dr. Armor, used an absolute rather than a relative standard. In his view, desegregated schools should optimally have 20-50% minority students, regardless of the percentage of minority students in the system. Dr. Armor also allowed a variance, which resulted in a range of acceptability of 10-60%.[55]
 
 
 62
 As plaintiffs point out, under any of these methods there are schools in Topeka that are racially identifiable by student assignment. Even under the most generous of these numerical standards, proposed by the school board's expert, there are six elementary and three secondary schools that are racially identifiable by student assignment.
 
 
 63
 Notwithstanding the dissent's view that the statistics regarding the percentages of minorities in the racially overbalanced schools do not add up to a current condition of segregation, we believe the figures speak for themselves. See supra at 856-58. In this connection, the charts in the dissent showing the racial inventories over the years at Belvoir, Hudson, Highland Park North, Lafayette, Quinton Heights, and Lowman Hill speak more eloquently about the current condition of segregation in Topeka than words ever could. See dissent at 936 n. 43; 938 n. 44; 939 n. 45; 939-40 n. 46; 941-42 n. 47; 946 n. 51.
 
 
 64
 b. Faculty and Staff Assignment
 
 
 65
 To determine racial identifiability by faculty/staff assignment, plaintiffs again used a standard based on the actual percentage of minority employees and a range of a few percentage points above and below that number. The school district contested the accuracy of plaintiffs' standard but presented no alternative one. We do not adopt plaintiffs' standard, but instead evaluate the data on its face.[56]
 
 
 66
 In 1985, the percentage of minority faculty/staff in the Topeka school system was 11.2% for the elementary schools and 12.65% for the secondary schools. In the elementary schools, the percentage of minority faculty/staff at individual schools ranged from 0% to 33.3%. Nine schools had less than 5% minority faculty/staff, and two had more than 25%.[57] In the secondary schools, the percentage ranged from 2.5% to 24.7%. One school had less than 5% minority faculty/staff, an additional three schools had less than 10%, and one had more than 20%.[58]
 
 
 67
 Faculty/staff data have been kept only since 1973 and, except for 1981, that data does not distinguish between faculty and staff. Rec., ex. vol. IV, at 263-68. Faculty/staff includes managerial personnel at both the school and district level, teacher aides, clerical/secretarial employees, skilled and technical employees, and service workers, as well as teachers and other professional staff. The distinction between faculty and staff is particularly relevant because the percentage of minority employees has always been lower than the minority student population, and has fallen steadily at the elementary level over the period such data was kept. Moreover, minorities are represented more heavily in staff positions than in faculty positions. In 1985, for example, district-wide statistics showed that 11.3% of elementary teachers and 8.0% of secondary teachers were minorities, while 19% of teacher aides and 20% of service workers were minorities. Rec., vol. IV, at 268. Any one faculty/staff person listed at any one school is thus more likely to be a teacher aide or service worker than a teacher.
 
 
 68
 We recognize that the small number of faculty and staff at any one school means that the presence or absence of one minority employee may have a considerable effect on the school's minority percentage. Nevertheless, we see no obviously neutral reason why McClure elementary school has no minority employees among its 25 faculty/staff and Topeka West high school has 3 among 120, while Avondale East elementary school has 10 minority faculty/staff out of a total of 31 employees and Robinson middle school has 12 out of 49.
 
 
 69
 c. Factors considered together
 
 
 70
 Because faculty/staff assignment is largely within the control of the school district, it is a potent tool for demonstrating that the district does or does not itself identify certain schools as white or minority. It also provides an opportunity for undoing some of the harm of segregated student assignments, because both white and minority students may benefit from the presence of minority role models. See Washington v. Seattle School District, No. 1, 458 U.S. 457, 472, 102 S.Ct. 3187, 3196, 73 L.Ed.2d 896 (1982) ("white as well as Negro children benefit from exposure to ethnic and racial diversity in the classroom"). Conversely, if the district disproportionately assigns minority faculty/staff to those schools with the highest percentages of minority students, the district is in effect reinforcing the identification of particular schools as white or minority. This practice of disproportionate assignments also reinforces the irrational notion that minority teachers are inferior and not fit to teach white children.
 
 
 71
 In Topeka, although the correlation is not completely uniform, see 671 F.Supp. at 1305, there is a clear pattern of assigning minority faculty/staff in a manner that reflects minority student assignment. This correlation is fatal to the school district's effort to show a lack of current segregation. Both student assignment and faculty/staff assignment can be expected to vary from school to school, the former because of population distribution, and the latter, to a lesser extent, because of differing teacher credentials. When they vary together, as they do in Topeka, leading to schools that are noticeably more white or more minority in both students and faculty, it is difficult to posit a neutral explanation.[59] The school district has not attempted to provide one.
 
 
 72
 Moreover, when we look beyond the numbers, we find that the schools that are marked as white or minority by their students and faculty/staff are also so marked by their geography, the residential population in their attendance areas, and by their history. Of the six racially identifiable elementary schools detected by Dr. Armor's method, five are now and always have been attended almost exclusively by white students. They are located on the western and northwestern edges of the school district, areas with mostly white populations.[60] The same is true of the three secondary schools. See infra part V B(2)(c)(vii). The one remaining elementary school, Belvoir, is located on the eastern edge of the school district. The area has long been inhabited by a significant minority population, and the school's student population is now and has been for over twenty years more than half minority. See infra part V B(2)(c)(i). Finally, the correlation between student assignment and faculty/staff assignment is not a one-year fluke. The same correlation has existed throughout the course of this litigation. See infra part V B(2)(b)(ii). Considering all of these factors together, there is sufficient evidence to support plaintiffs' contention that there is a current condition of segregation in Topeka.[61]2. The Causal Link Between De jure Segregation and the Current Condition of Segregation
 
 
 73
 Brown I established that the Topeka school system was one of de jure segregation. Because there is a current condition of segregation, we turn our attention to the causal link between these two conditions of segregation, which must be assessed in light of the burden and factors set out in part IV B, supra. We are convinced that the school district failed to meet its burden of showing the absence of this link. This failure, which the district court did not see because it failed to impose on defendants the proper burden of proof, is the key to our reversal.
 
 
 74
 Timing is central to an assessment of the Topeka school district's actions. After what was described as a "good faith" beginning, Brown, 139 F.Supp. at 470, the course the school district followed in the late 1950s and early 1960s may fairly be characterized as segregative. The decade from 1956 to 1966 is important because it established a framework from which the school district subsequently deviated very little.[62] A period of quiescence then followed, during which the system was simply administered as it stood. It was not until HEW threatened to withhold federal funds in the mid-1970s that the school district undertook some positive action to desegregate its schools. After that brief flurry of action, the school district again turned its attention elsewhere, but to its good fortune the oft-maligned forces of demography began to work in its favor. Two things are apparent from the record. First, Topeka has largely acted as if it had fulfilled its duty to desegregate at the conclusion of the four-step plan implemented in the 1950s. Second, although Topeka's schools have in fact become less segregated in the last decade, this lessening of segregation is due in part to forces beyond the control of the school district. Moreover, those desegregative actions which the school board did undertake were primarily the result of pressure from the federal government, or were instituted after this lawsuit was filed.[63] Although its record is better than that of many other school districts, Topeka has engaged in voluntary desegregation with little enthusiasm.
 
 
 75
 a. The general pattern in each decade
 
 
 76
 i. The mid-50s to mid-60s
 
 
 77
 This period was one of significant change in the Topeka school district. Most notably, the district expanded greatly with several city-imposed annexations at the end of the 1950s, the beginning of a spurt in population growth and shift to the newly annexed areas, and the school district's consequent opening of new schools in this outer white part of Topeka. As the white population moved outwards, the inner city population became increasingly heavily minority, and inner city schools were closed.
 
 
 78
 The mid-60s found the Topeka school system still heavily segregated. While the numeric polarization between schools had decreased to some extent systemwide,[64] and minority students were somewhat less concentrated,[65] the number of schools serving primarily white children had increased. Geographic polarization also increased, as a result of the building of so many primarily white schools on the outer edges of the district. Plaintiffs introduced evidence tending to show that the school district's use of portable classrooms and optional attendance zones served to maintain segregation by concentrating students of one race at certain schools. The school district's expert, Dr. Clark, conceded that his study of changes in attendance zone population because of changed attendance boundaries led him to conclude that one such boundary change might have had segregative effects not explainable solely by demographic shifts.[66]
 
 
 79
 We have no doubt that during this period the school district in fact maintained and perhaps promoted a segregated system by current standards. Moreover, the system that existed after the wave of school openings and closings ended, i.e., the location of schools and the race of their students, formed the basis for the current elementary system. Therefore, while the school district should not be judged primarily by actions now twenty or more years in the past, neither can those actions be ignored.
 
 
 80
 ii. Mid-60s to Mid-70s
 
 
 81
 This period was one of quiescence in the school district. Enrollment in the Topeka school system peaked in 1969, substantially ending the need for new school buildings. Outer Topeka continued to grow in white population, particularly in the western part of the city. Minority population began to spread out of its highly concentrated central areas into eastern Topeka.
 
 
 82
 The only significant change in the school system at the end of this period was that the number of virtually all-white schools dropped. At the elementary level, 19 out of a total of 35 elementary schools were virtually one-race in 1966; 13 out of a total of 34 were virtually one-race in 1974.[67] The change at the secondary level was even less: from 6 out of 14 schools in 1966, to 5 out of 15 schools in 1974. This change took place primarily in schools on the outskirts of the southeastern part of Topeka, the area into which minorities were spreading. The school district's conduct during this period can thus be summarized as letting demographic forces work without interference or encouragement. This also means that schools already heavily minority were allowed to increase in minority population.[68] It is apparent that while Topeka did not promote a segregated school system during this period, it maintained the system then in effect notwithstanding its affirmative duty to eliminate segregated schools.
 
 
 83
 iii. Mid-70s to the present
 
 
 84
 In 1974, the HEW compliance action began the third phase of the Topeka school system since Brown I. At the elementary level, HEW cited unequal facilities for minority and white children as well as "student racial compositions not consonant with a unitary plan." Five elementary schools were specifically listed as having "substantially disproportionate minority student compositions clearly the result of a former dual pattern of operation." At the secondary level, HEW found that the junior high schools attended by most minority students were inferior in facilities to those schools attended largely by white students. In addition, the district's transfer plan was criticized.[69] The Board denied that the district was in noncompliance and obtained an injunction against further HEW administrative proceedings. Nevertheless, the Board agreed to take "administrative steps to assure a more perfect unitary school district."[70] It developed and implemented two plans largely approved by HEW.
 
 
 85
 These plans had some success. At the end of the reorganization, there were no 90 + % minority elementary schools, the attendance boundaries of two 90 + % white schools had been redrawn so that they were no longer one-race, and a third one-race white school had been closed. At the secondary level, two heavily minority and one primarily white junior high school had been closed, although the minority population of one other junior high school had risen significantly as a result of the reorganization. The school district's desegregation indices for elementary schools dropped significantly between 1975 and 1981.[71]
 
 
 86
 Some of this decline, however, was the result of the movement of minorities into the western part of the school district. During the same six-year period, three additional elementary schools rose above the 10% minority level solely because of this demographic change.[72] This movement has continued. In 1985, two additional elementary schools were just barely no longer one-race for that reason.[73]
 
 
 87
 The defendants' experts, Dr. Clark, see, e.g., rec., vol. XI, at 2338-39, and Dr. Armour, see, e.g., rec., vol. XIII, at 2579, the district court, see 671 F.Supp. at 1302-03, 1310, and the dissent, see, e.g., dissent at 937, 938, 939, 941, all mistakenly believe that the changing demographics which resulted in unfavorable racial balances at various schools excuses the school board from achieving more acceptable racial balances. This view is clearly wrong where, as here, the school system is under an affirmative duty to dismantle a dual school system. "Until a unitary system is created, a school system is not absolved from this duty by reason of demographic changes." Vaughns v. Board of Educ., 758 F.2d at 988; see also, Lee v. Macon County Bd. of Educ., 616 F.2d 805, 809-10 (5th Cir.1980); cf. Tasby v. Wright, 713 F.2d at 91 n. 3, 93 (school districts' white population was 58.2% when lawsuit filed in 1970 and dropped to 29.53% by 1981; school district not yet unitary). It is only
 
 
 88
 "[w]hen state officials have not only made good-faith efforts to eliminate the vestiges of segregation, but have actually achieved a school system clean of every residue of past official discrimination, [that] immutable geographic factors and post-desegregation demographic changes that prevent the homogenation of all student bodies do not bar judicial recognition that the school system is unitary."
 
 
 89
 Ross v. Houston Indep. Sch. Dist., 699 F.2d at 225. The school district's excuse for the racial imbalance which exists today in Topeka's schools is that shifting residential patterns caused the problem. That is an unacceptable excuse when the school district has never fully dismantled the effects of the prior de jure segregation.
 
 
 90
 Other changes that took place in Topeka from the mid-70s to the date of trial are as follows: elections to the Board were changed in 1976 to ensure that all parts of the city were fairly represented; the Board has now, and has had for some time, significant minority representation; in 1981, the district abandoned a slightly segregative majority-to-minority transfer policy for a transfer policy that is slightly desegregative; in 1984, while this trial was pending, a black superintendent was appointed; and, five days before the beginning of trial, the district adopted an explicit policy against discrimination in faculty and staff assignment.[74] These changes are deliberate and voluntary actions on the part of the school district, and constitute evidence that the district is, as it claims, now committed to desegregation.[75]
 
 
 91
 There is no doubt that the Topeka school system has improved dramatically in the last ten years as far as desegregation is concerned. However, the system was equally undoubtedly in need of such improvement. The question now is whether these changes broke the causal link between the system that existed prior to them and the current system. Based on our review of the record, we have a definite and firm conviction that they did not. Approximately one quarter of Topeka's minority elementary students still attend three schools more than 50% minority, two of which have fallen into this category since at least 1966. One-race white schools have existed throughout the relevant period; many remain, and those that are no longer within the 90 + % white range are still heavily white schools. Most of the reorganization took place in the center of the school district; the schools on the periphery--the ones most clearly marked as minority or white schools--were largely unaffected. The distribution of faculty/staff has improved, but in 1985 there was still one school with no minority faculty/staff and eight schools with only one full- or part-time minority faculty/staff person, who may or may not be a teacher or other professional, and these schools are those same schools that have lacked minority faculty/staff since the 1960s. This is a system improved, but it is still the same system.
 
 
 92
 b. Individual Factors
 
 
 93
 Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 1693, 20 L.Ed.2d 716 (1968), identified faculty, staff transportation, extracurricular affairs, and facilities as facets of school operations that must be considered in determining racial identifiability of schools. Swann added student attendance, school siting, opening and closing, and the drawing of attendance boundaries as factors to be weighed. Swann, 402 U.S. at 25-29, 91 S.Ct. at 1280-83. The district court made detailed findings as to most of these. We discuss below those factors that most clearly demonstrate the continuing causal link between past and present segregation.
 
 
 94
 i. Student assignment over time
 
 
 95
 We begin by considering the subsequent history of the schools in existence at the time of Brown II. No real pattern emerges. Seventeen elementary schools have more or less maintained the same racial identity for the last twenty years, while nine have changed. For the most part, the major shifts in student attendance mandated by the school district have had relatively little effect, although there has been some improvement in the last ten years.[76] Nevertheless, the record convinces us that the causal connection between the Topeka school system in 1955 and the same system in 1985 has not been broken. The school district has unquestionably had the opportunity to draw up and execute a scheme designed to lead to comprehensive desegregation. Moreover, Topeka does not have the kind of geographical barriers that have sometimes frustrated desegration plans.[77] Its minority population is spread over half the city, not concentrated in hard-to-reach enclaves.[78] It has altered the attendance boundaries of almost every school and closed many of them; it has in place a slightly desegregative transfer plan that potentially could be significant; and it has apparently faced little or no racially-motivated opposition from the community.[79] Nonetheless, there is, we repeat, no pattern to the changes over the years. There should have been one. We simply see no evidence that Topeka dedicated itself to desegregation prior to the reopening of this case.[80] Although former members of the Board testified that they did not vote for plans with segregative effects, they did not testify that they regularly took desegregation concerns into account.[81] The reaction of at least one Board member to the white flight of the 1950s and 1960s was "What could we do? We can't make people not move, no way."[82] After hearing the testimony of the Board members, the district court commented, "I am not interested in just any intentional acts that would hinder integration. I am also wondering if there is any action taken by this school board and past school boards to promote that integration, rather than hinder.... [A]re we going to get to this ...?" Rec., vol. XII, at 2534. This perceptive question focused on precisely what is missing from the school district's evidence. By no stretch of imagination can the school district's conduct be characterized as acting "with all deliberate speed" to "convert to a unitary system in which racial discrimination would be eliminated root and branch."[83]
 
 
 96
 We do not ignore the changes made to the school system in the late 1970s. In our view, however, the effect of these changes was to make a system that was highly segregated as to student assignment into a system that is still segregated, although somewhat less so.ii. Faculty/staff assignment over time
 
 
 97
 Plaintiffs do not dispute the district court's finding that the hiring of minority faculty and staff is not now discriminatory. 671 F.Supp. at 1304. They do challenge the court's conclusion with respect to the assignment of faculty and staff. They point out that the court in fact found that the assignment of faculty/staff is disproportionate, and they argue that this disproportion, and its consistency over time, is "one of the classic indices of a segregated school system." Brief for Plaintiffs-Appellants at 38. They criticize the district court for having unduly minimized the import of this evidence of segregation.
 
 
 98
 For example, while it is true that all of the district's schools have been within 10% of the average percentage minority faculty/staff at least once in the last ten years, 671 F.Supp. at 1305, that statement is misleading considering that the percentage of minority faculty/staff in the system as a whole has ranged only from 9.9% to 16% in the last ten years at the elementary level and is currently about 11%. Thus, in 1975, when the average percentage was 9.9%, schools with no minority faculty or staff were still technically within 10% of the average. The 10% once-in-ten-years standard includes both McEachron, which had no minority faculty/staff for nine of the 13 years for which such statistics have been kept and in the last three years has had only one minority faculty/staff member out of approximately 25, and Lowman Hill, which has never had less than 15% and has once had more than 30% minority faculty/staff during the same time period. Furthermore, while it is true, as the district court noted, that the percentage of minority faculty/staff assignment has not invariably tracked the percentage of minority students, there is nevertheless a distinct pattern of correlation. McClure, for example, which has had more than 5% minority students only in 1979 and 1985, has had no minority faculty/staff since 1979, while Avondale East, which has generally had minority student percentages in the 30s and 40s has also generally had minority faculty/staff percentages in the 20s and 30s. Finally, because our data does not distinguish between faculty and staff, and because minority employees are more heavily represented as staff than as faculty, it is quite possible that the one minority faculty/staff person at McEachron, for instance, is a janitorial staff person or other service worker rather than a teacher or other professional role model.
 
 
 99
 The long-standing pattern of imbalances coupled with the tracking of student assignment percentages is strong evidence of a dual system because, as pointed out above, faculty/staff assignment is far less difficult to adjust than a factor such as student assignment. While the ratio of minority faculty/staff in schools with different levels of minority students has improved over the twelve years that records have been kept, that improvement alone does not alter the pattern. It merely makes it less dramatic.
 
 
 100
 There is one area in which the Topeka school system is clearly desegregated. Minorities are well-represented, indeed statistically over-represented, at the managerial level. Several principals are minorities, as is the current superintendent. This is both laudable in itself and an indication that whatever bias lingers in the assignment of faculty/staff is not deliberate. Nevertheless, although there has been improvement in this area, racial disparity does in fact linger because the school district has not consciously addressed the problem.[84] Inertia has thus led to the maintenance, albeit in less striking form, of a system that has kept white faculty at primarily white schools and minority faculty at predominantly minority schools.iii. Attendance boundaries and how (not) changed
 
 
 101
 Attendance boundaries determine the neighborhoods from which neighborhood schools draw their students. They can be used as an important tool in either imposing or undoing segregation under an ostensibly race-neutral neighborhood school policy. We do not disagree with the district court's finding that attendance boundaries have not been drawn in recent years with racial animus. In the past, however, the school district drew boundaries with significantly segregative effects, although for the most part it avoided obvious gerrymandering. Many of the schools affected by segregative boundary changes were subsequently closed, and other schools lost their status as predominantly minority schools bordered by schools with much lower percentages of minority students when minorities moved into the residential areas of the bordering schools.
 
 
 102
 A number of existing schools do have peculiar-looking attendance boundaries. Randolph has an arm jutting out to the east. Stout and Quinton Heights both include areas to the north and east some distance away from the school building. In the case of Randolph and Stout, the extensions have a desegregative effect. The reverse is true of Quinton Heights' current boundaries. See infra Part V B(2)(c)(v). As far as the record reflects, the current boundaries of Randolph and Stout are the only examples that Topeka has manipulated attendance boundaries in order to desegregate. Again, when it altered attendance boundaries the school board failed to use the opportunity in most instances to further desegregation, despite its affirmative duty to do so.
 
 
 103
 As the district court acknowledged, the most serious example of segregative attendance boundaries is Lowman Hill. Lowman Hill's attendance area is a more or less square area with the school located in the center. Plaintiffs point out that this area includes, and has included for the last 25 years, two areas of heavy minority population. These areas are now part of a general central Topeka minority population, but were relatively isolated when Lowman Hill's boundaries were first drawn to include them. Within the last ten years, three elementary schools bordering the Lowman Hill area, one with a minority student percentage significantly lower than Lowman Hill's, have closed.[85] The closings did not affect the minority student percentage at Lowman Hill. It remains a school with a heavy minority percentage bordered by schools with much lower minority percentages. It also remains the school whose attendance boundaries include the only significant group of minority population in the northwestern quarter of the school district. See infra Part VI B(2)(c)(vi).
 
 
 104
 The history of Lafayette is similar although not as extreme. The border between Lafayette and State Street, the school to Lafayette's north, has functioned as the boundary between the mostly white area served by State Street and the school to its north and the heavily minority area served by Lafayette and the schools to its south and southwest. Lafayette has long had twice the minority population of State Street; thus, since 1966, Lafayette's minority population has ranged from 52% to 69% while State Street's has ranged from 27% to 34%.[86] See infra Part VI B(2)(c)(iv).
 
 
 105
 While the boundaries of Loman Hill and Lafayette are consistent with a neighborhood school policy, as held by the district court, the original decisions to draw them to include the black population of the area had a segregative effect which the school district has never undone. The school district may not draw segregative attendance boundaries, maintain them for decades, and then take shelter behind the neutrality of its recent inaction. See Swann, 402 U.S. at 21, 91 S.Ct. at 1278.iv. Location of new schools
 
 
 106
 All of the elementary schools and all but one of the secondary schools opened by the school district since Brown II were built in the white outer part of the district. Robinson middle school, which serves the central part of Topeka, is the sole exception. Furthermore, many of these schools were built near to the edges of the district. Plaintiffs criticize both the location of these schools and the fact that they opened at all. With respect to the location, they argue that Topeka deliberately placed new schools as far as possible from minority residential areas in order to polarize the district into white outer and minority inner schools. With respect to the new schools themselves, they argue that Topeka should have taken advantage of the underutilized inner schools; that is, that Topeka should have voluntarily bused white children from outer Topeka to the inner city schools instead of putting up new buildings.
 
 
 107
 Almost all of the building in question took place in the late 1950s and early 1960s, before the Supreme Court made clear that prior de jure school districts must do more than operate a neutral system. Green, 391 U.S. 430, 88 S.Ct. 1689. Moreover, the city was annexing new territory during that time, a matter beyond the control of the school district, and it is not entirely unreasonable for the district to build schools "where the children are." Nevertheless, the erection of so many schools devoted to educating white children had a significant segregative effect on the district. See infra Part V B(2)(a)(i). While the building of new schools to accommodate an influx of white children arguably had a legitimate basis at the time, the school district did nothing to diminish the segregative effect of those schools, even after it became clear that school districts under an unfulfilled duty to desegregate must do more than operate a facially neutral neighborhood school system. As we have said, neighborhood school plans are permissible if they are effective in actually reducing segregation. School openings and locations are a crucial variable in such plans. Swann, 402 U.S. at 20-21, 91 S.Ct. at 1278-79. In Topeka, school openings under the neighborhood school plan in fact worked to increase segregation. A school district conscious of its constitutional duty would have attempted to counteract that effect. See Diaz v. San Jose Unified School District, 733 F.2d 660, 667-69 (9th Cir.1984) (en banc), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985). Topeka did nothing.
 
 
 108
 v. School closings
 
 
 109
 In contrast to school openings, the majority of school closings took place in the central and middle parts of Topeka. Like school openings, this pattern was dictated largely by the population shift to the outer part of the school district. Plaintiffs do not contend that schools were closed for any other reason, or that the impact of the closings was borne primarily by minority students. They focus instead on the effect of school closings, primarily on the opportunity closings provided for more equitably distributing students to other schools. They contend that school closings of highly segregated schools were not desegregative in practice because the school district simply reassigned the students at those schools en masse to a nearby school which then took over the segregated status of the school closed. The evidence supports this contention for the 1950s and 1960s. Although most of the receiving schools remained schools with a majority of white students, plaintiffs argue that these reassignments served to identify the schools to which the school district would subsequently channel minority students. School closings in the 1970s and beyond had less segregated effects. In this decade, the effects of closings have been mixed. A few school closings were desegregative. These later closings have not completely undone the effect of the earlier closings, however. On the whole, most school closings in the 1970s cannot be said to be either segregative or desegregative.
 
 
 110
 In sum, although the hiring of minority faculty and staff became nondiscriminatory, and even included significant representation of minorities in management, the district nevertheless maintained racial imbalance in the assignment of faculty and staff. In addition, the location of new schools intensified the system's dual nature. The drawing of attendance boundaries and other means of reassigning students were rarely used to desegregate. The closing of schools is the most significant desegregative device Topeka utilized. Even here, it is only in a few cases that a closing can unqualifiedly be characterized as desegregative. As we stated earlier, Topeka notably failed to focus its efforts on the complete eradication of the effects of prior segregation.
 
 
 111
 c. Individual schools
 
 
 112
 The dissent spends a great deal of time attacking our analyses of individual schools. The main point of that attack is that the increasing minority percentages for these schools resulted from demographics, not from school board actions. As we have previously stated, however, a school district is not absolved by demographics from its affirmative duty to desegregate before it achieves unitariness. See supra at 876-77.
 
 
 113
 Plaintiffs describe the history of the school district as one of targeting certain schools as minority. According to plaintiffs, while the identity of those schools shifts as population moves, the district as a whole is always polarized into schools with clear racial identities. We therefore consider what the district did and did not do with respect to individual schools.
 
 
 114
 i. Belvoir elementary school
 
 
 115
 Belvoir is and has been since the 1960s a school with one of the highest minority populations in the district. The school was annexed in the late 1950s and lies on the eastern edge of the current district boundary. Two federal housing projects were built within its attendance area in 1963 and 1965. Since 1966, its student population has never been less than 50% minority.[87] It is located in an area of minority population that was bordered by white populations to the north and south and a minority population to the west when the school was annexed. The bordering areas are now all areas with substantial minority populations.
 
 
 116
 Belvoir's boundaries were once altered to take in part of the attendance areas of a school that was closed. That closing did have a modest desegregative effect at Belvoir, but it did not change Belvoir's status as the school with the highest minority percentage in the system. Although it is no longer surrounded by schools with markedly lower minority percentages, it remains an east-side minority school as opposed to the west-side white schools. It cannot be said that the neighborhood school plan has been effective in desegregating Belvoir.
 
 
 117
 ii. Hudson elementary school
 
 
 118
 The school district built Hudson in 1963 in newly annexed territory. It is on the southeastern edge of the district and opened as a primarily white school. While the passage of time has dissipated Hudson's identity as a white school, this change is due solely to the spread of minorities into its attendance area, not to any action by the school district. The school was 46.55% minority in 1985-76. Rec., ex. vol. IV at 171.
 
 
 119
 iii. Highland Park North elementary school
 
 
 120
 Highland Park North was annexed to the school district in the late 1950s. Its percentage of minority students has risen significantly over the years: 21.6% in 1966, 42.1% in 1975, and 57.9% in 1985. This rise was paralleled by a shift in the surrounding residential population from primarily white to heavily minority. This shift is characteristic of the eastern part of the city, where Highland Park North is located. The only significant action the school district took with respect to Highland Park North was to assign it Parkdale students when that school closed. This reassignment increased Highland Park North's minority percentage at a time when it was already high.iv. Lafayette elementary school
 
 
 121
 Lafayette was a white school in the Topeka school system at the time of Brown I. It was 13.7% black at the end of the four-step plan in 1956. Federally subsidized housing projects were built in Lafayette's area in 1961 and 1962. By 1966, the school was 54.5% minority (26.1% black). The school was then a transition school between Parkdale elementary school to the southwest, with 85% minority students, and Sumner, State Street, and Rice elementary schools to the north and east, with 12.3%, 27.5% and 3% minority students, respectively. Belvoir, to the south, had approximately the same percentage of minority students. Lafayette has remained 55-65% minority (25-50% black). In 1985, Lafayette was 56.8% minority (41.4% black). It remains a transition school between schools with higher minority percentages to the south and lower percentages to the north and west.
 
 
 122
 The closing of three schools affected Lafayette's boundaries. We have insufficient information to evaluate one closing, in the 1960s, and the other two closings had negligible effects on Lafayette's minority percentages. Under its neighborhood school plan, the school district simply maintained Lafayette as a school with disproportionate minority percentages.
 
 
 123
 v. Quinton Heights elementary school
 
 
 124
 Quinton Heights was a white school at the central southern part of the school district in the 1950s. At the end of the four-step desegregation plan it was 7.3% black. In 1959, Pierce, an annexed black school, and in 1964, Van Buren, a formerly all-white school, were closed and some of their students sent to Quinton Heights. Quinton Heights' attendance boundary was extended to the north as a result.[88] By 1966, its minority student percentage was 36.4%. It was bordered by heavily minority Monroe elementary school to the northeast and otherwise by primarily white schools, including schools to the south annexed in the late 1950s.
 
 
 125
 Plaintiffs characterize the reassignments in the 1960s as part of a process of focusing Quinton Heights as a school for black students. In 1966, Quinton Heights' minority student percentage was seventh highest out of thirty-five elementary schools, and its minority population bordered two schools with much lower minority percentages (Central Park, with 15.5%, and Polk, with 11.5%). Indeed, on the maps available to us, it is quite noticeable that Polk's boundaries in 1970 correspond closely to a patch of white population surrounded by minority population assigned to other schools, including Quinton Heights.[89]
 
 
 126
 Two adjacent schools were closed during the 1970s. Each time, Quinton Heights' boundary was extended northwards. It is thus clear that Quinton Heights' current boundaries are the result of continued manipulation by the school district. They extend far into minority areas to the north and east of the school building and cross many natural barriers.[90] Quinton Heights is a "neighborhood" school only in the sense that some of its students do live in the immediate area of the school building. Most do not. Quinton Heights is entirely the product of the school district's actions; as such, the district may not disclaim responsibility for the makeup of the students who attend it.
 
 
 127
 vi. Lowman Hill elementary school
 
 
 128
 Lowman Hill was a white school in the pre-Brown Topeka school system. It had 17.4% black students at the end of the four-step plan in 1956. During the next decade a number of small adjustments were made to optional attendance zones around the school. Plaintiffs describe these adjustments as a process of drawing Lowman Hill's boundaries to include as many black and as few white students as possible. In 1959, an all-black school, Buchanan, was closed and its students sent to Lowman Hill. By 1966, Lowman Hill was 49.6% minority. The minority percentage at the five surrounding schools ranged from .2% to 15.6%. It is noticeable on the maps in the record that in 1970 Lowman Hill's boundaries included the only two significant areas of minority population in that part of Topeka.[91]
 
 
 129
 Lowman Hill's minority student percentage has ranged in the 40s since that time, dipping briefly into the high 30s in the early 1980s. It was not affected in any significant way by the reassignment of students due to the closing of neighboring Clay elementary school in 1975 and Polk in 1979; while its boundaries expanded somewhat, the student population it acquired was apparently of the same makeup as its existing population. Thus, the history of Lowman Hill is that the boundaries drawn in the 1950s and 1960s largely remain, as do their effects. Lowman Hill still has a significantly higher minority student percentage than its neighbors, although the disparity between them is less (in 1985, Lowman Hill was 41.9% minority while its four neighbors ranged from 7.7% to 31.5%). The school appears to have been designed and maintained as a school with a concentration of minority students. At best, it has been neglected in recent decades. See infra Part V B(2)(b)(iii).
 
 
 130
 vii. Predominantly white schools
 
 
 131
 Eight elementary schools were at time of trial and have been during the course of this litigation primarily white schools.[92] Even in 1985, only three of these schools crossed the 10% minimum that the school district's expert proposed, and did so only just barely.[93] The schools are in or near the western part of the district. Similarly, at the time of trial two middle schools and one high school--one-third of the secondary school system--were, and had been since they opened, primarily white schools. They too are in the western part of Topeka.
 
 
 132
 Plaintiffs focus on Topeka West High School as the quintessential example of deliberate channeling of white students to schools in the western part of the school district. The school was opened in 1961 six blocks from the western edge of the school district, the part of the district most distant from centers of minority population. Consequently, it was then and remains now a school with more than 90% white students, while the percentage of minority students at the other two high schools has been higher than average. Little evidence was introduced on the other white schools that has not already been discussed elsewhere. See infra Part V B(2)(b)(iv). To summarize, these schools were either annexed or built by the school district in the late 1950s and early 1960s. They opened as white schools with white faculty/staff and have largely remained so. The school district offered no evidence that it had ever attempted to eliminate these schools' identity as schools for white children.
 
 
 133
 3. Maximum Practicable Desegregation in Topeka
 
 
 134
 We look at last away from what has been done and what should have been done to what can still be done. The feasibility of further measures was not a focus of the case, and there was little evidence on the question. The district court explicitly found that "[a]t any time, more could have been done to achieve racial balance in the schools." Other courts that have found school systems to be unitary have specifically found that additional desegregation was impracticable.[94] Similarly, courts have refused to find school systems unitary where greater integration is achievable.[95]
 
 
 135
 It is apparent from this record that further desegregation in Topeka is not constrained by geographic obstacles as in some other cities.[96] Furthermore, out of the panoply of desegregation tools that have been developed, Topeka at present apparently uses only one: its minimally effective majority-to-minority transfer plan. We have no reason to think that Topeka has exhausted the repertoire available for desegregating schools. For example, it has failed to try magnet schools or to aggressively encourage voluntary transfers to improve racial balance.[97]
 
 
 136
 Indeed, there is every reason to believe that further desegregation in Topeka is feasible. The present commitment of the school board and district administration, the already widespread distribution of minorities, and the expected continued movement of minorities into western Topeka should make the course of further desegregation relatively smooth.
 
 
 137
 It was suggested at trial that further desegregation is, in effect, not worth the trouble. Under questioning from counsel for the State Board of Education, plaintiffs' expert Foster admitted that in the 1985 school year the movement of only 265 elementary students, or 3% of all elementary students, and 77 secondary students, or 1.2% of all secondary students, would have been sufficient to bring all of Topeka's schools into plaintiffs' 15 + /% range. Dr. Foster pointed out that this figure was arrived at by simply removing students from schools outside the 15 + /% range, without analyzing where they would go or which students would take their place. The actual movement of students would thus be more complex and burdensome than the numbers suggest. Dr. Foster also pointed out that such an approach would move schools now just beyond the 15% range to just within it, an improvement he did not find greatly desegregative as it would preserve the existence of schools differing by 30% in their minority percentage and thus still marked as minority or white schools.[98] A similar analysis was performed with respect to faculty/staff.[99]
 
 
 138
 The exercise above is illuminating in a number of respects. First, it indicates again that the desegregation plan which must be developed may not be too burdensome, a circumstance for which all can be thankful. Second, it reminds us of the dangers of focusing on numbers alone. Although numbers are usually the focus of desegregation plans, racial balance in itself is not the goal. The goal is to wipe out the effects of prior segregation. Setting target ranges is one means to that goal. It is clearly not the only one. Furthermore, as we have emphasized, schools are not racially identifiable by student and faculty assignment alone.
 
 
 139
 The lack of evidence or any attempt to argue that further desegregation is impracticable is perhaps the largest flaw in the school district's case. When the law requires the maximum desegregation reasonably feasible, and evidence suggests that more can be done, unitariness must await the implementation of those further steps. When it can be said that Topeka can do no more to eradicate the effects of past segregation and segregative acts, the Topeka school system may be declared legally unitary.
 
 C. Conclusion on Unitariness
 
 140
 After reviewing the record, we have concluded that there is a current condition of segregation in Topeka. Contrary to the district court, we are convinced that this condition is causally connected to the prior de jure system of segregation. This causal connection for the most part does not stem from active promotion of segregation. Topeka has generally heeded the prohibition against this form of discrimination.
 
 
 141
 Our basic disagreement with the district court is centered around the fact that the duty to desegregate requires more. What Topeka did not do is actively strive to dismantle the system that existed. It opened and closed schools with little or no thought given to the effect of such actions on segregation, and observed the segregative or desegregative effects of such actions with indifference. Even those school board decisions that had some desegregative effect were not carried out in such a manner as to disestablish the dual system. For example, rather than integrate the former de jure black schools, Topeka gradually closed them. Their students were then reassigned virtually en masse to other schools, which then took on the same minority-school identity.
 
 
 142
 The shifting distribution of Topekans throughout the city sometimes hindered, sometimes aided, the cause of desegregation, but the school district sought neither to reduce the impact of the former nor to encourage the effects of the latter. It simply administered the system, with due regard for economic efficiency and the quality of education in the district, but without a commitment to undoing the segregated structure of that education. Consequently, it permitted Topeka's schools to fall into three categories: schools that are now and always have been white, schools that are now and long have been heavily minority, and others. As we have noted, the mere existence of racially identifiable schools does not violate the Constitution. Where prior de jure segregation exists, however, we are convinced that permitting white schools and minority schools to remain racially identifiable as such without significant efforts to the contrary is in effect to permit the continuation of a dual system of education. Based on the evidence set out above, we have a definite and firm conviction that the district court erred when it found the Topeka school system to be unitary. Cf. Pitts v. Freeman, 755 F.2d 1423 (11th Cir.1985); Diaz, 733 F.2d 660; Adams v. United States, 620 F.2d 1277 (8th Cir.1980) (en banc); Brinkman v. Gilligan, 83 F.2d 243 (6th Cir.1978), aff'd sub nom. Dayton Board of Education v. Brinkman, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).
 
 VI.
 TITLE VI
 
 143
 Plaintiffs argue that the school district violated both section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 34 C.F.R. § 100.3(b). Section 601 forbids programs and activities receiving federal funds from discriminating on the basis of race, among other factors,[100] and 34 C.F.R. § 100 contains regulations implementing Title VI. The Topeka school system receives federal funds.
 
 
 144
 The Supreme Court held in Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), that discrimination under Title VI is to be measured by the constitutional standard of the Equal Protection Clause. Id. at 284-87, 98 S.Ct. at 2745-47. Because we have concluded that Topeka's school system is not unitary under constitutional standards, we necessarily reverse the district court's holding that the school district has not violated Title VI.
 
 VII.
 STATE DEFENDANTS
 
 145
 The state of Kansas intervened as a defendant in Brown I to defend the constitutionality of the Kansas law permitting segregation. It was not again actively involved in the litigation of the case until May 1980, when the Governor and members of the State Board of Education were joined as defendants for the purpose of granting injunctive relief.[101] The district court granted summary judgment before trial for the Governor on both the constitutional and Title VI claims. After trial, it held that the State Board of Education was not responsible for the racial conditions in the Topeka school district. We affirm both of these rulings.
 
 
 146
 The supreme executive power of the state of Kansas is vested in its Governor, who "shall be responsible for the enforcement of the laws of this state." Kan. Const. art. I, § 3. One of the Governor's powers is that of reorganizing state executive agencies. "[C]onstitutionally delegated functions of state officers and state boards" are exempt from this reorganization power. Id. § 6(a). The State Board of Education is such an exempt state board. Id. art. 6, § 2; State ex rel. Miller v. Board of Education, 212 Kan. 482, 511 P.2d 705, 709 (1973). Because the State Board of Education is the Kansas organ of government responsible for education, these provisions limit the Governor's executive power over education to that embodied in the power to enforce the laws of Kansas. Plaintiffs have not suggested that any Kansas law is now implicated in this litigation. The Governor is not vested by the provisions cited above with the power to enforce federal law, and plaintiffs have not shown any other source of such power. The district court was correct in concluding that the Governor is not able, under state law, to comply with such injunctive relief as may be ordered in this case. It was therefore proper to dismiss him from the case.
 
 
 147
 The correct disposition of the case against the members of the State Board of Education is more difficult to resolve. Kansas, like many other states, assigns the primary responsibility for the day-to-day management of public schools to local school authorities. See Kan. Const. art. 6, § 5. At the time of Brown I, the Kansas Constitution provided for a Superintendent of Public Instruction with limited authority. In particular, this officer did not have the authority to exercise general supervision of the public schools. Miller, 511 P.2d at 708. Apparently, the only method used by the state to encourage segregation was the permission granted by the law struck down in Brown I for segregation below the high school level. The Kansas legislature promptly repealed this statute in its next full session after Brown I, and has since enacted civil and criminal laws against racial discrimination. See Kan.Stat.Ann. §§ 21-4003, and §§ 44-1001 et. seq. This history is in contrast to the actions of other states that have been held liable for promoting segregation.[102] Moreover, the state was never held expressly liable for the actual segregation in Topeka's schools.
 
 
 148
 It is not necessary for us to decide whether requiring more of the state at this point would be consistent with the principle that a remedy may be no broader than the scope of the violation found, because plaintiffs have not shown that the State Board of Education has the power to act as they would have it act. The Kansas Constitution provides both for the State Board of Education and for locally elected school boards. The State Board is given the power of "general supervision" of the local boards. Kan. Const. art. 6, §§ 2, 5. The Kansas Supreme Court has defined this power as "something more than to advise but something less than to control." Miller, 511 P.2d at 713. Among the powers of the State Board is accreditation of schools. Plaintiffs argue that the State Board could have withheld accreditation of segregated schools, citing evidence that the Board is empowered to withhold accreditation on this basis.[103] The evidence refers, however, to hypothetical situations such as an official policy of not hiring black teachers or complete segregation of students. This does not establish that the State Board had the power to deny accreditation under the facts of this case. In addition, exhibits in the record show that the State Board was aware that there was actual segregation in some Kansas cities, and drew up a number of proposals to provide advisory assistance to these cities in desegregating.[104] These proposals are consistent with the State Board's argument that its role is primarily advisory in the area of desegregation.
 
 
 149
 Kansas statutes authorize local school boards to appoint employees to serve at the board's pleasure, set attendance boundaries, open and close schools, and adopt all necessary rules and regulations. Kan.Stat.Ann. §§ 72-8202e, 72-8212, 72-8213. These tools are the primary means of desegregating. No evidence suggests that the State Board exercises control over these tools. Plaintiffs argue that after Brown I some agency of the state had a duty to ensure that desegregation occurred. We are not persuaded that any authority other than the Topeka school district had then or has now the power to desegregate Topeka's schools.
 
 VIII.
 CONCLUSION
 
 150
 In concluding, we begin by stressing what we do not have in Topeka. We do not have a school system or a community actively resisting desegregation. Nor, on our record, has Topeka ever interposed the kind of obstacles to desegregation found in other cities. In recent times, the school district has won national recognition for its innovative work on its curriculum and has been honored with various awards for the excellence of its schools. In short, the Topeka school district is actively engaged in improving the education of its students.
 
 
 151
 This active engagement has largely been directed at concerns other than desegregation, however. Once the four-step plan approved by the district court in the 1950s was implemented, Topeka did not until very recent times, on our record, give serious consideration to the question of whether the duty imposed by Brown II had been fulfilled, save under the urging of HEW. Although that urging led to distinct improvements, for the most part the Topeka school district has exercised a form of benign neglect. The duty imposed by the Constitution, and articulated in numerous cases by the highest court in this land, requires more.
 
 
 152
 We reverse the finding of the district court that the Topeka school system is legally unitary. We remand the case to the district court for the formation of an appropriate remedy.
 
 
 153
 BALDOCK, Circuit Judge, dissenting.
 
 
 154
 It is not by accident that the court begins its opinion in the liability phase of this case with a quote from the plaintiffs' expert, Mr. William Lamson.[1] For in deciding that the U.S.D. 501 school board operates a dual school system with respect to student assignment, the court has relied heavily on the plaintiffs' theory of the case as supported by the testimony of Mr. Lamson. In deciding that the board operates a dual system with respect to faculty assignment, the court has adopted the plaintiffs' theory in large part, but impermissibly has made its own factual findings after an ad hoc evaluation of the evidence. See, e.g., Court's Opinion at 870 ("We do not adopt plaintiffs' standard, but instead evaluate the data on its face.").
 
 
 155
 In this case, the plaintiffs contended that the school board operated a dual school system as evidenced by: 1) racial identifiability in student and faculty/staff assignment, 2) inferior facilities, equipment, curriculum and instruction at schools with higher black enrollments, 3) lower minority test scores, and 4) survey attitudes indicating that some schools were perceived as white schools and others as minority schools. See generally rec. vol. I, doc. 242 (amended complaint).[2] On the other hand, the defendants contended that the plaintiffs' measures of "racial identifiability" alone, given the historically small percentage of minority students and faculty/staff did not indicate a current condition of intentional segregation based upon either 1) present discrimination or 2) a failure to eliminate the vestiges of past state-imposed segregation. Defendants suggested that de facto and racially neutral considerations, rather than de jure segregation, explained the assignment of students and faculty/staff.[3] Defendants also contended that recent school boards were committed to pursuing racial balance in student and faculty/staff assignment, and equal educational opportunity. Finally, defendants relied upon the implementation of two desegregation plans after Brown v. Board of Educ. (Brown I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and explained other steps taken to achieve and maintain a unitary system. The district court found in favor of the defendants on all issues and declared the system unitary. Brown v. Board of Educ., 671 F.Supp. 1290 (D.Kan.1987). On appeal, plaintiffs challenge the district court's judgment concerning student and faculty/staff assignment.
 
 
 156
 If appellate courts were empowered to make findings of fact, perchance the approach of this court on the issues of student and faculty/staff assignment could be justified. But for reasons which the Supreme Court has made clear, we must accept the factual findings of the district court unless they are clearly erroneous. Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985); see also Alexander v. Youngstown Bd. of Educ., 675 F.2d 787, 792-93 (6th Cir.1982). Although this court acknowledges that the district court's finding of unitariness must be upheld unless clearly erroneous, Court's Opinion at 859, the court has failed to give effect to this principle. Instead, this court has duplicated "the role of the district court" and has impermissibly engaged in "an exercise in appellate factfinding." See Jenkins v. Missouri, 807 F.2d 657, 667 (8th Cir.1986) (en banc). This is apparent throughout the court's opinion, but is especially salient in the court's characterization of what really occurred in Topeka during each decade subsequent to Brown I, a characterization which totally ignores the district court's findings and forgets that we do not try cases at the court of appeals. See Court's Opinion at 874-877. The same evidence that the district court found wanting this court accepts. This court is "engaging in an original evaluation of the voluminous and ofttimes contradictory record seeking an ultimate conclusion more satisfactory than that reached by the district court." Jenkins, 807 F.2d at 668.
 
 
 157
 The court claims that the district court erred because it misunderstood the burden of proof in this desegregation case. Court's Opinion at 854, 866-67. If that is true, why does the court not remand the case to thedistrict court for appropriate findings in accordance with the correct presumption and burden-shifting principles, given that this is very much a record case? See infra note 6; Vaughns v. Board of Educ., 758 F.2d 983, 992 (4th Cir.1985) (court remanded for new findings in light of correct legal principles). Instead, the court makes its own factual findings and remands the case for an appropriate remedy.
 
 
 158
 Moreover, I do not agree with this court that the district court "failed 'to apply the appropriate presumption and burden-shifting principles of law.' " Court's Opinion at 867 (quoting Brinkman v. Gilligan, 583 F.2d 243, 251 (6th Cir.1978), aff'd, Dayton Board of Educ. v. Brinkman (Dayton II), 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979)). This court compares the district court's action with that of the errant district court in Dayton II. The comparison misses the mark primarily because, as this court points out, Dayton II, like most of "[t]he Supreme Court desegregation cases[,] involved school systems in which the degree of segregation was sufficiently great that the parties did not seriously dispute on appeal that the plaintiffs had satisfied their burden on" ["the existence of a current condition of segregation."]. Court's Opinion at 859-60 n. 17, 859-60. While the "Dayton public schools [were] 'highly segregated by race'[.]"[4] Court's Opinion at 859 n. 17 (quoting Dayton II, 443 U.S. at 529, 99 S.Ct. at 2974), this is not so in Topeka. Here, there exists a genuine issue of fact as to whether there is even a current condition of segregation, particularly in the absence of any one-race minority or virtually one-race minority schools in this district. To be sure, there are eight 90% + white schools (ranging from 6.23% to 9.43% minority); however, those schools have steadily increased in minority enrollment over the years, and this is a system in which 31 out of 34 schools are majority white in student assignment. See infra note 18. Of the three schools that are majority-minority in student assignment, the greatest concentration is 61.86% minority. Id. This court's overinclusive approach to racial identifiability leads it to an incorrect finding that there is a current condition of segregation in Topeka.
 
 
 159
 The court begins by saying that, in a former de jure system, a school is racially identifiable and part of a current condition of segregation if it deviates, plus or minus (±) 15% or 20% or some other arbitrary amount, from a system-wide average of minority composition. See Court's Opinion at 869-70, 872-73 n. 59, 873; but see Price v. Denison Indep. School Dist., 694 F.2d 334, 360-64 (5th Cir.1982) (statistical racial identifiability not necessarily indicative of liability). Numbers reflecting the racial composition of student and faculty/staff assignment within a school system are absolutely critical in both the liability and the remedial phase of a school desegregation case. However, statistical measures of racial identifiability are measures of racial balance, a valid sociological objective, but not a constitutional command with respect to student assignment. Nevertheless, this court determines that once a plaintiff has shown statistical racial identifiability in a former de jure system, the plaintiff has established a current condition of segregation. Court's Opinion at 859-60, 869-70.
 
 
 160
 If a school is not racially identifiable as to student assignment by statistical measures, that certainly does not suggest an absence of segregation to this court. Rather one must look to a "broadly defined," Court's Opinion at 859-60, concept of racial identifiability which considers "demography, geography and the individual history of particular schools and areas of the city," in an effort to find liability. Id. at 861. Although the court acknowleges that one-race schools may evolve from "modern urban demography and geography," id. at 860 n. 18, and that "the mere existence of racially identifiable schools does not violate the Constitution," id. at 886, it completely fails to incorporate these observations in its analysis of this system. Nor does it consider other statistical measures relied upon by the district court which support a finding of no current condition of segregation and compliance with the affirmative duty to dismantle the dual system. See id. at 869-72, 876 n. 71. What the court has done is to apply an absolute presumption against the Topeka schools from the outset because of de jure status in 1954. Even if the presumption applies, the court has given no weight to the substantial evidence concerning de facto influences on racial composition in those schools. Although the court ratifies its conclusion concerning a current condition of segregation with descriptive references to geography, residential population and history, there is no attempt to consider causation in light of the substantial demographic testimony offered by defendants. Id. at 873, 876-77.
 
 
 161
 The district court implicitly recognized, Brown, 671 F.Supp. at 1295, "that once a court has found an unlawful dual school system," School Bd. v. Baliles, 829 F.2d 1308, 1311 (4th Cir.1987), the plaintiffs are " 'entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants.' " See Court's Opinion at 863 (quoting Baliles, 829 F.2d at 1311); see also Dayton II, 443 U.S. at 537, 99 S.Ct. at 2979 (1979); Keyes v. School Dist. No. 1, 413 U.S. 189, 210-11, 93 S.Ct. 2686, 2698-99, 37 L.Ed.2d 548 (1973); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 25-26, 91 S.Ct. 1267, 1280-81, 28 L.Ed.2d 554 (1971) (discussing remedy once a violation is established). If the system has achieved unitariness, the presumption ends. Baliles, 829 F.2d at 1311; Riddick v. School Bd., 784 F.2d 521, 543 (4th Cir.1986).
 
 
 162
 In a former de jure system, plaintiffs may establish the prima facie case by proving that there is a current condition of intentional segregation, that the de jure system or its vestiges remain or were reestablished in part of the school system. Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464, 467, 99 S.Ct. 2941, 2950, 2951, 61 L.Ed.2d 666 (1979); Keyes, 413 U.S. at 200, 210, 93 S.Ct. at 2693, 2698. Even an isolated condition of current segregation, resulting from past or present segregative acts, would violate the affirmative duty to eliminate the dual system and its vestiges and to convert to a unitary system in which racial discrimination is eradicated. Dayton II, 443 U.S. at 537, 99 S.Ct. at 2979; Columbus, 443 U.S. at 459, 99 S.Ct. at 2948; Swann, 402 U.S. at 15, 91 S.Ct. at 1275; see also L. Tribe, American Constitutional Law 1498-1500 (2d ed. 1988) (discussing Supreme Court school desegregation cases).
 
 
 163
 That critical finding shifts the burden of proof to the defendants because it provides "a sufficient basis for an inferential finding of system-wide discriminatory intent" which in turn will be applied to explain "racial separation in other parts of the school system." Columbus, 443 U.S. at 467-68, 99 S.Ct. at 2951-52. At that point, the defendants must come forward with "proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions." Keyes, 413 U.S. at 210, 93 S.Ct. at 2698. If intent cannot be disproved, the defendants must show that their "past segregative acts did not create or contribute to the current segregated condition," in the other parts of the system. Id. at 211, 93 S.Ct. at 2699; see Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979 ("Board has a 'heavy burden' of showing that actions that increased or continued the effects of the dual system serve important and legitimate ends").
 
 
 164
 The district court correctly cited Keyes and Swann in its discussion concerning the burden of proof and noted that the factual justification in this case for the legal presumption was doubtful.[5] Brown, 671 F.Supp. at 1295, 1295 n. 4 & 5. I take this to mean that the plaintiffs simply had not proven a current condition of segregation (a constitutional violation) in the Topeka schools which would warrant sustaining the presumption. But the district court went further when it focused on the defendants and held that, in the alternative and regardless of any presumptions in favor of the plaintiffs, the defendants had proven the existence of a unitary system. Id. Merely because the district court properly discussed an absence of discriminatory intent does not negate the fact that in this record[6] there is evidence tending to show that any past segregative acts of this school district are not responsible for schools currently which do not approach the system-wide minority average. See infra pt. VII, p. 935 (analyzing schools which court claims are racially identifiable and segregated). Indeed, this court at various points acknowledges an absence of evidence of segregative intent by current school officials. Court's Opinion at 868 ("we agree with the district court's findings that the current school administration is not presently acting with discriminatory intent"), see also id. at 880, 886; but see id. at 872, (concerning faculty/staff assignment in 1985-86, "it is difficult to posit a [racially] neutral explanation") ,879 & id. at 883 ("It is thus clear that Quinton Heights' current boundaries are the result of continued manipulation by the school district."). The district court also considered circumstantial evidence of past segregative intent manifesting itself in the current system, concerning the prima facie case and beyond. Of course, the district court had much quantitative and qualitative evidence to evaluate. Having performed its required task, it found that "the district's student and staff assignment criteria do not have the effect of discriminating against students because of their race." Brown, 671 F.Supp. at 1310 (denying relief based on Title VI regulation) (emphasis added). Because the record supports the district court's determination that there is not unlawful segregation in Topeka and that the system is unitary, albeit on conflicting evidence, I respectfully dissent.
 
 
 165
 In its opinion, the court dismisses my dissent as a product of misconstruing the principles of school desegregation law. Court's Opinion at 862-63, 867 n. 47, 868 n. 49, 869 n. 51. Apparently, the court views the affirmative duty to eliminate segregation and its vestiges as completely independent from, if not inconsistent with, the intent inquiry. To be sure, those statutory dual systems operating at the time of Brown I automatically assumed an affirmative duty to eliminate not only the dual system, but also the effects of that dual system on present school operations. Keyes, 413 U.S. at 200, 93 S.Ct. at 2693. However, the initial affirmative duty arises from the presence of intentional segregation whether once commanded by statute or practice.
 
 
 166
 Moreover, the intent inquiry is inclusive of whether a school board has acted affirmatively, not merely neutrally, to eliminate a dual system existing in 1954. A school board's proven failure to heed its affirmative duty and eliminate a dual system and its vestiges, whether that failure be by inaction or by conscious decision, is indicative of segregative intent and compounds the harm of an unconstitutional dual system. See Columbus, 443 U.S. at 461, 99 S.Ct. at 2948 ("Whatever the Board's current purpose with respect to racially separate education might be, it knowingly continued its failure to eliminate the consequences of its past intentionally segregative policies."); see also Green v. County School Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968). In deciding whether a school system is unitary, the ultimate inquiry must be whether past or present segregative intent has been eliminated from the present school operations.
 
 
 167
 Thus, a current condition of purposeful separation may arise either from a failure to eliminate 1954 de jure segregation and its effects or by subsequent actions which are segregative in their own right. Stated another way, plaintiffs are entitled to a system-wide desegregation order upon a finding that there is current racial separation which is the result of segregative intent, past or current. Plaintiffs are not entitled to a system-wide desegregation order based upon proven de facto racial separation not attributable to the actions of the school board. Keyes, 413 U.S. at 208, 93 S.Ct. at 2697 ("We emphasize that the differentiating factor between de jure segregation and so-called de facto segregation to which we referred in Swann is purpose or intent to segregate.") (emphasis in original). Thus, contrary to this court's reading of my dissent, I agree that school board action which has the effect of failing to disestablish the dual system violates the school board's affirmative duty. See Court's Opinion at 862 (quoting Pitts v. Freeman, 755 F.2d 1423, 1427 (11th Cir.1985)); Columbus, 443 U.S. at 449, 99 S.Ct. at 2942.
 
 
 168
 I must reject however, this court's contention that "[t]his is not a liability case in which plaintiffs must prove that the school board has committed unconstitutional acts; that was established in 1954." Court's Opinion at 862 (emphasis omitted). While this is not a case of initial liability, id. at 868, it is not a case like Swann, see Court's Opinion at 862, in which all parties agreed that the 1969 Charlotte-Mecklenburg school system was not unitary given the Supreme Court's 1968 Green decision, announced three years after the first desegregation plan implemented by that district in 1965. Swann, 402 U.S. at 7, 91 S.Ct. at 1271. In Swann, the issue was whether the district court was correct in selecting among alternative desegregation plans put forth by the parties. Id. at 11, 91 S.Ct. at 1273. Contrary to this court's assertion, Court's Opinion at 862, 868 n. 49, ours is not now a remedy case. Upon the reopening of this case in 1979, some 24 years after the first court-approved desegregation plan, the district court's task was to determine whether liability for the prior de jure system remained. Unlike Swann, the parties in our case hotly contested this issue.
 
 
 169
 If the liability inquiry in this case was frozen as of 1954 as suggested by the court, id. at 862, we merely would decree a remedy based upon the failure of the school board to have absolute racial balance at every school and much of this court's opinion arguing that (1) there is a current condition of segregation, (2) the school board has failed to fulfill its affirmative duty, and (3) there is a link between present school operations and the prior de jure system, would be superfluous. The inquiry in this case is not so simple because two complex factual issues are involved. The first is whether current disparities in this case comprise a current condition of segregation given that there is not a single one-race minority or virtually one-race minority elementary, middle or high school, in this system. But if there is a current condition of segregation, the burden of proof would shift to the school board as discussed above. The next complex factual issue in the case then becomes whether the effects of any past intentional segregation have been eliminated. An "essential predicate" for a system-wide remedy in this case is that the "Board's purposefully discriminatory conduct and policies, had current, system-wide impact." Columbus, 443 U.S. at 466 n. 15, 99 S.Ct. at 2951 n. 15.
 
 
 170
 The court also claims that the defendants' experts, the district court and I have erred because we have considered the school board's proof that, having dismantled a dual school system, it is not liable for schools which do not approach the system-wide minority average in student assignment. See Court's Opinion at 876-77. Who could argue with the court's statement that demographic change does not excuse a school board's failure to comply with its affirmative duty to eliminate the effects of a dual system? Id. (relying on Vaughns, 758 F.2d at 988, and Lee v. Macon County Bd. of Educ., 616 F.2d 805, 809-10 (5th Cir.1980)). In both Vaughns and Lee, the appellate court was concerned with virtually one-race minority schools which had not lost their racial identities. Vaughns, 758 F.2d at 991; Lee, 616 F.2d at 808, 811 (5 one-race minority schools). The disagreement between the court's opinion and my dissent on this point is that I view the school board as having accomplished its affirmative duty and having eliminated the effects that may be charged to a once-dual system. All virtually one-race minority schools have been eliminated, and there are no schools on the threshold of virtually one-race minority status. In any event, the school board is allowed to prove that schools which do not approach the system-wide minority average are not the product of past or present segregative intent or, stated another way, the school board may prove that its recent and remote actions are not the cause of present racial imbalance. In Keyes, the Court recognized that school officials may defend by showing that current racial separation is not a product of past segregative actions. Keyes, 413 U.S. at 211, 93 S.Ct. at 2698. Although the passage of time does not make intentional segregative acts which occurred decades ago any less intentional, id. at 210-11, 93 S.Ct. at 2698-99, the effects of such action may well be attenuated, given the dynamic environment of a school system. The court's absolute refusal to consider this evidence is tantamount to imposing strict liability on the school board in the absence of perfect racial balance.I.
 
 
 171
 This action began when the original plaintiffs challenged Topeka's maintenance of a segregated system of schools for grades kindergarten through six (K-6). Brown v. Board of Educ., 98 F.Supp. 797 (D.Kan.1951), rev'd, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). At the time, Topeka operated 22 elementary schools, 18 for white children and 4 for black children. Id. Many black children were bused a considerable distance to the 4 black schools. Id. at 798. The challenge involved both the contention that separate schools were inherently unequal and the contention that the physical facilities, curricula, faculty and student services of the black schools were inferior. Id. at 797-98. Circuit Judge Huxman, writing for a three-judge district court, adhered to precedent, Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), and held that separate but equal facilities were constitutional. Brown, 98 F.Supp. at 798-99; see generally In Memoriam, 474 F.2d preface at 13-14 (1973) (discussing judge's difficult decision). The district court entered as a finding of fact that the "physical facilities, the curricula, the courses of study, qualification of and quality of teachers, as well as other educational facilities in the two sets of schools are comparable." Brown, 98 F.Supp. at 798. The judgment was appealed to the Supreme Court, with initial arguments during the 1952 Term.
 
 
 172
 During September 1953, and prior to the Supreme Court's opinion, the Topeka school board adopted a policy to terminate the maintenance of segregation in the elementary grades. Rec. ex. vol. II at 60. The board adopted the first step of a desegregation plan which terminated the white-only segregation at two elementary schools (Southwest & Randolph) and discontinued the board's supplied transportation to 15 black children in those districts. In January 1954, the board adopted the second step of the desegregation plan to become effective in September 1954. Rec. ex. vol. II at 61. The second step terminated the white-only segregation in 12 more elementary schools, eliminated transportation for black students in these 12 districts, and permitted black students to continue at their former schools, if desired. Id.
 
 
 173
 In May 1954, the historic decision of the Supreme Court reversed the three-judge district court. Brown I, 347 U.S. 483, 74 S.Ct. 686. The Court held that "the segregation of children in public schools solely on the basis of race" denied minority group children equal educational opportunities contrary to the fourteenth amendment. Id. at 493, 74 S.Ct. at 691. With respect to the Kansas case, the Court expressly found that the non-elementary grade levels of the public schools were "operated on a non-segregated basis." Id. at 486 n. 1, 74 S.Ct. at 687 n. 1. The Court did not alter the finding of the district court of substantial equality "with respect to buildings, transportation, curricula, and educational qualifications of teachers." Id. at 486 n. 1, 74 S.Ct. at 687 n. 1.
 
 
 174
 In February 1955, the Topeka board adopted the third step of the desegregation plan to become effective in September 1955. Rec. ex. vol. II at 63. The plan addressed the four black elementary schools (McKinley, Buchanan, Monroe and Washington). Under the third step, McKinley was closed, and Buchanan, Monroe and Washington were placed within the general framework of the elementary school attendance districts. Id. All elementary students affected were given the option of finishing elementary school in their present schools, with the exception of McKinley students. Children entering kindergarten in school year 1955-56 were given the option of attending the school they would have attended in 1954-55, had they been old enough.
 
 
 175
 Having decided the question of constitutional liability, the Court ordered further argument on a remedy and issued its next opinion concerning appropriate relief in May 1955. Brown v. Board of Educ. (Brown II), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). The Court noted that "substantial progress" had been made in Kansas "from the transition to a system of public education freed of racial discrimination." Id. at 299, 75 S.Ct. at 755. Recognizing that full implementation of Brown I might "require solution of varied local problems" by school authorities, the Court remanded this case to the three-judge district court for consideration of whether the actions of school authorities constituted a good faith implementation of Brown I. Id. School authorities were to make a "prompt and reasonable start toward full compliance" with Brown I. Id. at 300, 75 S.Ct. at 756.
 
 
 176
 Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis.... They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system.
 
 
 177
 Id. at 300-01, 75 S.Ct. at 756-57. The district courts were to be guided by principles of equity and to retain jurisdiction during the transition period. Id. In June 1955, the Supreme Court mandate ordered the district court to take such actions "as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases." Id. at 301, 75 S.Ct. at 757.
 
 
 178
 On remand, the district court held a hearing on the formulation of a decree and judgment. In October 1955, the panel approved the plan already adopted and partially implemented by the Topeka board "as a good faith beginning to bring about complete desegregation." Brown v. Board of Educ., 139 F.Supp. 468, 470 (D.Kan.1955) (per curiam). The court characterized the plan as follows:
 
 
 179
 The central principle of the plan is that hereafter, except in exceptional circumstances, school children irrespective of race or color shall be required to attend the school in the district in which they reside and that color or race is no element of exceptional circumstances warranting a deviation from this basic principle.
 
 
 180
 Id. at 469. The court noted that in several respects, which were minor and not discussed, the plan did not comply fully with the Supreme Court mandate. Id. One serious objection to the plan was that part which permitted kindergarten children to attend the school which they would have attended had they started school one year previously. But because that part was temporary and not part of the permanent plan, it did not defeat a finding of good faith.
 
 
 181
 At the hearing, the plaintiffs objected to certain schools, such as Buchanan, remaining all black. The district court rejected this as a defect in the plan, stating:
 
 
 182
 Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school because of race or color.
 
 
 183
 If it is a fact, as we understand it is, with respect to Buchanan School that the district is inhabited entirely by colored students, no violation of any constitutional right results because they are compelled to attend the school in the district in which they live.
 
 
 184
 Id. at 470. In 1973, the Supreme Court indicated that this limited interpretation of Brown was rejected in 1968 by its decision in Green, 391 U.S. at 437-38, 88 S.Ct. at 1693-94. Keyes, 413 U.S. at 200-01 n. 11, 93 S.Ct. at 2693-94 n. 11. Meanwhile, the district court retained jurisdiction of this case for the purpose of entering a final decree pending full compliance with the Supreme Court's mandate to desegregate. The court's order approving the plan was not appealed.
 
 
 185
 In December 1956, the Topeka board considered the fourth step of its plan to comply with the Supreme Court's mandate in Brown II as ordered by the district court. Rec. ex. vol. IV at 120. This final step of the plan was to become effective in September 1956, and eliminated the kindergarten option provision criticized by the district court. Rec. ex. vol. II at 66. The plan also required all elementary students moving into districts, not designated as optional districts between two or more elementary schools, to attend the elementary school in the requisite district, subject only to traditional exceptions. Id. at 66. Two board members opposed the plan's optional features as prolonging the time before complete integration. Id. at 67. Concern was expressed about the future of the teachers at the de jure black elementary schools. Id. Notwithstanding, the superintendent, under questioning from the board, indicated that no additional steps were contemplated and that the adoption of the plan brought Topeka "into full compliance with the law." Id.
 
 
 186
 The fourth step of the plan was opposed by the president of the NAACP, Mr. Burnette. Mr. Burnette told the board that the NAACP only took legal action in this case as a "last resort." Rec. ex. vol. IV at 120. He opposed the plan because "it would take seven long years to terminate racial segregation" and no steps had been taken to integrate black teachers. Id. at 120-21. The fourth step of the plan was approved in January 1956. Id. at 121. The plan had been implemented fully as of the 1960-61 school year, and by 1961-62, all elementary students, who had been permitted to continue at the school which they attended prior to implementation of step four of the plan, had completed their elementary education.
 
 
 187
 Two observations should be made at this point. First, the school board hardly can be faulted for implementing its plan to desegregate the elementary schools. In its revised opinion, the court has downgraded the school board's initial desegregation efforts from "a remarkably enlightened beginning in the mid-1950's," see Brown v. Board of Educ., No. 87-1668, slip op. at 42 (filed Jul. 2, 1989 & withdrawn Jul. 19, 1989), to "a 'good faith' beginning", Court's Opinion at 874 (quoting Brown, 139 F.Supp. at 470). This court then characterizes "[t]he mid-50s to mid-60s," as "no doubt" segregative under modern authority. Court's Opinion at 874-75. The board had the approval of the district court and federal authority well into the 1970's, including that of this circuit, which echoed the district court's conclusion that Brown I and Brown II, while prohibiting segregation, did not require concern with integrative racial balancing in neighborhood schools.[7] See Keyes v. School Dist. No. 1, 445 F.2d 990, 1005 (10th Cir.1971) ("We never construed Brown to prohibit racially imbalanced schools provided they are established and maintained on racially neutral criteria, and neither have other circuits considering the issue."), modified, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); Board of Educ. v. Dowell, 375 F.2d 158, 166 (10th Cir.) ("It is still the rule in this Circuit and elsewhere that neighborhood school attendance policies, when impartially maintained and administered, do not violate any fundamental Constitutional principles or deprive certain classes of individuals of their Constitutional rights."), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967); Downs v. Board of Educ., 336 F.2d 988, 995-96, 998 (10th Cir.1964) (neighborhood schools which may result in racial imbalance not actionable; no duty to integrate), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965); Bell v. School City of Gary, 324 F.2d 209, 213 (7th Cir.1963) (neighborhood school plan drawn with no intent or purpose to segregate is constitutional even if effect is that some schools will not be racially balanced), cert. denied, 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964). Second, courts do not speak unless spoken to and cannot decide what is not before them. Here, the school board made hundreds of decisions since 1952 that the plaintiffs contend reflect segregative intent and effect, yet not until 1979 was the court asked to intervene. While this in no way would excuse noncompliance with the constitutional command to desegregate the schools, it does furnish a backdrop against which to understand the liability focus of this case.
 
 II.
 
 188
 The amplification of Brown I and Brown II began with the Court's decision in Green, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The New Kent County, Virginia system was considerably smaller than the Topeka system, with an enrollment of 1300 students in two schools, approximately 57% black and 43% white. Id. at 432, 88 S.Ct. at 1691. The court considered a plan which allowed a student to choose between schools which were essentially one-race schools with respect to "faculty, staff, transportation, extracurricular activities and facilities." Id. at 435, 88 S.Ct. at 1693. In every way, the schools were a product of de jure segregation. Although students had a choice between schools, attendance patterns largely reflected the de jure system. Id. at 441, 88 S.Ct. at 1696. Eighty-five percent of the black children attended an all-black school. Id. at 441, 88 S.Ct. at 1696. The court made it clear that school boards operating state-compelled dual school systems at the time of Brown II "were ... clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Id. at 437-38, 88 S.Ct. at 1693-94.
 
 
 189
 From 1955-1969, the Topeka school district underwent substantial transition. Due to annexation and unification between 1957 and 1964, the size of the district more than doubled, increasing from 16.60 to 37.45 square miles, which "fundamentally changed the system." See rec. vol. XI at 2399 (commenting upon changes from 1955-60). The population in Topeka grew until 1970, and thereafter declined. Rec. vol. XI at 2292-93; ex. vol. I at 12. This trend was reflected in school enrollment which has declined substantially in recent years.[8] The black and hispanic population increased significantly. Rec. ex. vol. I at 12. And the Topeka school board continued with its responsibility to eliminate de jure segregation and its vestiges.
 
 
 190
 In the 1955-56 school year, the board operated 23 elementary schools,[9] 7 junior high schools,[10] and 1 high school. Brown, 671 F.Supp. at 1293; rec. ex. vol. IV at 38; supp. vol. XI at 186, 225. At the time of Brown I, the Court recognized that Topeka did not operate de jure secondary schools. Brown I, 347 U.S. at 486 n. 1. In the 1955-56 school year, black elementary students attended 18 out of 23 elementary schools. Brown, 671 F.Supp. at 1293. At the elementary school level, the total black student population was 10.4% and three schools were 90 + % black (Buchanan, Monroe and Washington). See supra note 9. 45.6% of the black elementary students attended these three schools. Id. Thirteen elementary schools were 90 + % white. Id. At the junior high school level, the total black student population was estimated to be 11.2%. See supra note 10. There were no 90 + % black junior high schools, but 3 schools were 90 + % white (Holliday, Roosevelt & Capper).
 
 
 191
 In the 1968-69 school year, the school board operated 34 elementary schools,[11] 11 junior high schools[12] and 3 high schools,[13] having added Highland Park High School in 1959 through annexation and Topeka West High School in 1961 through construction. Rec. ex. vol. IV at 64; supp. vol. XI at 225. The system had 25,737 students. Rec. ex. vol. IV at 65; see supra note 8. Three of the four initially de jure black elementary schools had been closed by the 1968-69 school year. McKinley was closed in 1955, Buchanan in 1959, and Washington in 1962. Brown, 671 F.Supp. at 1293. Monroe, the only remaining de jure black elementary school (Monroe) had an enrollment which was 25% white. Id. At the elementary school level, the total minority[14] student population was 17.39% minority (12.40% black), and one school (Parkdale) was 90+% minority and three others were 50+% minority (Belvoir, Lafayette, Monroe). See supra note 11. Eighteen elementary schools were 90+% white. Id. At the junior high school level, the total minority student population was 16.50% (11.81% black). See supra note 12. There were no 90+% black junior high schools, but five junior high schools were 90 + % white (Capper, Eisenhower, Jardine, Landon & Roosevelt). Id. There were no 90+% black high schools, but one high school was 90+% white (Topeka West). See supra note 13. Minority students attended every school in the district, but in widely varying numbers. See supra notes 11-13.
 
 
 192
 In 1971, the Supreme Court provided greater guidance for the remedial phase of desegregation. Swann, 402 U.S. at 18, 91 S.Ct. at 1277. The Charlotte-Mecklenburg school system was considerably larger than the Topeka system, with an enrollment of more than 84,000 and 107 schools. Id. at 6, 91 S.Ct. at 1271. The racial composition was 71% white and 29% black. To support liability, the Supreme Court mentioned that two-thirds of 21,000 black students in Charlotte city schools attended 21 schools which were 99+% black. Id. at 7, 91 S.Ct. at 1271. The district court's objective was to have the schools approximate the racial composition of the system, 71% white and 29% black. Id. at 9-10 n. 4, 91 S.Ct. at 1272-73 n. 4. To that end, the district court endorsed a plan that called for busing to achieve schools 9% to 38% black. Id. at 9, 91 S.Ct. at 1273.
 
 
 193
 As a remedial phase case, Swann is important because it speaks "to what extent racial balance or racial quotas may be used as an implement in a remedial order to correct a previously segregated system." Id. at 22, 91 S.Ct. at 1279. The school board argued that the district court erred by seeking racial balance in the 71%-29% range for each school. Id. at 23, 91 S.Ct. at 1279. The Court recognized that the district court's "use ... of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement," and was within the district court's equitable discretion. Id. at 25, 91 S.Ct. at 1280.
 
 
 194
 The Court spoke to whether there is any constitutional requirement of racial balance.
 
 
 195
 If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate the schools does not mean that every school in the community must always reflect the racial composition of the school system as a whole.
 
 
 196
 Id. at 24, 91 S.Ct. at 1280. This is of paramount importance for this case because, despite the court's citation of this principle, see Court's Opinion at 861, 886, the court has not allowed it to operate. Rather, even after the Topeka board has implemented fully two desegregation plans and the system "improved dramatically in the last ten years as far as desegregation is concerned," Court's Opinion at 877, the liability focus of the plaintiffs and the court is unmistakably on the principle that more could have been done to achieve greater racial balance, that is more schools could approach the system-wide minority average in student assignment. See Court's Opinion at 876, 877-78, 882-84 (analyzing schools which plaintiffs suggest have "clear racial identities," id. at 882, and essentially criticizing school board decisions which resulted in these schools not approximating the system-wide average of minority students). However, "the fact that a school board's desegregation plan leaves some disparity in racial balance among various schools in the system does not alone make that plan unacceptable." Wright v. Council of the City of Emporia, 407 U.S. 451, 464, 92 S.Ct. 2196, 2204, 33 L.Ed.2d 51 (1972) (footnote omitted).
 
 
 197
 Equally important for this case is the Supreme Court's discussion in Swann of "whether every all-Negro and all-white school must be eliminated as an indispensable part of a remedial process of desegregation." Swann, 402 U.S. at 22, 91 S.Ct. at 1279. In a section entitled "One-Race Schools," the Court applied a common-sense approach to the problem of racial concentration in various parts of a metropolitan area.
 
 
 198
 The record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominantly of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation.
 
 
 199
 In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools.
 
 
 200
 Id. at 25-26, 91 S.Ct. at 1280-81. When there has been intentional segregation in the past, there is a presumption against schools that are one-race minority or virtually one-race minority, and the school board has the burden of showing assignment is genuinely nondiscriminatory. Id. at 26, 91 S.Ct. at 1281; Price, 694 F.2d at 353-56. The district court recognized this presumption, although it noted that this case does not "fit the Swann presumption easily." Brown, 671 F.Supp. at 1295. Even though the proportion of minority students in this system is smaller than in many cases and there are no one-race minority or virtually one-race minority schools, the literal Swann presumption could be applied to the 90+% white schools. See Price 694 F.2d at 364-65.
 
 
 201
 This court acknowledges the critical importance of a finding of "one-race" schools to support a current condition of segregation and liability overall. Court's Opinion at 860-61. The court correctly notes that the significance of "one-race" white schools in this case is limited because of Topeka's large majority white student population (74.05% in 1985). Id. at 869; see also Price, 694 F.2d at 364-65 (recognizing major purpose behind school desegregation cases is to secure rights of minority groups; literal compliance with Swann may not be required when system is heavily white and all schools are majority white). But the court departs from Swann when it imposes liability on the basis of student assignment in the absence of "one-race" minority schools or a district court finding of current intentional segregation. This court imposes liability for a lack of racial balance, while virtually ignoring the demographic testimony of defendants' expert (and other evidence adduced by the defendants), which was credited by the district court. See Court's Opinion at 869 n. 52 ("In a school system with a 26% minority student population, we think the number of schools in Topeka that approach or are over the 50% minority mark constitute persuasive evidence that the school system has not met its duty to desegregate.") (emphasis added).
 
 
 202
 In 1973, the Supreme Court added an important presumption which expanded the consequences of a current condition of intentional segregation in any part of a school system. Keyes, 413 U.S. at 208, 93 S.Ct. at 2697. The district court in that case had found contemporary and intentional segregation, including student and teacher assignment, with respect to schools in the Park Hill area in Denver, which were attended by almost 38% of the black student population. Id. at 199, 93 S.Ct. at 2692. Blacks comprised 14% of the students in the system, hispanics comprised 20%; for a system minority population of 34%. Id. at 195, 93 S.Ct. at 2690. Three of five elementary schools in the Park Hill area were 89+% minority; one junior high was 76+% minority and the other was 96+% minority. Id. at 199 n. 10, 93 S.Ct. at 2692 n. 10. Near Park Hill were 22 core city schools, all 22 were 70+% minority and 11 were 90+% black. The district court and the court of appeals essentially required independent proof that the core city schools were a product of official segregation. Id. at 205, 93 S.Ct. at 2695. The Court stated:
 
 
 203
 [W]e hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.
 
 
 204
 Id. at 208, 93 S.Ct. at 2697. The Court emphasized that purpose or intent to segregate is what differentiates actionable de jure segregation from de facto segregation. Id. Thus, plaintiffs would be entitled to the Keyes presumption upon a showing of purposeful segregation in a meaningful part of the school system. Id. at 208-09, 93 S.Ct. at 2697-98. As noted, once the presumption is invoked, the defendant school board must come forward with evidence showing that "the existence of subsequent or other segregated schooling within the same system ... is not also the result of intentionally segregative acts." Keyes, 413 U.S. at 210, 93 S.Ct. at 2698. The school board must either disprove segregative intent or show "that its past segregative acts did not create or contribute to the current segregated condition." Id. at 211, 93 S.Ct. at 2699.
 
 
 205
 The framework in Keyes formed the basis for the Court's decisions in Columbus and Dayton II. These cases held that if a school board was operating a dual school system in 1954, even absent a state provision so allowing, a plaintiff may satisfy his initial burden of proof by relying upon evidence of "recent and remote intentionally segregative actions" of the school board. Columbus, 443 U.S. at 463-65, 99 S.Ct. at 2949-51 (emphasis added); see Dayton II, 443 U.S. at 537, 99 S.Ct. at 2979. In both cases, the affirmative duty to eradicate the effects of past segregative conduct not only had been unfulfilled, but also segregative practices persisted. Columbus, 443 U.S. at 460-63, 99 S.Ct. at 2948-49; Dayton II, 443 U.S. at 537, 99 S.Ct. at 2979. Either type of violation would satisfy the intent requirement under the fourteenth amendment; the basis for a system-wide remedy was "purposefully segregative practices with current segregative impact." Columbus, 443 U.S. at 466, 99 S.Ct. at 2951; Dayton II, 443 U.S. at 537-38, 99 S.Ct. at 2978-79.
 
 
 206
 This court questions the applicability of Keyes and Columbus because those cases involved initial determinations of liability concerning policy-based dual, rather than statutorily dual, school systems. See Court's Opinion at 862. The court explains that the presumption developed in Keyes is limited only "to establish[ing] initial de jure segregation in a case where no statutorily mandated segregation exists." Court's Opinion at 863 n. 27; see also Columbus, 443 U.S. at 458, 99 S.Ct. at 2946 (using Keyes presumption to establish system-wide segregation in 1954); Dayton II, 443 U.S. at 535, 99 S.Ct. at 2978 (same). According to the court, a different presumption "applies ... after either statutorily-mandated or policy-based de jure segregation has been established." Court's Opinion at 863 n. 27. The court then cites Dayton II in a later discussion for support. Court's Opinion at 863. However, like Columbus, Dayton II involved an initial determination of system-wide liability in Ohio where statutorily mandated segregation ceased after 1888. 443 U.S. at 534-35, 537, 99 S.Ct. at 2977-78, 2979; Columbus, 443 U.S. at 455-56, 455 n. 4, 99 S.Ct. at 2945-46, 2945 n. 4. Segregation by official policy, not by statute, was at issue.
 
 
 207
 In both Columbus and Dayton II, the Keyes presumption was employed to decree a current system-wide remedy on the basis of recent and remote purposefully segregative action, including the failure to satisfy the affirmative duty to eliminate a dual system. Columbus, 443 U.S. at 467-68, 99 S.Ct. at 2951-52 (discussing use of Keyes ); Dayton II, 443 U.S. at 537, 99 S.Ct. at 2979 (citing Keyes ), 443 U.S. at 534, 541-42, 99 S.Ct. at 2977, 2981-82 (consequences of 1954 dual system and intentionally segregative effect of actions since 1954 furnished basis of liability). Thus, the Supreme Court not only affirmed lower court findings of officially dual school systems as of 1954, but also approved current system-wide remedies based upon the authority of Keyes. Columbus, 443 U.S. at 467-68, 99 S.Ct. at 2951-52.
 
 III.
 
 208
 In 1973, an action was filed against U.S.D. 501 and various other governmental defendants principally alleging that children in east and north Topeka (with higher concentrations of minority students) received inferior educational opportunities and facilities as compared to children in west and south Topeka. Johnson v. Whittier, No. T-5430 (D.Kan. filed Sept. 10, 1973). The filing of Johnson led to an investigation in November and December of 1973, by the U.S. Department of Health, Education and Welfare (HEW) to determine whether U.S.D. 501 was in compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Rec. ex. vol. II at 30.
 
 
 209
 In January 1974, HEW released its findings by letter. The findings of HEW are very similar to the plaintiffs' allegations in this case. Specifically, HEW determined four areas of non-compliance. First, HEW claimed that a "substantial number of ... schools continue to operate with student racial compositions not consonant with a unitary plan of student assignment capable of fully desegregating [the] district." Rec. ex. vol. V at 13. HEW found that five elementary schools "have substantially disproportionate minority student compositions clearly the result of a former dual pattern of operation." Id. The schools and minority percentages were: Monroe (73.98%), Lafayette (61.22%), Lowman Hill (49.08), Parkdale (91.81%) and Belvoir (71.90%). Id.; rec. ex. vol. II at 72. Second, optional attendance zones were criticized. In the "most extreme" (and only) case mentioned "students transferring from areas outside the Lafayette attendance area constitute approximately one-third of the minority enrollment." Rec. ex. vol. V at 13. Thus, HEW was concerned with transfers by minorities to schools with already high minority percentages. Third, HEW found that junior high school facilities in schools with higher minority percentages (Crane, 50.85%; Curtis, 28.90%; East Topeka, 63.32%; and Highland Park, 27.16%) generally were inferior to and older than the four schools with the lowest percentage of minority enrollment (French, 2.97%; Landon, 1.89%, Jardine, 2.13% and Capper, 1.23%). Id. at 13-14; rec. ex. vol. IV at 84 (1973-74 racial inventory). Fourth, HEW found that a larger percentage of minority students, as compared to white students, attended elementary schools with inadequate kindergarten rooms and smaller library media centers. Rec. ex. vol. V at 14; vol. X at 1435.
 
 
 210
 In February 1974, the board, while not admitting liability, directed its administrative staff to develop a plan for compliance which could include reassigning students, redefining attendance areas, closing schools and constructing new or modifying existing facilities. Rec. ex. vol. II at 72. The plan developed by the staff was presented in April 1974, and called for changing the attendance areas of 22 schools and closing 7 schools. Id. A concerned parents group complained about the lack of parental involvement and sought to be involved in the development of any plan. Id. at 74. Unlike a federal court, a democratically elected school board is charged with listening to parental concerns. The plan prepared by the staff was not adopted. Id. at 80. Instead, the board unanimously rejected the plan as creating inconvenience and hardship while lowering the quality of education. Id. at 80, 82. The board resolved that the "District determine if inequality of educational opportunities exist, and if so, take the remedial steps necessary to rectify the same, retaining the neighborhood school concept wherever possible." Id. at 80.
 
 
 211
 In June 1974, HEW initiated formal administrative proceedings to terminate federal funds for the district's alleged lack of compliance with Title VI. See In re Topeka Unified School District No. 501, HEW Docket No. S-79. In the Notice of Opportunity for Hearing, HEW's litigating position unfolded. Rec. ex. vol. V at 150-58. HEW alleged that Topeka never fully desegregated its elementary and junior high schools as required by Brown I and that there were a substantial number of schools that were "one-race, virtually one-race, or substantially disproportionate in student racial composition." Id. at 155 (pp 12, 13). In addition to alleging a dual system with respect to student assignment and facilities, HEW claimed that the school district "has continued to assign faculty in a manner which reinforces the racial identity of its substantially disproportionate and one-race schools." Id. at p 14.
 
 
 212
 The board went to federal court and sought to enjoin HEW from holding the hearing and cutting off federal funds. The board took the position that the entire Topeka system was still under the 1955 order to comply with Brown I. See Brown v. Board of Educ., 84 F.R.D. 383, 390-91 (D.Kan.1979). The district judge agreed and concluded that the district court was the proper forum for resolving desegregation claims. Id. at 391. The board then developed a short-range facilities plan which resulted in the closing of two elementary schools (Clay, 25.35% minority percentage, and Monroe, 82.73%) and two junior high schools (Crane, 52.85%, and Curtis, 25.64%), all at the end of the 1974-75 school year. Rec. ex. vol. II at 90-92, 96; ex. vol IV. at 87-88; vol. X at 1436. Monroe Elementary was the last formerly de jure black school, and it was closed at the end of the 1974-75 school year. Rec. ex. vol. II at 84, 90. Ironically, the board hired Dr. Gordon Foster, assisted by Mr. Lamson, who presented alternate suggestions. These parties became the plaintiffs' lead expert witnesses in this case.
 
 
 213
 By May 1975, the board had adopted an affirmative action plan, and approved the creation of a citizens' advisory committee and a specialized learning center to "be operated in a manner intended to encourage integration among minority and majority students." Rec. ex. vol. II at 94; ex. vol. IV at 3-8; vol. X at 1449-52. All of these programs are still in place, including the learning center which is known as the Topeka Adventure Center.[15] See Brown, 671 F.Supp. at 1309 (discussing Adventure Center).
 
 
 214
 In March 1976, a divided board adopted a long-range facilities plan, after sharing the proposal with and receiving input from the advisory committee and the community. Rec. ex. vol. II at 96, 99; vol. X at 1437. The plan was a major restructuring of the Topeka schools and it required five years for implementation due to budgetary limitations (cost of capital improvements) and to avoid a reduction in force. Rec. ex. vol. II at 97-98; rec. vol. X at 1454-55 (deputy superintendent Henson). The plan had three purposes: economic efficiency resulting in better conditions for students and staff alike, educational efficiency with respect to facilities and improvement of racial composition in the schools. Rec. vol. X at 1439. Board member Stratton[16] noted that financial concerns were important because of declining enrollment--the district had lost almost one-quarter of its enrollment (6,000 students) in five years. Rec. ex. vol. II at 97. Board member Hurd noted the overwhelming support in the community for the neighborhood school concept. Id. at 98. The plan contemplated the construction of new schools, the closing of older facilities, and the redrawing of attendance boundaries, taking into consideration the anticipated effects on the racial composition of the schools. For our purposes, the principal components of the plan, which this court refers to as a "brief flurry of action," Court's Opinion at 874, included: elimination of all remaining optional attendance areas; closure of five junior high schools (Boswell, Capper, East Topeka, Highland Park and Roosevelt); transfer of the ninth grade to the senior high schools in the 1980-81 school year, conversion of Central Park Elementary to a middle school and construction of a new middle school at the Holliday-State Street site; and the closure of six elementary schools (Central Park, Grant, Parkdale, Polk, Rice and Sheldon). Rec. ex. vol. II at 97-99, 100 (elimination of optional attendance zone at high schools); rec. vol. X at 1439-43 (discussion of middle school concept). In April, HEW officials came to Topeka for two days and discussed the long-range facilities plan, the capital improvements plan, the citizen's advisory group, the affirmative action plan and the Adventure Center. Rec. ex. vol. II at 101.
 
 
 215
 In September 1976, HEW moved to dismiss its administrative enforcement proceedings on the grounds that the school district had "adopted a plan to remedy the violations of Title VI ... alleged in the Notice of Opportunity for hearing in this matter." Id. at 175. An order of dismissal without prejudice was entered. Id. at 173. In April 1979, HEW received a complaint from Richard Gellar, M.D., alleging that the district's proposed closing of Central Park Elementary (which was to be converted into Robinson Middle School) "could result in the segregated placement of students within the District on the basis of race." Id. at 181. Dr. Gellar then amended his complaint to allege that the implementation of the Long-Range Facilities Plan "has resulted in increased segregation of students in schools since 1976." Id. at 184.
 
 
 216
 The Office of Civil Rights conducted an investigation and concluded that "there is not sufficient evidence to conclude that the District's pupil assignment practices implemented pursuant to the adoption of its Long Range Facilities Plan violate Title VI." Id. at 185. The Office found that the district was complying with the Long-Range Facility Plan and "reassigning students in a nondiscriminatory manner." Id. at 186. The Office also concluded that an open enrollment policy, which permitted students to attend a school other than their neighborhood school, "had not significantly affected the racial composition of its schools at this time," but continued monitoring was promised. Id. at 187. The concern was that open enrollment would contribute to increased minority enrollments at schools with high minority percentages. During the second year of the open enrollment policy, the board imposed a majority to minority limitation on the program which assured that transfers would only be approved if they enhanced racial balance. See rec. vol. XIII at 2700-01.
 
 
 217
 By the 1981-82 school year, the Long-Range Facilities Plan was implemented. Due to the conversion to middle schools, approximately 190 teachers were reassigned in 1980 "to achieve a distribution of minority staff members which will comply with the requirements of the law." Rec. ex. vol. IV at 218. In 1981-82, the board operated 26 elementary schools, 6 middle schools, and 3 high schools. See infra note 18. The administrative staff designed the Long-Range Plan to have an integrative effect as the district court apparently recognized, but this court ignores. Rec. vol. X at 1460-1461, XIII at 2719 (deputy superintendent Henson); Brown 671 F.Supp. at 1299-1300. For example, the junior high school areas formerly served by East Topeka (71.4% minority in 1979), were combined with those of Holliday and Curtis (lower minority percentages), to be served by Chase Middle School which opened in 1980 with 38.5% minority students. Rec. vol. IV at 106, 110, X at 1461, XIII at 2722. Rice Elementary (33.6% minority in 1980), which the district court noted had a desirable racial balance, 671 F.Supp. at 1299, was closed, but its attendance area was divided between Lafayette and Belvoir, thereby reducing the minority percentage in these schools. Rec. ex. vol. IV at 109; vol. X at 1461; vol. XIII at 2721. Lafayette went from 61.3% minority to 56%, while Belvoir went from 75.6% to 62.8% minority. Rec. ex. vol. IV at 109, 122. Likewise, the closing of Crane Junior High (52.9% minority in 1974) resulted in most of those students attending Boswell which increased minority students from 14.6% to 28.5%. Id. at 88, 91. Then Boswell (42.5% minority in 1979) was combined with Roosevelt (19.5% minority in 1979), and all students were sent to the new Robinson Middle School which opened with 32.9% minority students. Id. at 106, 110; rec. vol. XIII at 2722-23. Moreover, this court points out that "the target minority percentages approved by HEW in 1976 have either been met or improved on." Court's Opinion at 878 n. 76.[17]
 
 
 218
 With one exception resulting in the combination of two middle schools (Landon into French), the school boundaries for U.S.D. 501 remained constant from the 1981-82 school year until the end of the 1985-86 school year. Rec. vol. X at 1503-04. All schools remained open and the grade configurations remained the same. Thus, in analyzing whether there is a current condition of segregation, the district court had stable boundaries for a five-year period and could analyze data which was consistent (compiled the same way) and comparable (measuring the same phenomenon). What is apparent is that the racial composition remained stable, and even became more integrated, given slightly increased minority enrollment.[18] Brown, 671 F.Supp. at 1298.IV.
 
 
 219
 Having discussed the two desegregation plans completely implemented by the board as the law developed, I now contrast the district court findings with this court's understanding of those findings. As an initial matter, it is useful to consider the scope of the school board's affirmative duty to desegregate and the scope of our review of the district court's findings.
 
 A.
 
 220
 This court tells us that "[w]hat more can and should be done, if anything, is the final component in a determination of unitary status." Court's Opinion at 865. It is up to the school district to "demonstrate thatit has done everything feasible." Id. at 866. Topeka has implemented twodesegregation plans, one court-ordered and one effectively imposed by the federal government. Apparently, this court does not think that either plan counts for much, repeating in stentorian tone, that there is "no pattern to the changes over the years." Court's Opinion at 878 (emphasis omitted). Past efforts do not conform to the court's vision of that which must be done. See id. at 878 ("The school district has unquestionably had the opportunity to draw upand execute a scheme designed to lead to comprehensive desegregation.") (emphasis added). This court is unable to see the desegregative effect of many changes because it has strayed far beyond the purpose of desegregation law.
 
 
 221
 To comply with federal constitutional standards, the purpose of a desegregation plan, whether voluntary or decreed, is to eliminate an unconstitutional dual system and its vestiges arising from state-imposed segregation. Swann, 402 U.S. at 15, 28, 91 S.Ct. at 1275, 1282. A desegregation plan should be matched with the nature and scope of the constitutional violation. Id. at 16, 91 S.Ct. at 1276; see also Pasadena City Board of Education v. Spangler, 427 U.S. 424 at 434, 96 S.Ct. 2697 at 2703, 49 L.Ed.2d 599 (1976); Milliken v. Bradley (Milliken I), 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974). The plan should be remedial, designed to restore the victims of discriminatory conduct to the position they would have been in had the discriminatory conduct not occurred. Milliken I at 746, 94 S.Ct. at 3128. And in evaluating the plan, the intrinsic value of state and local control of public education should be considered. Dayton v. Board of Educ. (Dayton I), 433 U.S. 406 at 410, 97 S.Ct. 2766 at 2770, 53 L.Ed.2d 851 (1977). To those three ends, Milliken II, 433 U.S. at 280-81, 97 S.Ct. at 2757-58, a voluntary plan should accomplish the most desegregation feasible. Feasibility includes not only geographic factors, but also funding and transportation factors. Lee v. Anniston City School System, 737 F.2d 952, 957 (11th Cir.1984). "The effectiveness of a remedy is the question and it makes no sense to construct decrees that do not grasp the real world." United States v. Pittman, 808 F.2d 385, 394 (5th Cir.1987) (Higginbotham, J., concurring). Or, as stated by the First Circuit: "A realistic approach, moreover, serves the broader objective of ensuring that the courts do not intervene in school affairs any longer than is strictly necessary." Morgan, 831 F.2d at 324.
 
 
 222
 Thus, unitary or desegregated status does not mean that every school must approach the system-wide average of minority composition. As noted by the Fifth Circuit:
 
 
 223
 The constitution does not require school districts to achieve maximum desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally. "The constitutional command to desegregate the schools does not mean that every school in the community must always reflect the racial composition of the school system as a whole." [Swann, 402 U.S. at 24, 91 S.Ct. at 1280.]. "The school board's constitutional duty is to cure the continuing effects of the dual system, not to achieve an ideal racial balance." [Lee v. Tuscaloosa City School System, 576 F.2d 39, 41 (5th Cir.1978).].
 
 
 224
 Monteilh v. St. Landry Parish School Bd., 848 F.2d 625, 632 (5th Cir.1988) (footnotes omitted); accord Morgan, 831 F.2d at 325 ("Both the Supreme Court and this court have repeatedly stated that a judicially imposed desegregation remedy goes too far if it attempts to engineer some sort of idealized racial balance in the schools."); Flax v. Potts, 864 F.2d 1157, 1160 (5th Cir.1989) ("There is no constitutional mandate that each school in the school district reflect the racial composition of the school district as a whole."); Pitts v. Freeman, 755 F.2d 1423, 1427 (11th Cir.1985) ("We do not hold, however, that the defendants' affirmative duty compels them to adopt the most desegregative alternative available."); Lee, 737 F.2d 956-57.
 
 
 225
 When the constitutional violation is purposeful separation of the races caused by school officials in student and faculty/staff assignment, "[t]he mix that would have occurred but for the racism is a judicially created hypothetical." United States v. Overton, 834 F.2d 1171, 1176 (5th Cir.1987). The remedy is to match the school system to a model of unitary or desegregated status. Id. at 1176-77. A major focus of this court's liability analysis is on schools which are predominantly white due to residential migration to the western part of Topeka. But the dominant purpose of desegregation law is to remedy the racial discrimination against minority groups, discrimination which was ineluctably part of a de jure system. See Price, 694 F.2d at 364-65. Merely because some schools are largely white in this predominantly white system is not "per se offensive to the Constitution." Valley v. Rapides Parish School Bd., 702 F.2d 1221, 1226 (5th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983). What would be offensive to the Constitution would be the retention of all-minority or virtually all-minority schools "where reasonable alternatives may be implemented." Id. (quoted in Monteilh, 848 F.2d at 633); see, e.g., United States v. Pittman, 808 F.2d 385, 391 (5th Cir.1987) (rejecting magnet school plan which did not eliminate 2 one-race black schools serving 40% of the black elementary students). Given the district court's findings, that condition is not present here because: 1) there are no all-minority or virtually all-minority schools in this system, and 2) those schools which have higher than average concentrations of minority students are not due to the effect of segregative actions by the defendants given the well-supported findings of the district court.
 
 
 226
 The court also indicates its concern with the few schools which have majority-minority or near majority-minority student enrollments, see supra note 18. Court's Opinion at 869 n. 52, 872-73 n. 59. In a system which has achieved unitariness, a "no majority of any minority" requirement would be beyond what the Constitution requires. Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 434, 96 S.Ct. 2697, 2703, 49 L.Ed.2d 599 (1976). But even in a system which has not been declared unitary, the lack of absolute racial balance which is not attributable to the school board is not tantamount to hindering the process of desegregation.
 
 B.
 
 227
 Although this case involves constitutional claims of racial segregation by school officials, it is essential to keep in mind the proper division of functions between this court and the district court. Dayton Board of Educ. v. Brinkman (Dayton I), 433 U.S. 406, 410-11, 97 S.Ct. 2766, 2770-71, 53 L.Ed.2d 851 (1977). The district court is charged with hearing the evidence and rendering findings of fact. Our task is to review those findings under the clearly erroneous standard, with due regard for the power which Congress has invested in the district courts to make such findings. See Fed.R.Civ.P. 52(a). "The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court." Anderson, 470 U.S. at 573, 105 S.Ct. at 1511. Overstep, we have!
 
 
 228
 "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (emphasis added). This standard is not a license to replace the district court's view of the evidence with that of the reviewing court; the reviewing court may not reverse merely because it would have viewed the evidence differently or "given greater weight to certain evidence." 5A J. Moore & J. Lucas, Moore's Federal Practice, p 52.03 (1989); accord Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 855-58, 102 S.Ct. 2182, 2189-91, 72 L.Ed.2d 606 (1982); United States v. National Ass'n of Real Estate Bds., 339 U.S. 485, 495-96, 70 S.Ct. 711, 717-18, 94 L.Ed. 1007 (1950). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574, 105 S.Ct. at 1511. Applying these standards, the district court should be affirmed.
 
 
 229
 There is "great value" in relying on the factual findings of the district court. Dayton II, 443 U.S. at 534-35 n. 8, 99 S.Ct. at 2977-78 n. 8. The intent inquiry in school desegregation litigation almost always concerns objective numerical evidence that is circumstantial, in addition to testimonial evidence by school officials and other desegregation experts. Given the law, the intent inquiry in a desegregation case, including whether segregative intent from 1954 and beyond remains due to non-compliance with the board's affirmative duty, "is an issue that can present very difficult and subtle factual questions." See Columbus, 443 U.S. at 470-71, 99 S.Ct. at 2983-84 (Stewart, J., concurring in result).
 
 
 230
 This court apparently views its initial inquiry, concerning a current condition of segregation, as largely numerical. But "[W] here numbersalone are insufficient to define racially identifiable schools," the court invokes a broader form of racial identifiability which concerns "demography, geography, and the individual history of particular schools and areas of the city," to virtually assure liability. See Court's Opinion at 861. This approach is the one urged by plaintiffs' expert, Mr. Lamson. See rec. vol. III at 285-286, vol. IV at 459, 493-94, 522. While it is indisputable that racial identifiability may exist without reference to student assignment, and that faculty/staff assignment, facilities or extracurricular activities may result in a school being racially identifiable, see Keyes, 413 U.S. at 196, 93 S.Ct. at 2691 (citing Keyes v. School District No. One, 313 F.Supp. 61 at 74 (D.Colo.1970); Swann, 402 U.S. at 18, 91 S.Ct. at 1277, the court's expanded definition of racial identifiability is not supported by several of the cases it cites.[19] Court's Opinion at 861 n. 25.
 
 
 231
 The court justifies its de novo review of the numerical data as follows:
 
 
 232
 As a general matter, it is important to note that much of the record evidence consists of statistics and other undisputed facts. Our differences with the district court lie mainly in how the essentially undisputed facts are assessed in light of the school district's mandate to dismantle the segregated school system. We believe that the district court's finding of unitariness is flawed by the undue deference it gave to the school district's neighborhood school policy and the court's failure to give the proper weight to its own findings that certain actions and omissions by the school district had a segregative effect.
 
 
 233
 Id. at 868-69 (footnotes omitted). The court then makes the rather incredible statement that, in reaching its decision, "we did not rely upon the experts' opinions." Id. at 868 n. 50; compare id. at 869 n. 52 ("In a school district with a 26% minority student population, we think the number of schools in Topeka that approach or are over the 50% minority mark constitute persuasive evidence that the school system has not met its duty to desegregate.") with rec. vol. V at 622-23 (Dr. Foster's citing the presence of 3 elementary schools which are over 50% minority and 4 which are over 42% minority when asked his opinion of whether vestiges of the former dual school system exist).
 
 
 234
 The court contends that its disagreement with the district court merely concerns assessment of "essentially undisputed" facts, id. at 869, and of "basically uncontroverted evidence," id. at 868 n. 50; however, in no way can it be said that the implications of the numerical data in this case were uncontested. Indeed, the month-long trial of this case belies that notion. Moreover, the characterization of the numerical data is inherently the province of the district court.
 
 
 235
 In 1985, the Supreme Court settled that the clearly erroneous standard applies "even when the district court's findings do not rest on credibility determinations, but are based on physical or documentary evidence or inferences from other facts." Anderson, 470 U.S. at 574, 105 S.Ct. at 1511. In 1985, Rule 52 also was amended to encompass documentary evidence. The Advisory Committee addressed and rejected considerations offered in support of the view that it was not necessary to give special deference to factual determinations based on documentary evidence as opposed to credibility determinations:
 
 
 236
 These considerations are outweighed by the public interest in the stability and judicial economy that would be promoted by recognizing that the trial court, not the appellate tribunal, should be the finder of the facts. To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.
 
 
 237
 Advisory Committee on Civil Rules, Proposed Amendments to the Rules of Federal Civil Procedure, 105 F.R.D. 218, 223 (1984). There are sound policy reasons for adhering to the clearly erroneous rule in all cases, whether documentary or testimonial evidence is involved.
 
 C.
 
 238
 Another reason given for this court's rejection of the district court's factual findings is that it gave "undue deference" to the school district's neighborhood school policy. Court's Opinion at 869. A neighborhood school policy is not, in and of itself, violative of the fourteenth amendment. Crawford v. Board of Educ., 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217 n. 15, 73 L.Ed.2d 948 (1982). Just as equal educational opportunity is a national policy, so too is neighborhood schooling. See 20 U.S.C. § 1701. There are significant advantages to neighborhood schooling, such as students walking to school, the absence of long bus rides, easier participation in extracurricular activities and possibly greater parental involvement. Of course, the advantages of neighborhood schools cannot outweigh the school board's duty to comply with the Constitution and "dismantle the dual school system." Swann, 402 U.S. at 28, 91 S.Ct. at 1282. To that end, this court has insisted that a neighborhood school plan be "impartially maintained and administered," and "not used as a mask to further and perpetuate racial discrimination." Dowell, 375 F.2d at 166.
 
 
 239
 The Supreme Court has spoken in the remedial phase of school desegregation litigation concerning neighborhood school plans:
 
 
 240
 Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.
 
 
 241
 No fixed or even substantially fixed guidelines can be established as to how far a court can go, but it must be recognized that there are limits. The objective is to dismantle the dual school system. "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly non-discriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral.
 
 
 242
 Swann, 402 U.S. at 28, 91 S.Ct. at 1282. As the above passage makes clear, it is a present constitutional violation which empowers a federal court to depart from a neighborhood school plan in favor of some other form of assignment in order to dismantle a dual school system. See Davis v. Board of School Commr's, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971) (remedy dependent on having found a violation). If the dual school system has been dismantled and there is no constitutional violation, a neighborhood school policy is constitutionally permissible.
 
 
 243
 In the liability phase of this case, it was entirely appropriate for the district court to consider whether the school district had maintained and administered its neighborhood school policy in a neutral fashion, particularly because the district court found that "the effects of school segregation on residential choice, if any, are not cognizable today." Brown, 671 F.Supp. at 1297 (emphasis added). There are other reasons to reject the court's criticism of the district court's findings on this point. See Court's Opinion at 867, 867, n. 48. First, the district court was compelled to make its findings that the board maintained its neighborhood school policy in a race-neutral fashion because the major part of the plaintiffs' case was devoted to proving otherwise. See, e.g., rec. vol. II at 23-26; vol. X at 1418; supp. vol. XI at 241 (summaries of Mr. Lamson's findings). That is crystal clear on this 3,000 page plus record. The district court found that the neighborhood boundaries were not gerrymandered. Brown, 671 F.Supp. at 1301. Second, a fair reading of the district court's opinion in this case makes it evident that the district court was well aware of its responsibility to look beyond direct evidence concerning the intent of the school board, and also consider a foreseeability test in deciding whether the school board had failed to dismantle the dual system. The district court looked beyond the neighborhood school plan for segregative effect, thoroughly analyzing quantitative measures of racial composition.
 
 D.
 
 244
 Another reason the court gives for rejecting the district court's factual findings is that this court would weigh the evidence differently. Court's Opinion at 869 (discussing "court's failure to give proper weight to its own findings that certain actions and omissions by the school district had a segregative effect" and citing Diaz v. San Jose Unified School Dist., 733 F.2d 660 (9th Cir.1984) (en banc), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985), for an analagous proposition about clearly erroneous district court findings concerning segregative intent). Regrettably, this court does not give a fair recitation of the district court findings. We are told: "The district court made the following findings:
 
 
 245
 (1) that the neighborhood school attendance boundaries drawn in 1955 had the effect of maintaining segregation." Court's Opinion at 867 (emphasis added). What the district court said was:
 
 
 246
 A review of the school boundaries as they have developed over thirty years does not reveal a segregative pattern that remains today. The boundaries set around the former de jure black elementary schools after this case was remanded by the Supreme Court appear to have perpetuated the racial identity of those schools. But, the schools have long been closed and the segregative effects of those boundaries have attenuated entirely.
 
 
 247
 Brown, 671 F.Supp. at 1300. It was not clearly erroneous for the district court to find that 1955 boundaries for closed schools do not figure large into the current situation, over 30 years later. Though a court must look closely and carefully, conduct which resulted in segregative effect thirty years ago may indeed be so attenuated as to be insufficient to support a finding of intentional segregation caused by the school board. Keyes, 413 U.S. at 211, 93 S.Ct. at 2698; Higgins v. Board of Educ., 508 F.2d 779, 792 (6th Cir.1974). Moreover, this finding demonstrates that the district court did consider the effect of school board action or inaction.
 
 
 248
 (2) "that the construction of new schools since that time had the effect of 'promot[ing] racial separation;' " Court's Opinion at 867 (emphasis added).
 
 The district court said:
 
 249
 Although, on its face, the construction of schools, particularly on the west side of the district, appears to have promoted racial separation, the court does not believe that the district's school construction policy was intended to maintain or promote segregation. Most of the construction occurred during the peak years of student enrollment. More schools were needed. The location of the schools in areas of residential expansion was consistent with the race-neutral neighborhood school concept. There is no evidence that the students attending these schools could have been accommodated in the existing schools or that land was available in the older, more racially mixed areas of the district to build new schools.
 
 
 250
 ....
 
 
 251
 In sum, it does not appear that the district's school construction policy has promoted segregated residential patterns or segregated schools.
 
 
 252
 Brown, 671 F.Supp. at 1300 (emphasis added). This is a key finding, because with it, the trial court rejected Mr. Lamson's theory that the school board could have sent students to inner city schools with higher minority concentrations that were underutilized, rather than construct new facilities in areas that were expanding and predominantly white. See, e.g., rec. vol. II at 150-51, 179; III at 268-73, 311-14, 334-36; supp. vol. XI at 40-49. Contrary to this court's opinion, the trial court did not find that school construction since 1955 promoted racial separation.
 
 
 253
 (3) "that the reassignment of students from previous de jure schools to adjacent schools with higher-than-average percentages of minority students had the effect of increasing those percentages;" Court's Opinion at 867 (emphasis added). The district court discussed only one situation involving a de jure school on the page cited by this court, namely the transfer of Monroe students to Quinton Heights elementary school. See 671 F.Supp. at 1301. Monroe was closed at the end of the 1974-75 school year because at the beginning of that school year it only had 102 students. Rec. ex. vol. IV at 84, 90. Students were reassigned to Polk, Highland Park North and Quinton Heights. Rec. supp. vol. XI at 173. The minority percentage at Quinton Heights went from 37% (84 out of 227) in 1974-75 to 39.09% (77 out of 197) in 1975-76. Rec. ex. vol. IV at 87, 94. Thus, after Monroe closed, 7 fewer minority students attended Quinton Heights even after the Monroe students were added. Given that the percentage increase (2.09%) of minority enrollment was so small and was accompanied by a decrease in the absolute number of minority enrollment, it is hard to fault the district court for finding that the school district did not act improperly when it sent Monroe students to three neighborhood schools, including Quinton Heights.
 
 
 254
 (4) "and that the assignment of faculty had the effect of placing minority faculty disproportionately at schools with higher-than-average minority student percentages." Court's Opinion at 867 (emphasis added).
 
 The district court said:
 
 255
 Plaintiffs' major contention with regard to faculty and staff is that the assignment of faculty and staff has served to racially identify the schools in the district.
 
 
 256
 ....
 
 
 257
 Examining the school system as a whole, despite the tendency to have more minority staff in schools with a greater than average minority student population, the court does not believe the district's assignment policies serve to identify schools as intended for white or black students. The pattern identified by plaintiffs is not monolithic. The current percentages of minority staff in the district's schools are generally within ranges acceptable to other courts in desegregation litigation. Other facets of faculty and staff policies are nondiscriminatory. In sum, the record before the court with regard to the district's approach to faculty and staff is not indicative of a dual system of education.
 
 
 258
 Id. at 1304-05. As discussed below, the faculty/staff assignment pattern in this case was almost within the range set by plaintiffs' own expert, Dr. Foster, for the one year in which substantially complete data was available to him. See infra note 31 and accompanying text. The district court's finding that the faculty/staff assignment was not indicative of a current condition of segregation is supported by the record, particularly considering the assignment figures for the 1986-87 year.
 
 
 259
 Continuing with its description of the lower court findings, this court concludes that (5) "the school district's use of space additions, [ (6) ] its siting of Topeka West high school, [ (7) ] its drawing of attendance boundaries, and [ (8) ] its failure to adopt various reorganization plans did not further the process of desegregation." Court's Opinion at 867 (emphasis added) (citing Brown 671 F.Supp. at 1298-1301, 1308-09). That is only true if desegregation is viewed as replicating the system-wide minority average in every school, in addition to eliminating a de jure system and its vestiges. The emphasis of the plaintiffs' case was on the alleged segregative intent and effect of school board actions and the board's inattention to racial balance. The board came forward with legitimate, non-discriminatory reasons (strong enough to disprove segregative intent) for many of its actions and attributed the racial composition of several schools to demographic forces. More importantly, the school board was able to convince the district court that there was not a current condition of segregation in Topeka, something which is amply supported by the record and not refuted by this court's opinion.
 
 
 260
 Contrary to the study by the plaintiffs' expert, the district court found that space additions were not "intentionally used to promote segregation or that schools are racially imbalanced today because of space additions." Brown, 671 F.Supp. at 1299.
 
 
 261
 As for the siting of Topeka West high school, it must be remembered that Topeka never had a dual system of education at the high school level. The site for Topeka West was acquired in the early or mid-50's from a single family because it was big (40 acres) and well-located. Rec. vol. X at 1433, 1506-07. The district court found that the construction of Topeka West was a logical response to the overcrowding of Topeka High and the rapid population growth which was occurring in the western part of the district. Brown, 671 F.Supp. at 1300; see also rec. ex. vol. I at 14 (building patterns indicating that over half of new housing built in Topeka from 1950-70 was in the west area); rec. vol. X at 1432-33 (Topeka High School was overcrowded; Topeka West was built, without a planned athletic facility, only after a second bond election). Topeka doubled in population between 1955 and 1965. Rec. supp. vol. VII at 2094. Indeed, the enrollment at Topeka West was so great that some of the attendance area was transferred back to Topeka High School, furthering integration. Rec. vol. X at 1434. A site in west Topeka made sense because the newly annexed Highland Park High served the east part of the city, while Topeka High was centrally located. Brown, 671 F.Supp. at 1300; rec. ex. vol. I at 14. Moreover, the site was large enough to meet the school board's needs. Rec. vol. X at 1507.
 
 
 262
 Reorganization plans N and X, proposed in 1984, assumed that no school would have a minority enrollment of greater than 50%, and projections indicated that number would be reduced to 45%. Rec. ex. vol. V at 51; Brown, 671 F.Supp. at 1308-09. In 1985-86, three schools had majority-minority populations: Belvoir (61.86%); Lafayette (56.81%) and Highland Park North (57.93%). Brown, 671 F.Supp. at 1294. The district court was correct in finding that Plans N and X did not constitute a forgone opportunity to improve the racial composition of the schools. Indeed, the failure of Topeka to adopt Reorganization Plans N and X in 1984 should count for nothing in this case. See Court's Opinion at 877 n. 75 (acknowledging opposition to plans). If there is one consistent theme in this record it is that the plans were expensive ($13 million for N; $15 million for X) and that they were opposed by every segment in Topeka. See rec. vol. XII (testimony of former board members) at 2451 (opposition came from every quadrant geographically, as well as every racial segment), 2452 (plans were expensive), 2467 (cost of plans), 2471-72 (plans would have closed many schools and created some very large schools), 2479 (no sector of community would support plans), 2481 (NAACP vigorously opposed plans); vol. XIII (testimony of deputy superintendent) at 2728 (community attached tremendous importance to neighborhood schools and opposed plans).
 
 
 263
 In determining that there is no current condition of segregation in Topeka, the district court carefully examined 18 factors: statistical measures of student population; student transfer policy; optional attendance zones; space additions; school closings; school openings; school site locations; school boundary locations; history of the schools; facilities; extracurricular activities; curriculum; transportation; faculty and staff; community attitudes; equality of education; opportunities for desegregation; and other factors. The district court properly examined the traditional factors which bear on unitariness, in addition to those factors raised by plaintiffs which might have a bearing on unitariness. Baliles, 829 F.2d at 1312. Its findings in favor of the defendants in each area are supported by the record, and its ultimate finding of unitariness is likewise supported.
 
 V.
 
 264
 This court's criticism of the district court is succinctly stated:
 
 
 265
 The court evidently believed that if these two criteria, i.e., no intent to discriminate and consistency with a race-neutral neighborhood school plan, were met, the school district's actions would pass constitutional muster.
 
 
 266
 ....
 
 
 267
 While it did find that the school district had taken some actively desegregative actions, we are convinced that the court's overall conclusion on unitariness was fatally infected by the inadequacy of the burden of proof to which it held the school district.
 
 
 268
 Court's Opinion at 867, 868. The district court's attention to the neighborhood school plan already has been discussed in part. See supra p. 913-14. This court misses the mark if it is implying that intent is not relevant in this case. At a minimum, there must be a finding that the condition complained of is the effect of discriminatory intent, whether that discriminatory intent originated in 1954 or since. The district court made permissible inferences given the evidence. It determined that there was not a current condition of segregation and, therefore, the plaintiffs were not entitled to a presumption that the racial imbalance in the school system was a product of past segregative actions.
 
 
 269
 The whole of desegregation law is predicated upon a constitutional violation. "The school desegregation cases have also adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). The Constitution does not employ a no-fault approach to liability when it comes to school board actions. Contrary to the court's opinion, intent is still relevant because it bears on causation. Only intentional state action which brings about or maintains segregation results in a constitutional violation. Columbus, 443 U.S. at 464, 99 S.Ct. at 2950. Even in a system that once was dual, whether by statute or practice, "[d]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation.... [But] actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." Id. Thus, a district court may consider a school board's adherence to a neighborhood school policy which may lead to racial imbalance, as one factor among many, in deciding " 'whether an inference of segregative intent should be drawn.' " Id. at 465, 99 S.Ct. at 2950 (quoting Penick v. Columbus Bd. of Educ., 429 F.Supp. 229, 255 (S.D.Ohio 1977), aff'd in part and vacated in part, 583 F.2d 787 (6th Cir.1978), aff'd, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979)). "The inference is permissive, not mandatory." Higgins, 508 F.2d at 793 ("While it is true that a court may infer such an intent [purposeful segregation] from the circumstances there is no authority for the proposition that such an intent must be inferred in all cases where segregated patterns exist in fact") (emphasis in original).
 
 In Dayton II, the Court said:
 
 270
 We have never held that as a general proposition the foreseeability of segregative consequences makes out a prima facie case of purposeful racial discrimination and shifts the burden of producing evidence to the defendants if they are to escape judgment; and even more clearly there is no warrant in our cases for holding that such foreseeability routinely shifts the burden of persuasion to defendants. Of course, as we hold in Columbus today, ante [443 U.S.], at 464-65 [99 S.Ct. at 2950-51], proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose, and it may itself show a failure to fulfill the duty to eradicate the consequences of purposefully discriminatory conduct.
 
 
 271
 Dayton II, 443 U.S. at 536 n. 9, 99 S.Ct. at 2978 n. 9. Merely because Topeka built and operated neighborhood schools that fall outside the statistical measures proposed by plaintiffs' experts does not mean that there is a current condition of segregation in Topeka. After two desegregation plans, this case is, at best, one of "foreseeability" based upon effect, although plaintiffs contended that they had shown more. See, e.g., rec. vol. II at 23-26 (opening statement), III at 381 (plaintiffs' expert cataloged effect of school board actions), IV at 449 (plaintiffs' expert took "racial balance as your starting point," in proposing alternatives to board's administrative choices).
 
 
 272
 To be sure, "the measure of the post-Brown I conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." Dayton II, 443 U.S. at 538, 99 S.Ct. at 2979; Columbus, 443 U.S. at 458-59, 99 S.Ct. at 2946-47; Green, 391 U.S. at 437-38, 88 S.Ct. at 1693-94. That, however, does not bar the district court from considering the school board's evidence that its actions have been effective in dismantling the dual system, that the current racial composition of the school system is not a product of discriminatory intent originating before Brown I and living on in effect to the present day. This court's opinion, by downplaying intent and causation, specifically the school board's evidence that segregative effects of past discriminatory intent no longer remain, has imposed liability based on the inferences it wishes to draw from certain objective evidence and testimony upon which reasonable people could differ as to interpretation. On the surface, this process may appear to have the advantage of simplicity and consistency. But the close evidence in this case was hardly simple and we are not allowed such consistency at the expense of district court findings which have support in the record.
 
 
 273
 The district court was well aware that quantitative data in school desegregation cases may be indicative of past or present segregative intent. Brown, 671 F.Supp. at 1295. It also was cognizant of the school board's affirmative duty to dismantle the dual system. Id. at 1292-93. Finally, the district court recognized that it could draw an inference of segregative intent or an inference of the lack thereof, based upon the efficacy of the school board's desegregation efforts, including compliance with its affirmative duty:
 
 
 274
 Evidence of segregative motive or the absence of such intent is relevant but not controlling in determining unitariness. "The measure of the post-Brown I conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." Dayton II, supra, 443 U.S. at 538, 99 S.Ct. at 2935.
 
 
 275
 In sum, a unitary school system is one in which the characteristics of the 1954 dual system either do not exist or, if they exist, are not the result of past or present intentional segregative conduct of defendants or their predecessors.
 
 
 276
 Brown, 671 F.Supp. at 1293.
 
 
 277
 The court shall examine many factors to decide whether illegal segregation exists in U.S.D. # 501. But, the statistical measures of racial makeup of the schools' student bodies are of prime importance. Often in school desegregation cases such statistics alone prove a pattern of discrimination.
 
 
 278
 Id. at 1295.
 
 
 279
 If a district has consistently dragged its feet on desegregation, then the vestiges of the segregated system may remain.
 
 
 280
 Id. at 1308. Thus, I vehemently disagree with the court's conclusion that the district court incorrectly considered intent, while ignoring the board's affirmative duty.
 
 
 281
 The district court in this case discussed those factors which supported an inference of segregative intent or non-compliance with the affirmative duty to desegregate. It then explained why it rejected those inferences. See Alexander v. Youngstown Bd. of Educ., 675 F.2d 787, 792-93 (6th Cir.1982) (trial court may reject inferences of segregative intent). That critical discussion, however, is the departure for this court's reversal. See Court's Opinion at 867 (summarizing district court's findings). This court simply does not agree with the district court's declining to draw those inferences. Although this court claims that the district court did not properly evaluate the evidence for segregative effect, no fair reading of the district court opinion would support that conclusion. The district court's exhaustive discussion of statistical racial identifiability and its implications, as well as its detailed treatment of each school alleged to be racially identifiable, belie this court's conclusion that the district court "failed adequately to weigh the conduct of the school district." Id. at 868.
 
 
 282
 Perhaps the court has decided to dispense with the intent and causation inquiry because it seeks to ameliorate the effects of "subconscious racial discrimination." Court's Opinion at 865-66. Indeed, the court'sremark concerning "longstanding racism" carries with it an implication which is unwarranted. See Id.at 866 ("Courts must assess the school district's achievements with an eye to the possible and practical, but they must not let longstanding racism blur their ultimate focus on the ideal."). The court's explanation of the presumption it invokes, which I maintain is the same presumption discussed in Keyes, conforms with the tenor of the court's opinion:[20] "This presumption ensures that subconscious racial discrimination does not perpetuate the denial of equal protection to our nation's school children." Court's Opinion at 863 (footnote omitted).
 
 
 283
 The court tells us that a presumption different than the one in Keyes, see supra note 20, applies in this case because the school district was operating a de jure system in 1954. Court's Opinion at 862-63, 863 n. 27. Reliance is placed on a footnote in Keyes, 413 U.S. at 211 n. 17, 93 S.Ct. at 2699 n. 17. That footnote is contained in a discussion of defenses the school board may raise to the prima facie case, including the defense that the effects of past segregative acts have been completely attenuated. The footnote explains that once the presumption is invoked, plaintiffs are not forced to prove non-attenuation because the burden shifts to the school board to prove attenuation. Id. Express language in Keyes makes it clear that the presumption is not limited only "to establish[ing] initial de jure segregation in a case where no statutorily mandated segregation exists." Court's Opinion at 863 n. 27. The Keyes Court stated:
 
 
 284
 Thus, be it a statutory dual system or an allegedly unitary system where a meaningful portion of the system is found to be intentionally segregated, the existence of subsequent or other segregated schooling within the same system justifies a rule imposing on the school authorities the burden of proving that this segregated schooling is not also the result of intentionally segregative acts.
 
 
 285
 413 U.S. at 210, 93 S.Ct. at 2698; see also Columbus, 443 U.S. at 457 n. 5, 99 S.Ct. at 2946 n. 5.
 
 
 286
 The reason for the presumption is that " 'the prior doing of other similar acts, whether clearly part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent.' " Keyes, 413 U.S. at 207-08, 93 S.Ct. at 2696-97 (quoting 2 J. Wigmore, Evidence 200 (3d ed. 1940)). Thus, "a finding of illicit intent as to a meaningful portion of the item under question has substantial probative value on the question of illicit intent as to the remainder." Keyes, 413 U.S. at 207-08, 93 S.Ct. at 2696-97. The Supreme Court has yet to incorporate subconscious racial discrimination into the equal protection analysis.[21] While a finding of de jure segregation pursuant to statute in 1954 eases the plaintiffs' evidentiary burden, Columbus, 443 U.S. at 457 n. 5, 99 S.Ct. at 2946 n. 5, intent, whether proven by direct or circumstantial evidence, remains an essential element. This court apparently concedes as much, when in the context of its discussion of the burden of proof and unitariness states:
 
 
 287
 Finally, objective proof of the school district's intent must be considered. How a district lobbies its patrons and government agencies on issues that affect desegregation, whether it seeks and heeds the desegregation recommendations of others, and the cooperativeness of the district in complying with court orders, for example, bear on the manner in which the district has shaped current conditions in the school district.
 
 
 288
 Court's Opinion at 865 (emphasis added and footnotes omitted). Several cases, including one of our own, also have considered good faith of the school district in deciding unitariness. Dowell v. Board of Educ., 890 F.2d 1483, 1499 (10th Cir.1989); Morgan, 831 F.2d at 321; Ross, 699 F.2d at 226. Good faith speaks to intent and causation and making such inquiries is inconsistent with claiming that intent is irrelevant.
 
 
 289
 The court comments that: "A focus on provable intent alone would deny a remedy to too many Americans." Court's Opinion at 863. While this may be true once there has been a finding of a current condition of segregation in a meaningful portion of a school system with a relevant history of segregation by law, see Keyes, 413 U.S. at 210, 93 S.Ct. at 2698, such a finding should be a prerequisite to invoke the presumption discussed in Keyes and insure that any resultant system-wide desegregation order is linked to past or present racial discrimination. What the court has done in this case is to substitute its judgment for that of the district court concerning the degree of imbalance necessary to invoke and sustain the presumption. Nowhere is this more evident than in the court's discussion of whether there is a current condition of segregation with respect to student and faculty/staff assignment in the Topeka schools.
 
 VI.
 
 290
 It is clear that to sustain the presumption, the plaintiffs were required to prove "a current condition of segregation from intentional state action" with respect to "a meaningful portion of [the] school system."[22] Keyes, 413 U.S. at 205, 208, 93 S.Ct. at 2696, 2697. "Significant racial imbalance" in schools may operate as a "signal" to shift burden of proof, but even that "is a very different matter from equating racial imbalance with a constitutional violation calling for a remedy." Milliken v. Bradley (Milliken I), 418 U.S. 717, 741 n. 19, 94 S.Ct. 3112, 3125 n. 19, 41 L.Ed.2d 1069 (1974). Turning first to student assignment, what the court has done is to decide that if certain schools do not fall within certain percentages of minority enrollment, say 11% to 41% or even 10% to 60%, those schools are racially identifiable and indicative of a current condition of segregation resulting from the prior de jure system. Court's Opinion at 869-70.
 
 A.
 
 291
 Plaintiffs' expert Mr. Lamson testified that a school was racially identifiable as black if it had more than twice the system-wide average of black students. Rec. vol. III at 365. In 1985-86, the black student percentage was 18.4%, so a school with than more than 36.8% black students would have been racially identifiable. On the other hand, a school was racially identifiable white if it had less than one-half the system-wide average of black students. Id. Thus, a school would have been racially identifiable white if it had less than 9.2% black students. Moreover, under Mr. Lamson's view of racial identifiability, a school which had the system-wide average of black students still might be racially identifiable and segregated if neighboring schools had a greater percentage of white students. Rec. vol. IV at 531-32. Thus, according to his view, in 1952-53, Belvoir was segregated when it had 20.8%[23] black students and system-wide black percentage was 11%. Id. at 456-59. Likewise, in 1985-86, Robinson Middle School was racially disproportionate, according to Mr. Lamson, when it had 20.84% black students and the system-wide middle school black percentage was 19.01%. Id. at 486-88. Plaintiffs' expert Dr. Foster did not agree with Mr. Lamson that a school which had the system-wide minority average still could be racially identifiable. Rec. vol. V at 687-88.
 
 
 292
 Dr. Foster advocated using a measure of ± 15% of the system-wide minority percentage to come up with racially identifiable schools, although he acknowledged using ± 20% in other cases he had worked on. Rec. vol. IV at 549-51; vol. V at 705-10. When the system-wide minority percentage was below 15% or 10%, Dr. Foster used a sliding scale of ± 10% or ± 5%. Rec. vol. IV at 553-54, 575-78. The trial judge seems to have analyzed the plaintiffs' case in part with a ± 15% standard. Brown, 671 F.Supp. at 1295-96; see rec. vol. V at 578. But he came to a very different ultimate finding than this court, which has attached far more significance to the measure: "[W]e believe it perfectly reasonable to use a ± 15% deviation in assessing whether the school system ever achieved unitariness." Court's Opinion at 870 n. 54. Using this standard, there were 15 racially identifiable elementary schools in 1985-86; 7 racially identifiable minority, 8 racially identifiable white. Rec. vol. V at 593, 711; supp. vol. XIII (pl. ex. 155D); see Court's Opinion at 872-73 n. 59. There were 4 racially identifiable secondary schools using the ± 15% standard; 1 racially identifiable minority, 3 racially identifiable white. Rec. supp. vol. XIII (pl. ex. 155G); see Court's Opinion at 872-73 n. 59.
 
 
 293
 The court discusses the testimony of defendant's expert, Dr. Armor, and gives the impression that Dr. Armor suggested a standard whereby a school would not be racially identifiable (segregated) if it contained minority students within a 10% to 60% range. Court's Opinion at 870, 873 see also id. at ---- (court's discussion of "predominantly white schools."). The court then concludes, using this standard, that there are 9 schools which are racially identifiable. Id. at 870. Yet, Dr. Armor was critical of the concept of basing liability on quantitative measures of racial identifiability.[24]
 
 
 294
 In the interest of completeness, this court should have summarized Dr. Armor's testimony concerning the implications of his "range of acceptability of 10-60%." Id. at 870. This court should have explained that Dr. Armor, under questioning from the court, offered his conclusion, based on three quantitative measures (his absolute standard, the dissimilarity index and the relative exposure index) that the school board had met its affirmative duty under Brown I and had desegregated the elementary grades as to student assignment.[25] Rec. vol. XIII at 2641-42. Had the court done so, it would not have been able to attribute a finding of nine racially identifiable schools by student assignment which result in a current condition of segregation, to Dr. Armor. See Court's Opinion at 870, 873, 884 (invoking Dr. Armor's approach to justify findings).
 
 
 295
 Dr. Armor did point out that under his 10-60% range, one elementary school (Belvoir; 61.86) exceeded it and five elementary schools fell below it (Crestview, 8.94%; Gage 9.43%; McCarter, 9.16%; McClure, 7.21%; Potwin 7.73%). Rec. vol. XIII at 2580; ex. vol. IV at 170-74. Applying this 10-60% range to the secondary schools, three schools were below (French, 6.23%; Landon, 9.29% [now closed]; Topeka West, 7.94%). See rec. ex. vol. IV at 175-76. However, Dr. Armor preceded and concluded his list with the caveat that merely being outside his range is not necessarily indicative of a current condition of segregation. Rec. vol. XIII at 2579, 2580. This is in accord with plaintiffs' expert Dr. Foster who admitted that racially identifiable schools under his ± 15% standard are not necessarily unlawfully segregated. Rec. vol. VI at 792-93. Dr. Armor testified as follows:What I have been talking about in terms of this standard or a definition of integrated school has been primarily from the social science conception of what would constitute, what we ought to define as an integrated school or a desegregated school. It doesn't necessarily mean that a school that falls outside that range is, is in violation of the [C]onstitution or is wrong or is improper. One has, in any liability analysis one has to add to that--even my standard one needs to add the analysis of why a school is 5 percent minority or 70 percent minority outside my ideal range because if it's not, if it's that way because of demographic factors, then I don't, I don't see necessarily a basis for why it has to be changed; but I would still hold that ideally or what you strive for ought to be schools within that range.
 
 
 296
 Rec. vol. XIII at 2579. The district court's finding that "students are not separated on the basis of race," Brown, 671 F.Supp. at 1298, is supported by Dr. Armor's testimony and the factual findings regarding the above schools contained in the balance of the district court's opinion. Id. at 1294, 1301-04.
 
 
 297
 Assuming, arguendo, that this court's interpretation of Dr. Armor's testimony concerning the 10-60% range had merit, I submit that it would be anomalous to find a current condition of segregation regarding student assignment based on only one elementary school (Belvoir) which exceeded the target minority percentage and just barely (by 1.86%). Regarding the 8 predominantly white schools mentioned by Dr. Armor, in a system with low minority percentages overall, it is not unexpected to find some schools which will have large percentages of white students. Court's Opinion at 869. More importantly, every single one of those predominantly white schools identified by Dr. Armor, with the exception of McCarter (which went from a 9.20% minority percentage to 9.16%), has increased the percentage of minority enrollment when the 1985-86 figures are compared to those in 1981-82. See supra note 18.
 
 
 298
 Moreover, the district court considered other measures of integration in deciding that unlawful segregation did not exist. Brown, 671 F.Supp. at 1298. Specifically, Dr. Armor testified concerning the dissimilarity index and the relative exposure index which are measures of system-wide integration. It is passing strange for the court to all but dismiss the significance of these measures in its discussion of whether there is a current condition of segregation, yet report them[26] and rely upon them concerning the positive effects of the board's implementation of its second desegregation plan. Court's Opinion at 870 n. 55 (rejecting measures because they would not identify a hypothetical all-black school), 875-76, 876 n. 71 (relying on measures to indicate success of school district's desegregation efforts from 1975-81). The court's criticism of these measures, that "they say nothing about the racial balance in individual schools," Court's Opinion at 870 n. 55, is really only partially correct because the formulas rely upon data concerning each individual school. Dr. Armor readily indicated that these indices are to be supplemented by looking at individual schools. Rec. vol. XIII at 2655; see also Court's Opinion at 870 n. 55. And so the district court did.
 
 
 299
 The dissimilarity index measures the departure of a school system from perfect racial balance.[27] Id. at 2581. If every school had the system-wide minority composition, there would be perfect racial balance and the index would have a value of zero. Id. On the other hand, if every school were completely segregated, the index value would be expressed as 1.0 (or 100).[28] Id. The relative exposure index measures the opportunity for interracial contact given the number of whites and minorities in the system. Id. at 2582. A value of zero indicates total interracial contact, whereas a value of 1.0 (or 100) indicates a total separation. Id. Thus, regarding either measure, a decreasing value reflects a desegregative effect. Dr. Armor preferred the exposure index because it is less a measure of racial balance. Id. at 2583.
 
 
 300
 Dr. Armor calculated the dissimilarity index and relative exposure index for Topeka over time.[29] Regarding the elementary schools, he testified that from 1966 to 1985 both indices dropped significantly indicating that: 1) there has been a "very substantial decline in the level of segregation" over 20 years, and 2) this improvement came at a time when the percentage of minority students increased from less than 20% (16.5%) to its present level of 26%, and 3) the 1985 value of approximately 15 in the exposure index suggests that a "very substantial degree of interracial contact" is occurring at the elementary level. Id. at 2587. Regarding the middle schools, he reported similar trends, though not quite as dramatic: declines in both indices, improvement during a time when the percentage of minority students rose from 15% to its present level of 26%, and "a very substantial degree of desegregation." Id. at 2587-88. As to the high schools, neither index shows appreciable change over time, although both indices have dropped slightly. Id. at 2588. The reason for this is that both indices started out quite low and it is difficult to get below 10 on the exposure index (1985 value for high schools was 7.3). Id. at 2588.
 
 
 301
 Dr. Armor reasoned that had Topeka done nothing concerning integration, it is very likely that the indices would have remained at their significantly higher 1966 levels. Id. at 2589-90. Contrary to this court's appellate factfinding, see Court's Opinion at 880 (attendance boundaries) & 881-82 (school closings), Dr. Armor testified that "the reason why desegregation has improved to this extent was a series of school closings and boundary changes" affecting predominantly minority or white schools. Rec. vol. XIII at 2590. Dr. Armor also testified that the system's transfer policies over the years had no significant effects, either segregative or desegregative. Id. at 2598. The policies were neutral. Id. This evidence favorable to the defendants was corroborated by defendants' other expert, who considered what would have happened had school boundaries been held constant as of 1963.[30]
 
 B.
 
 302
 The plaintiffs' experts disputed Dr. Armor's work, just as he disputed theirs. For example, plaintiffs' expert Dr. Crain testified concerning the limitations of these indices and that other cities had lower dissimilarity and exposure indices and that more could be done as evidenced by Plans N and X that were not adopted. Rec. vol. IX at 1270-73, 1282-84, 1287; but see F. Welch & A. Light, New Evidence on School Desegregation-U.S. Comm'n on Civil Rights Clearinghouse Pub. No. 92, 38 (1987) ("The fact that the dissimilarity index is useful in depicting changes within a district does not imply that it is useful in comparing districts."). Dr. Foster indicated that he used the dissimilarity index "to determine the progress made across the State of Florida in school desegregation from year to year when data are available," and explained that it was not used "on a school-to-school basis." Rec. vol. IV at 556, vol. V at 686. In short, the experts disagreed concerning the proper approach and whether there was a current condition of segregation regarding student assignment.
 
 
 303
 For this reason, we need pay particular attention to the Supreme Court's conclusion in Anderson that a factual finding cannot be clearly erroneous when "there are two permissible views of the evidence," when credibility is at issue, and even when it is not. 470 U.S. at 574, 105 S.Ct. at 1511. We have noted:
 
 
 304
 The Anderson Court justified this conclusion by asserting that "[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." Anderson, 470 U.S. at 574, 105 S.Ct. at 1512. Although even the trial judge may not always be confident that he "knows" what happened, he is in the best position to "determine whether the plaintiff has succeeded in presenting an account of the facts that is more likely to be true than not." Id. at 580, 105 S.Ct. at 1515.
 
 
 305
 Pitre v. Western Elec. Co., Inc., 843 F.2d 1262, 1266 n. 1 (10th Cir.1988). If ever there were a case for application of these principles, this is the one.
 
 
 306
 For this case not only involves documentary evidence, it also involves credibility determinations. At one point, in consistently exercising his discretion to admit evidence that might bear upon the truth of the issues, the trial judge remarked: "Let me say, it is the duty of a court to listen to the experts on both sides, and decide which set of experts to believe. I think it is necessary that I hear everything I can hear on this subject." Rec. vol. IX at 1222. It does not surprise me that the trial judge exercised his prerogative to believe the defendants' experts.
 
 
 307
 Even on this cold record, it appears that the defendants' experts may have had a patina of believability that comes with acknowledging ambiguity (the evidence is rarely all one way), yet still supporting a position. See M. Chesler, J. Sanders & D. Kalmuss, Social Science in Court--Mobilizing Experts in the School Desegregation Cases 90-106 (1988). For example, defendants' expert Dr. Armor testified that the open enrollment plan which operated for two years and then was discontinued in 1980 had a slightly segregative effect. Rec. vol. XIII at 2624; Brown, 671 F.Supp. at 1298. Likewise, defendant's expert Dr. Clark testified that a boundary change for Parkdale between 1963-64 and 1966-67, which resulted in a greater concentration of minority students "could be discussed in terms of having partly segregative effects, partly demographic effects." Rec. vol. XI at 2326; ex. vol. I at 43. The court notes this fact in its opinion, Court's Opinion at 875, while completely ignoring the conclusion of defendants' expert which supports the district court's findings.
 
 
 308
 The plaintiffs put on much testimony concerning factual matters which the Supreme Court decided as a matter of law years ago, namely the educational and psychological harms of segregation. Brown I, 347 U.S. at 494-95, 74 S.Ct. at 691-92. Plaintiffs' expert Dr. Crain testified that segregated schools are responsible for the following problems as they affect blacks who might attend such schools: 1) depressed performance on standard achievement tests, which cannot be remedied by compensatory education, 2) higher failure rates on minimum competency testing, 3) a propensity to attend black colleges, 4) a propensity to quit college, if a white college is selected, 5) lack of clear career aspirations, 6) employment discrimination, 7) discomfort with white supervisors, 8) more frequent job changes, 9) higher juvenile delinquency, 10) higher teenage pregnancy, 11) greater unhappiness at age 40, 12) a desire to live in an unintegrated area, 13) infrequent home ownership, and 14) greater discomfort around whites. Rec. vol. IX at 1231, 1237, 1243, 1251-52, 1254, 1255, 1257, 1259, 1260, 1261, 1262. Viewing the transcript, I do not think that this remarkable list, which Dr. Crain claimed was applicable to Topeka based on his brief visit, id. at 1264-65, enhanced his credibility. Nor did his definition of a segregated system seem consistent with that term as commonly understood in desegregation cases. Dr. Crain testified that, in his view, a segregated system was "when you have that perception of unequal racial composition," because "the harmful effects are going to start occurring because the whole process of desegregation is going to start hitting." Rec. vol. IX at 1289. Finally, Dr. Crain was quite willing to criticize the work of defendants' expert Dr. Poggio, by equating a cognitive abilities test with the Kansas Minimum Competency Test, yet Dr. Crain clearly was unaware of the sequence of the tests and the characteristics of each--regarding the Kansas Minimum Competency test, he did not know its objectives, what it purports to measure, how the test was designed or whether the passing scores change from year to year. Rec. supp. vol. X at 2862-71; supp. vol. IX at 2922-31 (Dr. Poggio's refutation of Dr. Crain's criticisms). Without question, the trial court credited Dr. Poggio's analysis over that of Dr. Crain. Brown, 671 F.Supp. at 1307-08.
 
 
 309
 Plaintiffs' expert Mr. Lamson was similarly emphatic. He testified that his task was "to identify all of those instances where administrative action would have tended to affect the racial composition of the schools." Rec. vol. III at 363, see also vol. II at 105. After looking at hundreds of physical and administrative decisions (construction, portable building use, attendance boundaries, optional attendance zones) that affect student assignment for thirty years, Mr. Lamson's conclusion is notable for its simplicity and its partiality:I can confidently state that I was unable to find one instance where any of those physical and administrative educational tools were used as a part of a purposeful and ongoing program of affirmative pupil desegregation at either the elementary, junior high or middle, or senior high school level.
 
 
 310
 Quite to the contrary ... all of those administrative tools were used in an ongoing manner to actively separate the Black and white elementary, junior high and middle, and senior high students of the Topeka school system wherever and whenever feasible.
 
 
 311
 Rec. supp. vol. XI at 240-41. Mr. Lamson's testimony proves a bit much. Analyzing the motivations and actions of multimembered public bodies over three decades is difficult at best, but concluding that the Topeka system underwent no desegregation 25 years after Brown I blinks reality. Common sense tells us that even a broken clock is right twice a day. Yet too much of Mr. Lamson's methodology has found its way into this court's opinion, given the trial court's rejection of the proposed findings supporting it. This is especially true concerning the court's comments about optional attendance zones, attendance boundaries, and school openings and closings, Court's Opinion at 877-82, because plaintiffs' other lead expert, Dr. Foster, did not do an independent analysis of these factors. Rec. vol. V at 693; vol. VI at 739.
 
 C.
 
 312
 The court also has found a current condition of segregation pertaining to faculty and staff assignment. Court's Opinion at 870-72. The court's reasoning here is questionable because, after rejecting the plaintiffs' standard as "very narrow," id. at 870 n. 56, the court then finds liability when, even under the plaintiffs' "very narrow" standard, all that would have been necessary to eliminate racial identifiability regarding certificated faculty would have been to exchange 13 pairs of faculty members in 1981-82. Rec. vol. V at 663-66. That is only 26 certificated faculty out of 911 then employed, or 2.85%.[31] Id.; rec. vol. VI at 773-74. Faculty members are not fungible; whether this could be accomplished depends upon being able to send 13 minority faculty members into different schools, and replacing them with 13 white faculty members, while making sure that all have the right teaching certificates. Rec. vol. V at 664-65.
 
 
 313
 We begin with the proposition that "principals, teachers, teacher-aides and other staff who work directly with children at a school" may not be assigned so that the racial composition of the staff will indicate that a school is intended for white or minority students. Singleton v. Jackson Mun. Separate School Dist., 419 F.2d 1211, 1217-18 (5th Cir.) (remedy phase), rev'd on other grounds, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970). Even if the racial composition of a school could be identified by assignment of faculty, that factor, in and of itself, does not mean that the school system is dual with respect to student assignment. Dayton II, 443 U.S. at 536 n. 9, 99 S.Ct. at 2978 n. 9. While a school should not be racially identifiable by its faculty, United States v. Montgomery County Bd. of Educ., 395 U.S. 225, 236, 89 S.Ct. 1670, 1676, 23 L.Ed.2d 263 (1969), the racial composition of the faculty need not be equivalent to that of the student population, Fort Bend Indep. School Dist. v. City of Stafford, 651 F.2d 1133, 1138 (5th Cir.1981). It is possible for a school district to be unitary with respect to student assignment, but not with respect to faculty/staff assignment. Pasadena, 427 U.S. at 436, 96 S.Ct. at 2704-05; Morgan, 831 F.2d at 318-19.
 
 
 314
 Topeka is not heavily populated, has not been growing and does not have a large minority population as a percentage of the total population.[32] This is reflected in the data on minority employment, which has remained fairly constant over the last five years.[33] Dr. Foster indicated that faculty composition should approximate the minority percentage enrollment in a school system, something which has not occurred in Topeka.[34] Rec. vol. V at 656. Dr. Foster acknowledged, however, that one would have to look at the relevant labor pool, an analysis that was not performed here. Id. at 657-58; see also Hazelwood School Dist. v. United States, 433 U.S. 299, 308, 97 S.Ct. 2736, 2741-42, 53 L.Ed.2d 768 (1977). But, Dr. Foster did testify that the demand far exceeds the supply of minority faculty members and that he found no fault with the district's recruiting policies. Rec. vol. VI at 757-59.
 
 
 315
 Dr. Foster analyzed faculty staff assignment, "not as a raw figure of percentage points from the mean," e.g. ±15% of the mean minority percentage. Rec. vol. V at 646. For example, in 1985-86, the percentage of minority faculty staff at the elementary schools was 11.23%. Rec. ex. vol. IV at 261. 15% of 11.23% is 1.68%; thus, a school could vary by ±1.68% from the minority percentage of 11.23%. Id.; rec. vol. V at 650. This means that a school would be racially identifiable if it had more than 12.9% (11.23% plus 1.68%) or less than 9.6% (11.23% minus 1.68%) minority faculty/staff. Id. Applying this concept to the secondary schools which had a minority faculty staff percentage of 12.65%, a school would be racially identifiable if it had more than 14.6% (12.65% plus 1.90%) or less than 10.8% (12.65% minus 1.90%) minority faculty staff. Rec. ex. vol. IV at 262. Applying this very tight standard is based on the theory that the school district has greater control over faculty staff assignments and that, insofar as possible, we should "get every school just like every other." Rec. vol. V at 646, 650-51. Under this method, 22 out of 26 elementary schools are racially identifiable and 8 out of 9 secondary schools are racially identifiable. Rec. ex. vol. IV at 261-62.
 
 
 316
 This court has rejected Dr. Foster's standard. The court has also rejected the district court's approach which used a ±10% variation around the mean because in one year, 1975, the standard would not have classified elementary schools as racially identifiable even if they had no minority faculty and staff. Court's Opinion at 879; see Brown, 671 F.Supp. at 1305 (noting that in 1985 only six schools had minority staff percentages beyond ±10% of the district-wide average and that all schools have been within ±10% range in last 10 years). In fairness to the district court, the problem identified by this court with the ±10% standard would have occurred only for the first of the ten years; in all other years, the district-wide elementary minority staff percentage exceeded 10%.[35] Moreover, it should be noted that in Dowell, Dr. Foster testified that he had " 'no problem' " with a ±10% standard, however, the system-wide average of black faculty in the school district at issue (Oklahoma City) was 36.9%. Dowell v. Board of Educ., 890 F.2d at 1537 (10th Cir.1989) (Baldock, J., dissenting).
 
 
 317
 In finding its "distinct pattern of correlation," Court's Opinion at 879, between minority enrollment and assignment of minority staff, the court initially used an ad hoc approach which was difficult to apply objectively. In its revised opinion, the court has indicated that a school is racially identifiable as to faculty/staff assignment if it is racially identifiable minority as to student assignment, using a ±15% standard, and 17.3% or more of the faculty/staff at the school is minority. Court's Opinion at 872-73 n. 59. Likewise, a racially identifiable white school (using a ±15% standard) is racially identifiable as to student assignment if 5.6% or less of the faculty is minority. Id. Using this method, there are 14 out of 19 schools racially identifiable by faculty/staff assignment in 1985-86. This means that not all of the schools identified as racially identifiable by the court as to student assignment are racially identifiable as to faculty/staff assignment.
 
 
 318
 Racially Identifiable Schools by Student Assignment (k-15% std.) (Asterisk
 
 
 319
 * Indicates Racial Identifiability as to Faculty/Staff) Under the Court's
 
 
 320
 Method
 1985"86 1985"86 1986"87
 Elementary Minority Minority Minority
 Schools(26) Students Faculty/Staff Faculty/Staff
Belvoir 61.9 14.8 16.67
Highland Park North 57.9 19.2 * 18.18
Lafayette 56.8 17.3 * 14.81
Quinton Heights 49.4 21.6 * 12.50
Avondale East 44.1 33.3 * 18.18
Hudson 46.6 19.2 * 15.38 7 r.i.
Lowman Hill 41.9 25.4 * 13.04 min.
-------------------------------------------------------------------------------
Bishop 10.5 1.7 * 5.56
McEachron 10.3 4.3 * 5.26
Whitson 10.2 2.8 * 7.69
Gage 9.4 4.8 * 7.14
McCarter 9.2 10.9 9.09
Crestview 8.9 10.7 12.00
Potwin 7.7 14.1 7.69 8 r.i.
McClure 7.2 0.0 * 5.00 white
Middle Schools (6) 1 r.i.
Eisenhower 48.7 18.5 * 15.56 min.
-------------------------------------------------------------------------------
Landon 9.3 9.6 closed 2 r.i.
French 6.2 5.6 * 13.89 white
High Schools (3) 1 r.i.
Topeka West 7.9 2.5 * 5.88 white
----------
 
 
 321
 Id. at 872-73, n. 59 & 60, 873-74 n. 61; supp. vol. XIII (pl. ex. 155D & 155G); rec. ex. vol. IV at 122-29, 170-77, 261-62; rec. ex. vol. II at 160-61.
 
 
 322
 Although the court plainly has adopted a ±15% standard for analyzing racial identifiability as to student assignment, it is interesting to compare the schools that the court finds racially identifiable as to faculty/staff assignment with the schools identified (as to student assignment) using Dr. Armor's "most generous" method. See Court's Opinion at 870, 872-73, 879; see also supra p. 922 (listing schools identified by Dr. Armor for further study). There are only four schools in common to both lists (Gage, McClure, French and Topeka West). All of these schools have increased minority student representation over the years and in 1986-87, had increased minority faculty and administrative personnel.
 
 
 323
 The court notes that the data concerning faculty and staff was not as complete as it might be, and the problem seems to be that a breakdown of minority teaching and managerial personnel for each school was not available. Rec. vol. V at 660. Dr. Foster was able to prepare a breakdown of the district by employment category which tends to refute some of the court's statements, however. Dr. Foster broke the data down into two areas overall. I suspect that the first group must be certificated.
 
 
 324
 1985"86
 Minority Total % Minority
Categories Employees Employees Employees
District-wide Managerial 8 54 14.8
School-based Managerial 8 50 16.0
Elementary Classroom Teachers 42 373 11.3
Secondary Classroom Teachers 28 349 8.0
Other Teachers &
Professional Staff 44 467 9.4
 ---- ---------
Subtotal 130 1,293
Teacher Aides 37 195 19.0
Clerical/Secretarial 14 165 8.5
Skilled & Technical 10 83 12.0
Service Workers 43 212 20.3
 ---- ---------
Subtotal 104 655
Total 235[36] 1,948 12.1
 ---- --------- ----------
 ---- --------- ----------
 
 
 325
 Rec. ex. vol. IV at 268. According to Dr. Foster, given the 12.1% minority average, minorities were slightly underrepresented as elementary classroom teachers and were considerably underrepresented as secondary classroom teachers and clerical/secretarial workers. Rec. vol. V at 662. The court tells us that "minorities are represented more heavily in staff positions than in faculty positions." Court's Opinion at 872. After comparing the percentages, the court then makes the statement that "[a]ny one [minority] faculty/staff person listed at any one school is thus more likely to be a teacher aide or service worker than a teacher." Id. Given the similarity in the absolute numbers of elementary and secondary minority teachers (70) and teacher aide and service workers (80) in the system, one does not have to be a statistician to realize the limited significance of this simplistic appellate finding. Still, that questionable finding is the springboard for the perhaps well-meaning, but very condescending, comment by the court that "because minority employees are more heavily represented as staff than as faculty, it is quite possible that the one minority faculty/staff person at McEachron, for instance, is a janitorial staff person or other service worker rather than a teacher or other professional role model." Court's Opinion at 879; see also id. at 877.
 
 
 326
 In that same vein, the court remarks that the "practice of disproportionate assignments also reinforces the irrational notion that minority teachers are inferior and not fit to teach white children." Court's Opinion at 872. There simply is no evidence of that in the current Topeka system based on this record. No one disputes that it is important to have white and minority students exposed to positive role models of different races, see rec. vol. VI at 761, but the court's remark is simply inflammatory. Indeed, in a colloquy between Dr. Foster and counsel for the school board, it was revealed that as late as 1971, representatives of the black community appeared before the board seeking "the assignment of black teachers as black role models in predominantly black schools." Rec. vol. VI at 762. Dr. Foster testified that "blacks consistently across the country have demanded that their schools not be staffed predominantly by white teachers, but that black principals and black teachers also appear before the black children." Id. Of course, the bottom line here is the constitutional imperative that staffing decisions be neutral and "that you don't want an absence of either race or ethnic group in any school if you can avoid it." Id.
 
 
 327
 The court tells us that the distinction between faculty and staff is important, but never comes to grips with what that distinction is. Court's Opinion at 871-72. On the basis of absolute numbers, it appears that 167 minority employees are involved with the educational function (the first group above plus teacher aides) and 67 minority employees are involved with the service function. The strong implication of this court--that minorities are being hired merely for janitorial and service jobs--is not supported. Moreover, such an implication is inconsistent with the court's observation that the current superintendent is black, as are several principals and managerial personnel. Court's Opinion at 879.
 
 
 328
 The district court recognized that there was a "tendency to have more minority staff in schools with a greater than average minority student population," yet after a careful review of all the evidence, decided that there was not a current condition of segregation with respect to staff assignment. Brown, 671 F.Supp. at 1305. In deciding that faculty/staff assignment remains segregated, Court's Opinion at 872, this court has relied in part upon the extremes of the data to conclude there is an unlawful pattern. For example, in 1985-86, every elementary school had some minority staff, with the exception of McClure.[37] Only one elementary school had more than 7 minority faculty/staff, Avondale East at 10.45 faculty/staff members. Yet, that is the one the court uses to illustrate its apparent conclusion that there is a segregated system of faculty staff assignment at the elementary level. Court's Opinion at 872; see also id. at 879. When one looks at the elementary data, it is apparent that a perfectly uniform distribution is unlikely given the lack of elementary minority personnel--there were 42 elementary classroom teachers and 74.50 minority faculty/staff members to be assigned to 26 elementary schools. Rec. ex. vol. IV at 261, 268.
 
 
 329
 Likewise, the court compares Robinson Middle School with 12.20 minority staff members out of 49.35, not with other middle schools[38], but with Topeka West High School which had 3 minority out of 120. Court's Opinion at 872. Note that in 1984-85 Topeka West had almost three times the minority faculty/staff (8.55 out of 114.30) than it did in 1985-86.
 
 
 330
 Given the court's interest in complete data which breaks out the professional staff that actually works in the particular schools, it is most surprising that the court's opinion does not cite or discuss the minority staffing report for 1986-87 which finally includes administrative and certificated staff assigned to the schools. Rec. ex. vol. II at 160-61. Although admitted over plaintiffs' objection, rec. vol. XVI at 2523-2525, this more current and more relevant report presents a far less extreme picture of minority assignment for the system. Every school in the system has minority personnel. With a 10.78% minority average for elementary school personnel (55 out of 510), elementary schools range from 4.35% minority staffing (Quincy) to 18.18% (Avondale East and Highland Park North).[39] More significant, because of the small numbers involved, is that every elementary school has from one to four minority personnel. Rec. vol. II at 161.
 
 
 331
 With a 13.22% minority average for middle school personnel (23 out of 174), schools range from 6.67% (Jardine) to 16.67% (Robinson).[40] Every school has from two to seven minority personnel. Finally, at the high school level there is a minority average of 9.77% for high school personnel, ranging from 5.88% (Topeka West) to 11.84% (Highland Park High).[41] The range is from five to eleven minority faculty members.
 
 D.
 
 332
 The district court recognized that the "pattern identified by the plaintiffs is not monolithic." Brown, 671 F.Supp. at 1305. And it is not. The numerical evidence on this point cuts both ways. But this court's finding that this is "a system that has kept white faculty at primarily white schools and minority faculty at predominantly minority schools," Court's Opinion at 879, appears radical given these numbers. Moreover, I agree with the district court that "as important as the racial percentages of the faculty and staff is the fair assignment of qualified and dedicated faculty throughout the district." Id.; see also Milliken v. Bradley (Milliken II), 433 U.S. 267, 280 n. 15, 97 S.Ct. 2749, 2757 n. 15 (one must not lose sight of educational function of schools). This is a school district that is applying the research concerning effective schools.[42] See U.S. Dep't of Education, What Works-Research About Teaching and Learning 45 (1986) ("The most important characteristics of effective schools are strong instructional leadership, a safe and orderly climate, school-wide emphasis on basic skills, high teacher expectations for student achievement, and continuous assessment of pupil progress."); rec. supp. vol. V at 1584-1608, 1635-36 (district has uniform curriculum guides), 1641-42, 1651-53, 1749; supp vol. VII at 2033; vol. XII at 2521-22. It is a system in which schools throughout the district have received outside recognition. Rec. supp. vol. V at 1617-18 (Highland Park H.S., 1984), 1619-20 (Topeka West H.S., 1985), 1620-21 (Eisenhower Middle School, 1985), 1621 (Highland Park Central, 1985), 1622 (School District, 1986), 1623, (Topeka West H.S.--National School of Excellence, 1984; Robinson Middle School--National School of Excellence, 1985), 1624 (Bishop Elementary School--State Program of Excellence, 1986), 1732 (Head Start, 1974). Finally, the evidence clearly established that the Topeka schools are committed to an awareness of cultural diversity and equal educational opportunity for all. Rec. supp. vol. V at 1759, 1632, 1653-54, 1657-58, 1686, 1717, 1760-61, 1772-73; vol. XII at 2444-45. Ironically and commendably, this is a district that includes the study of Brown v. Board of Education in its curriculum. Rec. supp. vol. V at 1722.
 
 VII.
 
 333
 At trial, plaintiffs contended that eight schools were "racially identifiable non-white or vestige schools." Brown, 671 F.Supp. at 1297. These included Eisenhower Middle School and seven elementary schools: Avondale East, Belvoir, Highland Park North, Hudson, Lafayette, Lowman Hill and Quinton Heights. The court has analyzed the latter six of these schools for "what the district did and did not do," Court's Opinion at 882, totally ignoring the district court's findings and the de facto reasons for the racial composition of these schools. Court's Opinion at 882-85. Part of the court's analysis of these schools is contained in an earlier part of its opinion. See Court's Opinion at 880 (discussing attendance boundaries of Lafayette, Quinton Heights and Lowman Hill). Appendix A contains the 1969-70 elementary school attendance boundaries; appendix B contains those for 1985-86.
 
 
 334
 Ironically, this court's analysis of these racially identifiable schools is placed in a section entitled "The Causal Link Between De jure Segregation and Current Condition of Segregation." Court's Opinion at 874. The court steadfastly refuses to consider an alternative interpretation of the evidence which would show the absence of a link between the present lack of perfect racial balance and the prior de jure segregation. The court's position is that any consideration of demographic factors which resulted in a lack of racial balance would be to absolve the school board of its affirmative duty. Id. at 876-77, 882. Not so. Courts routinely have considered the presence or absence of demographic factors over which the school board had no control in deciding whether school systems were unitary. See, e.g., Morgan, 831 F.2d at 320 (system unitary; court considered racial concentration in court-drawn school districts); Lawrence, 799 F.2d at 1043 ("In Lawrence County, unlike the situation in Pasadena Board of Education, the School Board's failure to achieve a desegregated school system has not resulted from population migration into, or out of, or within this small rural county."); Ross, 699 F.2d at 226 (system unitary; current housing patterns after desegregation order resulted in several one-race schools). The rationale for this is best stated by this court in a passage concerning one-race schools:
 
 
 335
 Although virtual one race schools "require close scrutiny," they are not always unconstitutional.[18]
 
 
 336
 Court's Opinion at 860, 860 n. 18. The above is equally applicable to schools which depart from the system-wide minority average--"they are not always unconstitutional" for they "may well have evolved for reasons beyond school board control." Id.
 
 
 337
 Concerning these eight schools that the plaintiffs contend are "racially identifiable," the district court found that "the schools are attended by more white students than black students (1,248 white students, 1,079 black students). Indeed, white students make up close to half (49.3%) of all the students that attend these allegedly non-white schools." Brown, 671 F.Supp. at 1298. As the following reveals, there is no need for the appellate fact finding that is going on here, the district court's finding that these schools do not reflect a current condition of unlawful segregation is not clearly erroneous; indeed, it is amply supported by the record and the weight of the evidence. Moreover, the district court's factfinding is free of several errors which permeate the appellate factfinding.
 
 A.
 
 338
 Belvoir elementary was annexed in approximately 1959, thus plaintiffs cannot claim it was a vestige of the former de jure system. Rec. supp. vol. XI at 148. This court attaches significance to the fact that Belvoir's student population has not been less than 50% minority. Court's Opinion at 882. Yet, the district court carefully explained why this does not create liability:
 
 
 339
 Belvoir Elementary School is centered in an area with a high minority population. It is surrounded by other schools with higher than average minority populations. It is not the black school in a racially mixed area. It is a school with a higher than average black student population in a residential area with a higher than average black population.
 
 
 340
 Brown, 671 F.Supp. at 1300 (emphasis in original). The district court made further findings, which certainly are corroborated by the data on racial composition.[43] The district court's findings also are supported by the defendants' expert Dr. Clark, who analyzed Belvoir's hypothetical racial composition, assuming its boundaries remained constant. Rec. ex. vol. I at 28, 34-35.
 
 
 341
 The district court found that two federally subsidized housing projects constructed in 1963 (Pine Ridge; 210 family units) and in 1965 (Trail Ridge; 148 family units) caused the minority elementary student population to increase to over 50%. Brown, 671 F.Supp. at 1302; rec. ex. vol. IV at 215. Plaintiffs' expert Mr. Lamson did not take these housing projects into account. Rec. vol. IV at 463. The district court also found that closing Rice Elementary in 1981 and reassigning some of those students to Belvoir improved the racial balance at Belvoir. Brown, 671 F.Supp. at 1302. This court characterizes the closing as having "a modest desegregative effect at Belvoir," Court's Opinion at 882, but the data reveal that the minority percentage dropped by approximately 13%. See supra note 43. The Belvoir attendance district now is largely minority and the changed racial mix in the school has been caused by actions other than those of the school board. See Higgins, 508 F.2d at 791 ("the law imposes no affirmative duty upon school officials to correct the effects of segregation resulting from factors over which they have no control").
 
 B.
 
 342
 This court's complaint about Hudson Elementary is that "[w]hile the passage of time has dissipated Hudson's identity as a white school, this change is due solely to the spread of minorities into its attendance area, not to any action by the school district." Court's Opinion at 882. It seems anomalous to find fault with the school board concerning residential movement which altered the original racial composition at Hudson. But it is consistent with this court's view that residential patterns which detract from racial balance are always the responsibility of the school board, while residential migration which improves racial balance should not inure to the benefit of the school board insofar as liability is concerned. See Court's Opinion at 863-64 ("A showing that the school district has not promoted segregation and has allowed desegregation to take place where natural forces worked to that end is insufficient."). Following this logic, residential movement could lead to absolute racial balance and still support a finding of school board liability, especially given the court's view that a school which approaches the system-wide minority average may still be racially identifiable.
 
 
 343
 Apparently, the defendants are constitutionally liable for Hudson because it now exceeds the system-wide minority average by 20%, with a 46.55% minority student population. See Court's Opinion at 882. The plaintiffs view Hudson as racially identifiable black, notwithstanding that 53.45% of the students were white in 1985-86. Appellants' Brief at 38; Brown, 671 F.Supp. at 1301. Hudson is perhaps the archetype for illustrating the court's refusal to consider the effect of demographic factors which result in changing student racial composition at various schools. The district court gave clear reasons explaining the racial composition at Hudson, reasons which do not encompass liability for these defendants. Hudson was constructed in 1963 and has steadily increased in minority enrollment.[44] The boundaries of Hudson have not changed since 1964. Rec. ex. vol. IV at 13-29. The district court found that "the construction of subsidized housing projects in the Hudson attendance area" in 1965 (Colonial Townhouses; 137 family units), in 1967 (Highland Park Apartments; 200 family units) and in 1970 (Deer Creek; 92 family units), together "with the general increase of minority residents on the east side," was responsible for the increase in minority enrollment at Hudson. Brown, 671 F.Supp. at 1302; rec. ex. vol. IV at 215. Plaintiff's expert Mr. Lamson did not take into account the effect of any of these demographic changes. Rec. vol. IV at 464-65.
 
 
 344
 Plaintiffs' position concerning Hudson and Avondale is legally untenable. After conceding that the increased minority enrollment at Hudson and Avondale East is "purely [the] result of residential change," plaintiffs continue:
 
 
 345
 In a de jure school system, the school board has the duty to react to residential change to ensure that no school becomes disproportionately Black. Swann, 402 U.S. at 14 [91 S.Ct. at 1275]. The failure of the Topeka School Board to prevent Hudson and Avondale East from becoming disproportionately Black is a constitutional violation.
 
 
 346
 Appellants' Brief at 38. Plaintiffs' position is not supported by the law or the facts. After two desegregation plans and over thirty years after Brown I and Brown II, it cannot be said that Topeka operates a de jure system. Apparently, plaintiffs' conception of the duty imposed by the Supreme Court is never-ending. The Court, however, has declared to the contrary. In Swann, the Court recognized that once the constitutional violation is eliminated, school authorities are not "constitutionally required to make year-by-year adjustments of the racial composition of student bodies" even if the community experiences demographic changes. Swann, 402 U.S. at 31-32, 91 S.Ct. at 1283-84. Moreover, there is no requirement that every school in the district reflect the system-wide average minority enrollment, either before or after a finding of unitariness. See Pasadena, 427 U.S. at 434, 96 S.Ct. at 2703.
 
 C.
 
 347
 Like Belvoir, Highland Park North Elementary was not part of the Topeka system in 1954. Instead it was annexed in 1959, rec. vol. IV at 394, and is estimated to have had close to the system-wide average of minority students then.[45] There has been a steady increase in minority students attending due to residential patterns. Brown, 671 F.Supp. at 1302. This court's complaint is that when Parkdale closed in 1978, the "reassignment [of Parkdale students] increased Highland Park North's minority percentage at a time when it was already high." Court's Opinion at 882. As the district court points out, however, the school board was able to close Parkdale, a predominantly black school (85.6% minority) while reassigning its students to a nearby school, Highland Park North. Brown, 671 F.Supp. at 1302. Moreover, as footnote 45 indicates, the increased minority percentage for 1978-79 was caused by two factors: an increase of 43 (170-127) minority students and a decrease of 21 (142-121) white students. Considering the court's fleeting approach to some of these schools, see, e.g., Court's Opinion at 882, it is unclear how the court's observation trumps the district court's reasoned analysis rejecting constitutional liability.
 
 D.
 
 348
 Lafayette Elementary began as an all-white de jure school. Brown, 671 F.Supp. at 1302. It has increased in minority enrollment and has remained a majority-minority school, although the composition of the minority groups has varied over the years.[46] Id. (noting that minority composition was 56-59% over the last five years, with a varied composition). This court notes that federally subsidized housing projects were built in the area in the early 1960's. Court's Opinion at 883; rec. ex. vol. IV at 215 (1961-Eastboro Apts.; 28 family units; 1962-Eastboro Apts.; 76 family units). More units were built in 1970. Rec. ex. vol. IV at 215 (Ripley Park Apts., 102 family units).
 
 
 349
 This court first looks to 1966 and reports the racial compositions of Lafayette's neighboring schools (omitting Highland Park North). Court's Opinion at 77. I have done the same in chart form comparing the minority percentages with the surrounding schools, in 1966 and now.
 
 
 350
 School Direction from 1966"67 Minority % 1985"86 Minority %
 Lafayette
Lafayette 54.49 56.81
Parkdale SW 93.12 closed 1978 (85.62% min.)
Sumner NW 12.29 31.47
State Street NE 27.52 26.26
Rice E 3.00 closed 1981 (33.55% min.)
Belvoir SE 59.72 61.86
Highland P.N. SW 21.60 57.93
 
 
 351
 Rec. ex. vol. II at 48-A, 49-B; ex. vol. IV at 54-55, 97, 109, 170-74.
 
 
 
 The court then concludes that Lafayette "remains a transition school between schools with higher minority percentages to the south and lower percentages to the north and west." Court's Opinion at 77. To understand what the court means, it is necessary to refer to the court's previous discussion on school boundaries. Court's Opinion at 70. There, the court decides that Lafayette is the product of segregated boundaries because it has a different minority percentage than every one of its neighboring schools. In the words of the court:
 The border between Lafayette and State Street, the school to Lafayette's north, has functioned as the boundary between the mostly white area served by State Street and the school to its north [Lundgren] ... and the schools to its south and southwest [Highland Park North and Belvoir]. Lafayette has long had twice the minority population of State Street; thus, since 1966, Lafayette's minority population has ranged from 52% to 69% while State Street's has ranged from 27% to 34%.
 Id. (footnote omitted). This conclusion is remarkable not only because it is appellate factfinding concerning intent including noncompliance with the affirmative duty on "objective" facts that are far from obvious, but also because it ignores that the surrounding population of the Lundgren and State Street schools (as of 1980) had far less black concentration than did the surrounding population of Lafayette, Highland Park North and Belvoir. See rec. ex. vol. I at 49. Moreover, it conflicts with the district court's finding on this point attributing the increased minority percentage to demographic factors, Brown, 671 F.Supp. at 1303, rather than a "segregative effect" of boundary changes by defendants. The district court's finding is supported by common sense and the defendants' expert, Dr. Clark. See rec. ex. vol. I at 35, 43-45.
 Once again, the district court's findings make more sense than ours. Looking at the chart, see supra p. 940, it is apparent that Topeka closed two schools with greater and lesser minority concentrations than Lafayette. The district court noted that the closing of Parkdale resulted in the Lafayette minority percentage increasing by four percent (from 62% to 66%), Brown, 671 F.Supp. at 1302; however, the next year saw the percentage return to its prior level (from 66% to 62%), and decrease thereafter. See supra note 42. The district court then thought that the closing of Rice, which resulted in reassignment of some students to Lafayette, may have contributed to the minority percentage decreasing in future years. Brown, 671 F.Supp. at 1302. Dr. Clark, defendants' demographic expert, using residential population data which had a high correlation (.8 to .9 out of 1.0) with school attendance data, viewed the increased minority percentage at Lafayette as a result of demographic changes. He concluded that the closure of Parkdale, with respect to Lafayette, was overall desegregative. Rec. vol. XI at 2338, 2373, 2388-89; ex. vol. I at 35, 43, 45.
 This court's ultimate conclusion, that "[u]nder its neighborhood school plan, the school district simply maintained Lafayette as a school with disproportionate minority percentages," Court's Opinion at 883; see also id. at 880, ignores the demographic factors involved and implies that the school district had an obligation to racially balance Lafayette because it exceeded the system-wide minority percentage.
 E.
 Like Lafayette, Quinton Heights Elementary began as an all-white de jure school. Brown, 671 F.Supp. at 1303. The district court noted the steady increase in minority student population, and that the minority concentration has remained approximately 50% over the last several years.[47] Id. This court's approach to analyzing the school has been to adopt the conclusion of plaintiffs' expert contained in his report and testimony, while simplifying the analysis and not discussing the effect of allegedly segregative optional attendance zones, as did Mr. Lamson. See Court's Opinion at 883; rec. vol. XI at 139-48, 173-78 (Lamson Report on Quinton Heights, School Closings), vol. III at 248-59 (Lamson testimony concerning Quinton Heights) (cited in Court's Opinion at 883 n. 88), 284, 287, 290-93 (closure of Monroe and Polk and affect on Quinton Heights); see also Court's Opinion at 874-75 (summarizing 1955-65 in Topeka system--"Plaintiffs introduced evidence tending to show that the school district's use of portable classrooms and optional attendance zones served to maintain segregation by concentrating students of one race at certain schools."). Of course, to adopt the full analysis with the discussion of optional attendance zones would conflict with the district court's finding that "any segregative effect of the zones was slight and does not remain today." Brown, 671 F.Supp. at 1298. The district court's finding, which necessarily includes the optional attendance zones discussed by plaintiffs' expert, is supported by the testimony and report of defendants' expert Dr. Clark. Rec. vol. XI at 2304-05, 2309-10, 2318-19, 2321-22, 2327-28. Dr. Clark analyzed the effect of boundary changes in Topeka, including optional attendance zones. See supra note 30; see also rec. ex. vol. I at 19. But concerning school closings, the court has been convinced by the testimony of plaintiffs' expert.
 Again, we track this court's odyssey. The court begins by considering two closings: Pierce and Van Buren. In 1957, Pierce was annexed to the district; in 1958 the adjacent schools to the west with which it shared a common boundary were Quinton Heights and Monroe. Rec. supp. vol. XI at 140; rec. ex. vol. IV at 12. In 1958, the enrollment began to decline at Quinton Heights at an average rate of 21 students per year. Rec. supp. vol. XI at 142. In 1959, the 79 remaining black students at Pierce were assigned to three other elementary schools: Quinton Heights, Highland Park North, and Highland Park Central. Id. at 142. Plaintiffs' expert admitted that what effect this had on the racial composition of Quinton Heights is not known. Id. at 143. Mr. Lamson also reported that during 1956-66 Quinton Heights lost white students while gaining black students. Id. at 142.
 In 1962, the attendance boundary of Quinton Heights was expanded northward into what had been areas served by Van Buren and Central Park. Id. at 144; rec. vol. III at 251. This resulted in a gain of 45 students for Quinton Heights after it had lost an average of 21 students for the previous 4 years. Rec. supp. vol. XI at 144. Van Buren, however, still had an attendance area and continued to operate. In 1964, Van Buren was closed; most students were sent to Monroe; some were sent to Quinton Heights.[48] Rec. vol. III at 255; supp. vol. XI at 145-46.
 This court continues with the observation that by 1966 the minority percentage of Quinton Heights was 36.4% and certain schools surrounding Quinton Heights had greater and lesser concentrations of minority students. Court's Opinion at 883. And so we continue. The following chart provides more detail.
 School Direction from 1966"67 Minority % 1985"86 Minority %
 Quinton Heights
Quinton
Heights 36.42 49.43
Highland
Park Central SE 16.64 35.09
Avondale East SE 14.96 44.14
Avondale West SW 1.26 16.61
Stout W .50 26.83
Central Park NW 15.49 closed 1980 (42.90% min.)
Polk N 11.54 closed 1979 (48.00% min.)
Monroe NE 79.45 closed 1975 (82.73% min.)
Highland
Park North NE 21.60 57.93
 
 
 
 352
 Brown, 671 F.Supp. at 1299; rec. ex. vol. I at 48A; ex. vol. IV at 54-55, 87, 101, 105, 170-73. The court tells us that by 1966 Quinton Heights "was bordered by heavily minority Monroe elementary school and otherwise by primarily white schools." Court's Opinion at 883. This statement is in error.
 
 
 353
 The average minority percentage in 1966 for elementary schools was 16.49%. Rec. ex. vol. IV at 56. Keeping this in mind, it appears that other schools, besides neighboring Monroe, had minority percentages which very nearly met, or exceeded, the system-wide elementary average. As the above chart points out, Highland Park Central, Avondale East, Central Park and Highland Park North simply are not one-race white or virtually one-race white schools. Moreover, I do not see the significance of the court's statement that Quinton Heights had the seventh largest minority population out of 35 schools. How does this fact create liability? Thus, the district court did not err when it rejected the attempt to "characterize the reassignments in the 1960s as part of a process of focusing Quinton Heights as a school for black students." Court's Opinion at 883.
 
 
 354
 The court next demonstrates its ability to find its own facts by describing the population density maps in relation to a neighboring school of Quinton Heights: "Indeed, on the maps available to us, it is quite noticeable that Polk's boundaries in 1970 correspond closely to a patch of white population surrounded by minority population assigned to other schools, including Quinton Heights." Id. The court's subjective observation demonstrates the limitations of its approach. The map cited by the court, rec. ex. vol. I at 67, tells us the percentage of black population by block. Notwithstanding the intended breadth of the court's analysis, the map does not tell us about other minorities, e.g., hispanic. Nor does it tell us much about population density or anything about student density. See rec. vol. IV at 485. Yet, the court's clear implication from looking at the map is that the boundary around Polk as of 1970 was drawn in such a way as to exclude minorities. The following chart, comparing the minority percentages of Polk with its neighboring schools, including Quinton Heights, as of 1970, the date of the map, undercuts the court's finding.
 
 
 355
 School Direction from Polk 1970 Minority %
Polk 21.33
Monroe SE 79.91
Quinton
Heights S 45.86
Central Park SW 24.53
Lowman Hill NW 41.52
Clay NW 21.26
 
 
 356
 Rec. ex. vol. I at 48A; rec. ex. vol. IV 70-71. The court's finding is suspect for at least two reasons. First, as the above chart shows, the minority population in the area is dispersed to several schools in the area. Polk is hardly an all-white school, with a 78.67% white student enrollment. Indeed, after Monroe closed in 1975, plaintiffs' expert Mr. Lamson testified that Polk was racially disproportionate black with a 30.4% black enrollment, while the elementary average was 14.82%. Rec. vol. III at 284 and supp. vol. XI at 173; ex. vol. IV at 91. Second, Polk exceeded the system-wide minority elementary average which was 18.67% in 1970. Rec. ex. vol. IV at 72. These factors, not considered by this court, convince me that the court has made a finding in error.
 
 
 357
 Continuing with the analysis of Quinton Heights, the court next complains about two adjacent school closures in the 1970's because they resulted in extending the northern boundary of Quinton Heights into northern areas with high minority concentrations. Court's Opinion at 883. Unfortunately, the court does not share with us which closings are involved, id., but I suspect they are Monroe which closed in 1975, and Polk which closed in 1979. When Monroe closed, its attendance area was divided between Polk, Highland Park North and Quinton Heights. Rec. supp. vol. XI at 173. As I previously noted, the effect on Quinton Heights was negligible; although the minority percentage increased from 37 to 39.09%, seven fewer minority students attended in 1975. See supra p. 915 (noting that 2.09% increase largely due to declining white enrollment). Indeed, not until the fall of 1979 did the number of minority students at Quinton Heights exceed what existed immediately prior to the closing of Monroe. Thus, expanding Quinton Heights' attendance area northward when Monroe closed could hardly support a firm and definite conviction that Quinton Heights' boundaries were being manipulated so as to racially identify the school as intended for minority students.
 
 
 358
 Apparently the closing of Polk resulted in the reassignment of its students to Quinton Heights, Sumner, and Lowman Hill. Rec. vol. III at 291. The minority percentage at Quinton Heights did increase from 38.95% (in 1978-1979) to 50.23% (in 1979-80), with the addition of 44 minority students and 5 white students. This is the only action here which arguably is indicative of inattention to the affirmative duty. The district court, however, rejected that inference. Brown, 671 F.Supp. at 1303. Based on the foregoing, I cannot agree with the statement that: "It is thus clear that Quinton Heights' current boundaries are the result of continued manipulation by the school district." Court's Opinion at 883. The court's analysis is inconsistent with its contention that the district court should not have focused on intent, and that there was indeed none. Court's Opinion at 868.
 
 
 359
 The court attaches great significance to the fact that Quinton Heights is a relatively long district which extends into minority populations in the north and east. Id. at 883. But what the court does not point out is that the southernmost part includes all of the area for Topeka Country Club and the Kansas National Guard Armory, which easily comprises one-quarter of the school's attendance area. See rec. ex. vol. I at 49; rec. ex. vol. V at 60. These areas probably have few, if any, elementary students; thus from a practical perspective, the Quinton Heights area is not as long as it may appear because its southernmost area is occupied by large institutions. Merely because the balance of the school's attendance boundaries includes minority population, or that the school includes Topeka Avenue or railroad tracks, does not compel a conclusion that the boundaries were drawn with segregative intent or effect. See rec. vol. III at 291-92 (Mr. Lamson commenting about undesirable configuration of attendance area). Indeed, the presence of natural barriers in elementary attendance areas is hardly unique in this system. See rec. ex. vol. V at 225-228 (listing 20 elementary schools with natural barriers, e.g. institutional spaces, major thoroughfares, waterways, railroad tracks).
 
 
 360
 The court's earlier discussion of "peculiar-looking attendance boundaries" is peculiar in itself because, like the court's subjective approach to map reading, the court of appeals has moved far beyond its review function into the realm of a trial court. Court's Opinion at 880. Still, based on this untethered perception of "peculiarity," the court declares that Quinton Heights' current boundaries are segregative. Id. Put simply, the court seeks to overturn the district court's factual finding that the attendance zones are not gerrymandered. Brown, 671 F.Supp. 1300. Notwithstanding the countless hours spent on this case by the panel, I remain firmly convinced that we have added very little to the district court's amply supported findings. Admittedly, the evidence is not perfectly consistent and all in defendants' favor. But it is not nearly so one-sided or in favor of the plaintiffs' as this court apparently believes. The trial judge had a firm grip on the applicable law and a superb command of the facts in this complex case. We have done no better, even assuming that we were so empowered.
 
 F.
 
 361
 Notwithstanding that Lowman Hill Elementary began as an all-white de jure school, this court finds that "[t]he school appears to have been designed and maintained as a school with a concentration of minority students." Court's Opinion at 884. The court begins by describing plaintiffs' contention concerning optional attendance zones, see Appellants' Brief at 13 n. 20; rec. supp. vol. XI at 96-98; vol. III at 235-41; however, it is unclear whether the court accepts those contentions, in light of the district court's rejection of those same contentions. Court's Opinion at 883-84; see Brown, 671 F.Supp. at 1298 (optional attendance zones (all eliminated in 1976) did not have significant segregative effect; any effect attenuated). The emphasis of this court seems to be on the inclusion of two areas that have greater concentrations of black residents[49] in the northwestern part of central Topeka, within the Lowman Hill attendance boundaries. The district court pointed out that these two areas "are closer to the Lowman Hill Schools than other schools in the area." Brown, 671 F.Supp. at 1301. Indeed, that was the observation of defendants' expert Dr. Clark.[50] Rec. vol. XI at 2344-45.
 
 
 362
 In 1959, a new and expanded Lowman Hill school was constructed which received black students from Buchanan. Rec. supp. vol. XI at 92. This increased Lowman Hill's minority percentage to 49.63% by 1966, but the school has never had a majority-minority population.[51] Brown, 671 F.Supp. at 1301. The district court gave very close attention to this school and its relationship to surrounding schools.
 
 
 363
 This court mentions the closings of three surrounding schools and complains that these closings "did not affect the minority student percentage at Lowman Hill." Court's Opinion at 880. The court then provides the answer to "why not?" when it tells us that "the student population it [Lowman Hill] acquired was apparently of the same makeup as its existing population." Id. at 884. The answer is not surprising when one compares the minority percentages of the schools that closed in relation to Lowman Hill.
 
 
 364
 Year School Closed Minority % Year Lowman Hill Minority % Year Other
 Closed School Closed
1975 Clay 25.35 47.04
1979 Polk 48.00 40.74
 Central
1980 Park 42.90 43.13%
----------
 
 
 365
 Rec. ex. vol. IV at 86, 101, 105. The above chart indicates that the schools that were closed were very similar in minority concentration to Lowman Hill. If anything, the presence of racially similar neighboring schools that were ultimately closed undercuts the court's finding that Lowman Hill is racially identifiable and used to concentrate minorities.
 
 
 366
 Looking at the neighboring schools and their racial composition in 1985 hardly compels the conclusion that Lowman Hill is racially identifiable.
 
 
 367
 School Direction from Lowman Hill 1985"86 Minority %
Lowman
Hill 41.89
Quinton
Heights SE 49.43
Randolph SW 14.81
Gage NW 9.43
Potwin N 7.73
Sumner NE 31.47
----------
 
 
 368
 Rec. ex. vol. I at 49B; rec. ex. vol. IV at 170, 173-74. It should be pointed out that nearby Quinton Heights had a higher minority percentage than Lowman Hill. The district court recognized that although several surrounding schools had a lower minority percentage, this alone did not require it to conclude that the actions of the school board resulted in a segregative effect. Brown, 671 F.Supp. at 1301. It noted that Lowman Hill was centrally located and had stable boundaries over time. Id. Perhaps if this court had de novo review, the panel majority would come to a different conclusion, but on these very mixed facts the district court's call was certainly not clearly erroneous.
 
 G.
 
 369
 The court next shifts to "primarily white schools," as racially identifiable. These apparently are schools which this court has determined should have greater minority enrollments, both in the past and the future.[52] Court's Opinion at 884. These schools purportedly have an identity as "schools for white children," id. at 884, which I suspect can only be changed to the court's satisfaction by strict racial balancing, regardless of the de facto reasons for their current racial composition. The purpose of desegregation law is to wipe out the effects of the prior de jure system, not to eliminate every difference in racial composition between schools. See supra p. 909-11. Moreover, many of these schools have experienced increases in minority percentages as a result of residential movement. Brown, 671 F.Supp. at 1303-04. Despite this court's clear view that positive changes in racial composition due to demographic factors are not relevant to determining whether the vestiges of a prior de jure system remain, see Court's Opinion at 874, 875, one would expect that a school district operating a dual system would have taken action to oppose or modify the effects of trends. That is not what has happened in Topeka. Brown, 671 F.Supp. at 1304.
 
 
 370
 Concerning the location of new schools, this court makes the following statement which could give the wrong impression:
 
 
 371
 All of the elementary schools and all but one of the secondary schools opened by the school district since Brown II were built in the white outer part of the district. Robinson middle school, which serves the central part of Topeka, is the sole exception. Furthermore, many of these schools were built near to the edges of the district.
 
 
 372
 Court's Opinion at 881; see also id. at 874-75. The judgment in Brown II was announced May 31, 1955. To be sure, numerous schools were opened in the western part of the district and had substantial white enrollments. The district court identified these as:
 
 
 373
 McClure, Sheldon, McEachron, McCarter, Bishop and Hudson elementary schools, as well as Jardine [1961], Eisenhower [1961] and Landon Junior High Schools [1963] and Topeka West Senior High School [1961]. These schools were in areas of residential expansion. During the same period, new schools with mixed racial compositions replaced existing facilities at Lowman Hill, Lafayette, Highland Park Central, Central Park and Belvoir elementary schools.
 
 
 374
 Brown, 671 F.Supp. at 1299; rec. supp. vol. XI at 194, 225. It should be added that Quinton Heights was replaced in 1954. Rec. supp. vol. XI at 40, 50. Thus, several schools which were not on the outer edge of Topeka were included in the district's new school construction during and subsequent to the mid-50's: Lowman Hill, 1959; Quinton Heights, 1954; Lafayette, 1956; Highland Park Central, 1965; Belvoir, 1967; Central Park, 1967. Brown, 671 F.Supp. at 1299; rec. supp. vol. XI at 40, 43, 50, 92, 166, 170.
 
 
 375
 Based on its erroneous finding that Topeka's neighborhood school plan resulted only in the construction of schools for white children in the far reaches of the district, thereby increasing segregation, the court tells us that "[a] school district conscious of its constitutional duty would have attempted to counteract that effect." Court's Opinion at 881 (citing Diaz, 733 F.2d at 667-69); see also Court's Opinion at 864 and 864 n. 31 (endorsing "castigation" approach). Although Diaz contains helpful language that a neighborhood school policy must be carefully analyzed as to application and enforcement before constitutional liability may be imposed, 733 F.2d at 664, the case is both legally and factually distinguishable. The duty of the school board in Diaz was different than that of these defendants; clearly established California state law required affirmative action to relieve segregation, regardless of the cause. Diaz, 733 F.2d at 666-67. Moreover, according to the majority in Diaz, the board failed to consider state guidelines and rejected alternatives which would have enabled it to comply with its duty. Id. at 669. That is not what occurred here. Noticeably absent from the plaintiffs' evidence is any complaint to the school board or the district court, when the school construction in question occurred.
 
 
 376
 Finally, I come to Topeka West High School, built in 1961 and considered by the plaintiffs and the court[53] as "the quintessential example of deliberate channeling of white students to schools in the western part of the school district." Court's Opinion at 884; see also id. at 881 (plaintiffs/court finding "that Topeka deliberately placed new schools as far as possible from minority residential areas in order to polarize the district into white outer and minority inner schools."). Once again, this court's focus on "deliberate" conduct is inconsistent with its criticism of the district court for considering intent. Although this court criticizes the location of the school, which is near the western edge of the district, there were valid reasons, which have been discussed elsewhere, for placing the school in that location. See supra p. 916; see also Brown, 671 F.Supp. at 1300. The notion that Topeka West was built to channel white students from Topeka High, as contended by the plaintiffs, is not supported by the facts. In 1961, Topeka High was a winner of the prestigious Bellamy Award. Rec. vol. X at 1500. But it was overcrowded with 2,300 students. Rec. vol. IX at 1442-43. Topeka West opened with 700 students the first year, 900 the second, 1100 the third and continued to grow until 1969 when part of the attendance area was transferred back to Topeka High. Id. at 1434. Topeka High led high school enrollment totals for several years after the opening of Topeka West. Like Topeka High, Topeka West has won a prestigious award: Topeka West was designated a National School of Excellence recently, rec. supp. vol. V at 1622-23. Topeka West has had increased minority enrollment over the years as the western portion of Topeka becomes more residentially integrated.[54]H.
 
 
 377
 In addition to school openings, the court has undertaken to overturn the district court's finding that, on the whole, school closings were "an integrative device." Brown, 671 F.Supp. at 1299. Again, the court takes shelter in describing the plaintiffs' contention: "that school closings of highly segregated schools were not desegregative in practice because the school district simply reassigned the students at those schools en masse to a nearby school which then took over the segregated status of the school closed." Court's Opinion at 881; see also supra note 53. The court then adopts this as its finding: "The evidence supports this contention for the 1950s and 1960s." Court's Opinion at 881. Regarding the 1970's on the whole, the court tells us that most closings were not segregative or desegregative. Id.
 
 
 378
 In its section on school closings, the district court mentioned 13 closings by name. Brown, 671 F.Supp. at 1299. I have discussed several closings in the context of this dissent and see no reason why the district court should be overturned. This court's one paragraph summary analysis of school closings, while giving the appearance of completeness, does not facilitate my review. I cannot respond to the court's position without knowing which closings are covered by its findings and why.
 
 VIII.
 
 379
 The district court recognized that the plaintiffs "hinge their case on this absence of racial balance in all schools and the failure of the defendants to promote racial balance." Brown, 671 F.Supp. at 1295.
 
 
 380
 At any time, more could have been done to achieve racial balance in the schools. But, it begs the issue of this case to argue that racial balancing must be done today because it was not done yesterday. More should be done to improve racial balance in the schools if the existing imbalance follows from defendants' past intentional segregative conduct.
 
 
 381
 Id. at 1309. Thereafter, the district court found that the present racial imbalance does not derive from "the de jure system or a foot-dragging segregationist policy." Id.
 
 
 382
 In 1985-86, Topeka had no one-race or virtually one-race minority schools. Whether we look at percentages or absolute numbers, the district court was not clearly erroneous in deciding that the Topeka system was not currently segregated. Of 34 schools, only three had majority-minority populations. Brown, 671 F.Supp. at 1294. Those three schools (Belvoir, 146 minority students (ms); Lafayette, 217 ms; and Highland Park North, 179 ms) served 542 minority elementary students or one-quarter of the minority elementary population (2,141 ms). See rec. ex. vol. IV at 170, 171, 174; Court's Opinion at 877. Five elementary schools (Crestview, 32 ms; Gage, 25 ms; McCarter, 35 ms; McClure, 23 ms; Potwin, 18 ms) had 90 + % white enrollment, yet they served 6.2% of the minority elementary population. Id. at 170, 172, 174. Two of the middle schools which are now combined (French, 241 white students (ws); and Landon, 205 ws) served 31 percent of the white middle school population (1,446 ws); while serving 6.95% of the minority middle school population (37 ms/532 ms). Id. at 175-176. At the high school level, Topeka West had a 90 + % white enrollment, serving 41.6% (1391 ws/3349 ws) of the white high school population, but also serving 11.48% (120 ms/1045 ms) of the minority high school population. Id. at 176-77. Though this court views the evidence differently, I submit that the district court's finding is supported by these numbers, when considered on this record, and looking back to the prior years. See supra text accompanying notes 9-13; see also supra note 18.
 
 
 383
 Although the court repeatedly tells us that racial balancing is not the objective, the court does acknowledge that "numbers are usually the focus of desegregation plans." Court's Opinion at 886; see also id. at 860. Without question, numbers resulting in better (strict) racial balance are the only remedy for what the court perceives as "schools that are now and always have been white, schools that are now and long have been heavily minority, and others." Court's Opinion at 886. The court seems to be leaning toward replication of the system-wide minority average in every school when it indicates that even compliance with a ± 15% standard for student assignment would be insufficient. Court's Opinion at 885. In the words of this court:
 
 
 384
 Dr. Foster also pointed out that such an approach would move schools now just beyond the 15% range to just within it, an improvement he did not find greatly desegregative as would preserve the existence of schools differing by as much as 30% in their minority percentage and thus still marked as minority or white schools.
 
 
 385
 Id. at 885-86. (footnote omitted). The inherent nature of a 15±% standard for student assignment means that some schools may vary by as much as 30%, though many probably will not. My research has not disclosed any court finding that compliance with a ± 15% standard as to student assignment was indicative of a current condition of segregation.
 
 
 386
 When one looks carefully at the most recent data we have on student assignment, see supra note 18, while considering the racial composition of this system (74% white), this court's views are unique, given the wide distribution of minority students throughout the system and the absence of one-race minority schools. Indeed, several courts reviewing desegregation plans have given effect to the language in Swann that some "one-race, or virtually one-race, schools within a district [are] not in and of [themselves] the mark of a system that still practices segregation by law." 402 U.S. at 26, 91 S.Ct. at 1281. See, e.g., Morgan, 831 F.2d at 323 (Boston system with majority-minority student enrollment unitary; there was "substantial degree of integration" despite several schools with 80%+ enrollments of one race and several schools out of compliance with court-ordered desegregation plan); Calhoun v. Cook, 522 F.2d 717, 719 (5th Cir.1975) (Atlanta system with 85% black enrollment unitary; 92/148 schools 90%+ black); Ross v. Houston Indep. School Dist., 699 F.2d 218, 219, 226 (5th Cir.1983) (Houston system with 74% minority enrollment unitary; 55/226 schools were 90%+ black and 2 schools all white). I submit that the presence of some predominantly white schools in this system and three schools which have a slight majority of minority students does not violate the equal protection clause. Washington, 426 U.S. at 240, 96 S.Ct. at 2047-48 (predominantly one-race schools not alone violative of equal protection).
 
 
 387
 Because the numbers are not indicative of a current condition of segregation, and the testimony relied upon by the district court supports the very opposite, it becomes necessary for the court to engage an unyielding presumption against the Topeka system from the outset. The court simply has jumped the gun in invoking the Keyes presumption to arrive at the preliminary and critical conclusion that there is a current condition of segregation in Topeka. Nowhere is this more evident than in footnote 61, Court's Opinion at 873-74, when the court explains that its discussion of the current condition does not conflict with the district court's conclusion that there is no unlawful segregation in Topeka. This court reasons that because the district court "did find the existence of racial disparities in school enrollment and staff/faculty assignment," it should have immediately invoked a presumption against Topeka: "Our disagreement with the district court is chiefly on the significance of these findings in a district with Topeka's history, and bearing the weight of a presumption against it which the district court failed to accord." Court's Opinion at 874 n. 61. This court's understanding of the district court's findings differs from mine. See supra p. 914-17. But even granting the comparatively small departure from perfect racial balance in this system, Topeka's history is one factor, among many, that a court may consider in deciding whether the presumption should be invoked. "While that history of discrimination cannot and should not be ignored, it 'cannot in the manner of original sin, condemn governmental action that is not itself unlawful.' " Riddick, 784 F.2d at 539 (quoting City of Mobile v. Bolden, 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (plurality opinion by Justice Stewart)). To require perpetual application of the presumption would mean that no school district which had a de jure system in 1954, could ever be free of the presumption and achieve unitary status. The requirement of a current condition of segregation resulting from past or present segregative intent (as opposed to segregation resulting from voluntary demographic change), prior to the operation of the presumption, allows a school system to redeem itself and, one day, be free of federal court supervision. See Riddick, 784 F.2d at 538-39 (rejecting argument "that the Norfolk school board must continue to justify all of its actions because of the history of segregation."). That day should come for U.S.D. 501 in Topeka.
 
 
 388
 Alternatively, even if the presumption applies, the school board may adduce proof that the effects of past segregative intent have attenuated completely. Keyes, 413 U.S. at 211, 93 S.Ct. at 2699. This was recognized in Dayton II when the Court indicated that the Dayton school board "had failed to come forward with evidence to deny 'that the current racial composition of the school population reflects the systemwide impact' of the Board's prior discriminatory conduct." Id. 443 U.S. at 537-38, 99 S.Ct. at 2979-80 (quoting Brinkman, 583 F.2d at 258). Here, "the Board was given ample opportunity to counter the evidence of segregative purpose and current, systemwide impact," Columbus, 443 U.S. at 467-68, 99 S.Ct. at 2951-52, and such evidence was credited by the district court.
 
 
 389
 In repeatedly castigating the defendants for noncompliance with the affirmative duty, the court relies upon the same incomplete approach that plaintiffs' expert took--not considering regional and local migration and other demographic factors which necessarily influence school board decisions. See rec. vol. IV at 510-511. For example, the court criticizes the defendants for building new schools in the late 1950's and 60's to accommodate population growth in western Topeka and concludes that "the erection of so many schools devoted to educating white children had a significant segregative effect on the district."[55] Court's Opinion at 881. In arriving at this conclusion, the court apparently relies upon the following: "With respect to the new schools themselves, [the plaintiffs] argue that Topeka should have taken advantage of the underutilized inner schools; that is, that Topeka should have voluntarily bused white children from outer Topeka to the inner city schools instead of putting up new buildings." Court's Opinion at 881; see also rec. supp. vol. XI at 158-72 (Lamson theory). It is one thing to theorize that students could have been bused to a slightly underutilized seven grade (K-6) elementary school (e.g. Lowman Hill with an average of 43 spaces unused from 1957-66, or Quinton Heights with 28 spaces unused in 1966), but it is quite another to match the grade levels of spaces available each year with the grade levels of a hypothetical group that would be assigned to the school annually. See rec. vol. IV at 448-49 (underutilization analysis did not consider grade level of students); vol. X at 1538-41; supp. vol XI at 169. Moreover, this suggestion ignores the complaint that HEW had in 1974 concerning educating students in older schools. See supra p. 905.
 
 
 390
 Another of the administrative possibilities suggested by Mr. Lamson to improve racial balance would have been to combine Highland Park Central and Highland Park South in 1968, and build a school between the two. This proposal would have entailed abandoning two existing buildings with large enrollments, and the expense of building a new school. Rec. vol. X at 1475-76. The combined enrollment of the new school would have been 1,334 students, something which has never occurred in Topeka, and what deputy superintendent Henson thought was "too large an elementary school for this community or any community." Id.; rec. vol. IV at 512-13; see also supp. vol. XI at 170. Moreover, in suggesting alternatives for the 1950's and 1960's decisions concerning elementary boundaries, some of these alternatives would have required busing and lunch provisions for students, but Mr. Lamson did not consider that the Topeka system lacked a hot lunch program until the mid-60's. Rec. vol. IV at 443-448, 510; supp. vol. XI at 34-35, 56.
 
 
 391
 Unfortunately, one could get the wrong impression concerning the board members' attitude about desegregation. This court seems to fault the board members for not testifying that they regularly took desegregation concerns into account. Court's Opinion at 878. I do not read their testimony as precluding such concerns. Mr. Dennis C. Payne, board member from 1957-65, explained that the neighborhood concept was in keeping with the desegregation required by Brown because, previously, black children were not allowed to attend the schools closest to their homes. Rec. vol. XII at 2417 ("So we felt the neighborhood concept was what everybody wanted and what we wanted."). Mr. Payne testified to an absence of gerrymandering for racial segregation. Id. He also testified that he was aware of white flight due to the original four step plan and adherence to the neighborhood school plan. This court quotes his response: "What could we do? We can't make people move, no way." Id. at 2423 (quoted in Court's Opinion at 878). Considering the time period to which this statement refers, and the school district's then-recent adoption of a plan which met with the approval of this court, I would suggest that the school board could not prohibit people from moving, although perhaps it could have changed the consequences of a move with respect to school assignment. Cf. Ross, 699 F.2d at 225 (when district has successfully implemented plan to achieve unitary status, there is "no affirmative fourteenth amendment duty to respond to the private actions of those who vote with their feet").
 
 
 392
 Mr. Joe Douglas, Jr., the fire chief of the City of Topeka, and a board member from 1977-85 (board president for two years), testified that he and the other black member of the board opposed the open enrollment plan, which was adopted due to pressure from working parents who wanted their children to attend schools close to day care arrangements. Rec. vol. XII at 2441; see Court's Opinion at 878 n. 81. The plan was soon discontinued because of its effect on minority percentages. Rec. vol. XII at 2442-43. It was replaced by a majority to minority transfer plan.[56] Id. at 2443-44; Brown, 671 F.Supp. at 1298. While he was on the board, Mr. Douglas advocated that no school in the district should exceed 50% minority, but the fact that some schools exceeded that percentage was not indicative of segregation, which he termed "as in the eye of the beholder." Rec. vol. XII at 2454-55. Contrary to the court's assertion that board members did not consider desegregation concerns, Mr. Douglas testified that the school board that he served on "took as a priority the lowering of minority percentages."[57] See Court's Opinion at 878; rec. vol. XII at 2456. The current superintendent of schools, Dr. Edwards, supported the commitment to improve the racial composition of the schools. Rec. vol. XII at 2530.
 
 
 393
 During trial, there was testimony about concerns identified by the National Commission on Excellence in Education which prepared A Nation at Risk. Rec. supp. vol. VII at 1996-99. The Commission emphasized that improved education is essential not only to assure that the United States will remain competitive internationally, but also to assure "the intellectual, moral and spiritual strengths of our people which knit together the very fabric of our society." National Commission on Excellence in Education, A Nation at Risk: The Imperative For Educational Reform, at 7. It appears that Topeka has heeded the call to provide "all, regardless of race or class or economic status, ... a fair chance and ... the tools for developing their individual powers of mind and spirit to the utmost," for "individuals in our society who do not possess the levels of skill literacy, and training essential to this new era will be effectively disenfranchised, not simply from the material rewards that accompany competent performance, but also from the chance to participate fully in our national life." A Nation at Risk at 4, 7. "No person of goodwill toward his fellow man can logically argue" with the naturally correct premise of Brown I: equal educational opportunity in a unitary system for all children regardless of race. Keyes v. School Dist. No. 1, 521 F.2d 465, 490 (10th Cir.1975) (Barrett, J., concurring), cert. denied, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976). But neither this court's opinion nor the record convinces me that the equal opportunity and benefits provided to all by Topeka's neighborhood schools will be improved by the protracted federal court supervision which is sure to follow at the expense of valued local control.[58] See Milliken I, 418 U.S. at 741, 94 S.Ct. at 3125 (recognizing virtues of local control of public education).
 
 
 394
 Like the district court, I do not think that the constitutional command to eliminate the dual system goes unheeded 35, or even 30, years after Brown I. Within that time, tremendous demographic and social change has affected Topeka and its school system. The school board has demonstrated concern for improving the racial composition in the Topeka schools while retaining the neighborhood school concept. In some cases, the two are not compatible, but in this system substantial integration has been achieved, and the system is now unitary, although not perfect. Because I am not persuaded of a remaining constitutional violation, and I am persuaded that the appellate court has retried the case for a different outcome, I would affirm the district court's judgment declaring the Topeka system unitary at last.[59] Brown, 671 F.Supp. at 1311.Appendix A
 
 
 395
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEAppendix B
 
 
 396
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 Statement by William Lamson during trial. Rec., vol. II, at 162-63. Mr. Lamson has done demographic studies in desegregation cases since 1970. His services as an expert have been utilized by the Department of Justice, the Department of H.E.W., the N.A.A.C.P., the A.C.L.U., and various school boards. Rec., supp. vol. 12 pl. ex. 25. In 1975, the defendant Board of Education hired him to put together a ten-year forecast of student enrollments. Rec., vol. II, at 103
 The district court echoed Mr. Lamson's view about the nature of segregation: "[R]acially conscious student assignment with the goal of racial balance has been approved as a remedy in desegregation litigation. This is because school segregation has an inertia which often cannot be countered by a purely neutral force." Brown v. Board of Educ., 671 F.Supp. 1290, 1297 (D.Kan.1987) (citation omitted) (emphasis added).
 
 
 [2]
 Section 601 states:
 "No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."
 42 U.S.C. § 2000d (1982). The Topeka school district received federal funds through the Kansas State Department of Education.
 
 
 [3]
 Linda Brown, a child named plaintiff in the original suit, is now the mother of two intervening child plaintiffs
 
 
 [4]
 Rec., ex. supp. vol. 13, pl. ex. 155 B. The record on appeal consists of pleadings, transcripts, and exhibits. We cite them respectively as "Rec., doc. # ," "Rec., vol. # ," and "Rec., ex. vol. #"
 
 
 [5]
 Rec., ex. vol. IV, at 54-56
 
 
 [6]
 Lyman elementary school had been deannexed in 1967. Rec., vol. III, at 281
 
 
 [7]
 Rec., ex. vol. IV, at 134-38
 
 
 [8]
 
 Percentage of Minority Students
 In Topeka Elementary Schools In 1985
School Per Cent School Per Cent
-------------------------------------------------------------------
Avondale East 44 . 1 Lundgren 15.8
Avondale West 16 . 6 McCarter 9.2
Belvoir 61 . 9 McClure 7.2
Bishop 10 . 5 McEachron 10.3
Crestview 8 . 9 Potwin 7.7
Gage 9 . 4 Quincy 20.5
Highland Park Central 35 . 1 Quinton Heights 49.4
Highland Park North 57 . 9 Randolph 14.8
Highland Park South 28 Shaner 20.7
Hudson 46 . 55 State Street 26.3
Lafayette 56 . 8 Stout 26.8
Linn 29 . 4 Sumner 31.5
Lowman Hill 41 . 9 Whitson 10.2
 
 
 [27]
 2% of all elementary students in 1985 were minorities
 Source: Rec., ex. vol. IV, at 170"74.
 
 
 [9]
 Rec., vol. III, at 306-07. Plaintiffs' expert Lamson used the figures for black rather than minority students in his analysis and testimony. Where we repeat his figures, we therefore refer to black students and white students. We also refer to black students when we discuss pre-1966 numbers, as it is only in that year that figures begin to be available for minority students generally. Otherwise we refer to minority students. See Keyes v. School Dist. No. 1, 413 U.S. 189, 197, 93 S.Ct. 2686, 2691, 37 L.Ed.2d 548 (1973). The parties are in agreement that the difference in analysis between black students and minority students is not significant in this case. Rec., vol. IV, at 409-10; rec., vol. V, at 598, 602-03
 
 
 [10]
 Rec., vol. VII, at 1050
 
 
 [11]
 Id. at 1051
 
 
 [12]
 Rec., ex. vol. II, at 56-57
 
 
 [13]
 
 Percentage of Minority Students
 In Topeka Secondary Schools in 1985
Middle Schools Per Cent High Schools Per Cent
*957_ -------------------------------------------------------------------------------
Chase 33.4 Highland Park 33.6
Eisenhower 48.7 Topeka High 30.9
French 6.2 Topeka West 7.9
Jardine 17.3
Landon * 9.3
Robinson 28.5
 The percentage of minority students in all middle schools was 26.9%, while the minority percentage at the high school level was 23.8%. Source: Rec., ex. vol. IV, at 175"77.
 
 
 *
 Landon is now closed
 
 
 [14]
 See, e.g., Riddick v. School Bd. of the City of Norfolk, 784 F.2d 521, 533 (4th Cir.), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986); United States v. Texas Educ. Agency, 647 F.2d 504, 506 (5th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982); cf. Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 534 & n. 8, 99 S.Ct. 2971, 2977 & n. 8, 61 L.Ed.2d 720 (1979) (whether school district is intentionally operating a dual school system is a question of fact)
 
 
 [15]
 The Fifth Circuit defines unitariness as " 'a district in which schools are not identifiable by race and students and faculty are assigned in a manner that eliminates the vestiges of past segregation.' " Monteilh v. St. Landry Parish School Bd., 848 F.2d 625, 629 (5th Cir.1988) (quoting United States v. Lawrence County School Dist., 799 F.2d 1031, 1034 (5th Cir.1986))
 
 
 [16]
 Cf. Morgan v. Nucci, 831 F.2d 313, 319 (1st Cir.1987) (considering number of one-race or racially identifiable schools, good faith on the part of the school district, and maximum practicable desegregation); Ross v. Houston Indep. School Dist., 699 F.2d 218, 227 (5th Cir.1983) (considering conditions in district, accomplishments to date, and feasibility of further measures)
 
 
 [17]
 The Supreme Court desegregation cases involved school systems in which the degree of segregation was sufficiently great that the parties did not seriously dispute on appeal that the plaintiffs had satisfied their burden on this issue. See Dayton II, 443 U.S. at 529, 99 S.Ct. at 2975 (Dayton public schools "highly segregated by race"); Wright v. Council of City of Emporia, 407 U.S. 451, 455, 92 S.Ct. 2196, 2199, 33 L.Ed.2d 51 (1972) (complete segregation); Swann, 402 U.S. at 24, 91 S.Ct. at 1280 (no challenge to finding of prior dual system); Green v. County School Bd. of Educ., 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968) (complete racial identification of schools). The issue was potentially more significant in recent circuit cases in which a school district had been under court order for some time and many of the vestiges of prior de jure segregation had been eliminated. Even in these more recent cases, however, no clear standard has been articulated. See Morgan, 831 F.2d at 319-21 (considering number of one-race schools as part of unitariness determination); Price v. Denison Indep. School Dist., 694 F.2d 334, 347-68 (5th Cir.1982) (discussing need to consider various factors in determining whether constitutionally violative condition of segregation exists)
 
 
 [18]
 Given modern urban demography and geography, one-race schools may well have evolved for reasons beyond school board control. See, e.g., Calhoun v. Cook, 522 F.2d 717, 719 (5th Cir.1975). Thus, where a school system consists of de facto one-race schools, rather than de jure, the system is not unconstitutional
 
 
 [19]
 See Morgan, 831 F.2d at 320 (listing standards ranging from 70% to 90% and declining to decide whether 80% or 90% is more appropriate for Boston); Tasby v. Wright, 713 F.2d 90, 91 n. 2, 97 n. 10 (5th Cir.1983) (90% standard for one-race schools; 75% standard for predominantly one-race schools). Swann did not define the term "one-race school," presumably because two-thirds of Charlotte-Mecklenburg's black students attended schools that were 99+% black. See Swann, 402 U.S. at 7, 91 S.Ct. at 1271
 
 
 [20]
 See Morgan, 831 F.2d at 320 n. 7 (rejecting 75% standard in district 72% black); Castaneda v. Pickard, 781 F.2d 456, 461 (5th Cir.1986) (school 97.88% Mexican-American not a vestige of discrimination in district 88% Mexican-American); Ross, 699 F.2d at 220, 226 (affirming finding of unitariness for district 80% minority although 57 out of 226 schools were 90 + % one-race); Price, 694 F.2d at 336, 339-40 (schools not necessarily racially identifiable in district 88% white although 7 out of 8 elementary schools 90 + % white); Calhoun, 522 F.2d at 718-19 (85% black district unitary although more than 60% of schools all or substantially all black)
 
 
 [21]
 See Dayton II, 443 U.S. at 529 n. 1, 99 S.Ct. at 2975, n. 1; Milliken v. Bradley, 418 U.S. 717, 726, 94 S.Ct. 3112, 3118, 41 L.Ed.2d 1069 (1974); Ross, 699 F.2d at 226; Lee v. Macon County Bd. of Educ., 616 F.2d 805, 808-09 (5th Cir.1980)
 
 
 [22]
 See Morgan, 831 F.2d at 320; Tasby, 713 F.2d at 91 n. 2; Ross, 699 F.2d at 226; Price, 694 F.2d at 364; Stout v. Jefferson County Board of Education, 537 F.2d 800 at 802 (5th Cir.1976)
 
 
 [23]
 See Texas Educ. Agency, 647 F.2d at 508; cf. Lee v. Tuscaloosa City School System, 576 F.2d 39 (5th Cir.) (per curiam); United States v. Board of Educ. of Valdosta, Ga., 576 F.2d 37 (5th Cir.) (per curiam) cert. denied, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978); Carr v. Montgomery County Bd. of Educ., 377 F.Supp. 1123, 1134 (M.D.Ala.1974), aff'd, 511 F.2d 1374 (5th Cir.) (per curiam), cert. denied, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975)
 
 
 [24]
 See Milliken v. Bradley, 433 U.S. 267, 280 n. 14, 97 S.Ct. 2749, 2757 n. 14, 53 L.Ed.2d 745 (1977); Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 434, 96 S.Ct. 2697, 2703, 49 L.Ed.2d 599 (1976); Swann, 402 U.S. at 24-26, 91 S.Ct. at 1280-81
 
 
 [25]
 See Morgan, 831 F.2d at 320 (noting difficulty of further desegregating schools located in geographically isolated or heavily black sections of Boston); United States v. Lawrence County School Dist., 799 F.2d 1031, 1043-44, 1047 (5th Cir.1986) (considering demography and geography in reversing trial court's refusal to order new student assignment plan). Price, 694 F.2d at 347-68 (authoritatively demonstrating that degree of racial balance is only one of many factors to be considered); Stout, 537 F.2d 800 (affirming remedy leaving three schools one-race because of geographic isolation and barriers); cf. Carr, 377 F.Supp. at 1141 (criticizing formulas for determining racial balance as "highly artificial" and severely disruptive)
 
 
 [26]
 See Keyes v. School Dist. No. 1, 413 U.S. 189, 196, 93 S.Ct. 2686, 2691, 37 L.Ed.2d 548 (1973) (what is a segregated school depends on facts of the particular case; faculty and staff percentages and community and administrative attitudes as well as racial composition of student body are relevant); Price, 694 F.2d at 347-68; Lawrence County School Dist., 799 F.2d at 1039-40 (looking to student and faculty percentages and history and location of school)
 
 
 [27]
 The dissent mistakenly refers to this as the "Keyes presumption." Dissent at 904, 919-920, 920-21. The Keyes presumption states "that a finding of intentional segregative school board actions in a meaningful portion of a school system ... creates a presumption that other segregated schooling within the system is not adventitious." Keyes, 413 U.S. at 208, 93 S.Ct. at 2697. This is a presumption that is used to establish initial de jure segregation in a case where no statutorily mandated segregation exists. The presumption referenced in the instant case applies only after either statutorily-mandated or policy-based de jure segregation has been established. See id. at 211 n. 17, 93 S.Ct. at 2699 n. 17 (Keyes court making this distinction); see also Tasby v. Wright, 713 F.2d 90, 94 (5th Cir.1983) (district court relied on wrong presumption). The dissent's misunderstanding of this difference has an obvious and critical impact on its assessment of this record. See dissent at 920-21 ("It is clear that to sustain the presumption, the plaintiffs were required to prove 'a current condition of segregation from intentional state action' "); id. at 951 ("The court simply has jumped the gun in invoking the Keyes presumption to arrive at the preliminary and critical conclusion that there is a current condition of segregation in Topeka."); see also id. at 951-52 (dire predictions if Keyes presumption is required at the outset). The presumption required here is not the Keyes presumption but the presumption placed on all school districts previously found liable for operating a de jure system
 
 
 [28]
 As one commentator has observed, "[A]mericans share a historical experience that has resulted in individuals within the culture ubiquitously attaching a significance to race that is irrational and often outside their awareness." Lawrence, The Id, the Ego, and Equal Protection: Reckoning With Unconscious Racism, 39 Stan.L.Rev. 317, 327 (1987)
 
 
 [29]
 See Wright v. Council of City of Emporia, 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972); Davis, 402 U.S. at 37, 91 S.Ct. at 1292; Swann, 402 U.S. at 25, 91 S.Ct. at 1280
 
 
 [30]
 See Pitts v. Freeman, 755 F.2d 1423, 1427 (11th Cir.1985)
 
 
 [31]
 See Diaz v. San Jose Unified School Dist., 733 F.2d 660 (9th Cir.1984) (en banc) (castigating school district for consistently choosing more segregative alternatives), cert. denied, 471 U.S. 1065, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985)
 
 
 [32]
 See 20 U.S.C. § 1701 (1982) (declaring it to be the public policy of the United States that neighborhood schools are the appropriate basis for determining public school assignments); Crawford v. Los Angeles Bd. of Ed., 458 U.S. 527, 537 n. 15, 102 S.Ct. 3211, 3217 n. 15, 73 L.Ed.2d 948 (1982); Diaz, 733 F.2d at 677 (Choy, J., dissenting)
 
 
 [33]
 See Swann, 402 U.S. at 28, 91 S.Ct. at 1282; Diaz, 733 F.2d at 664
 
 
 [34]
 On remand, the district court in Tulsa County developed a plan to desegregate Tulsa's schools, which we subsequently affirmed. 459 F.2d 720 (10th Cir.1972). The Supreme Court then summarily reversed our affirmance of the proposed plan and remanded for reconsideration in light of Keyes. 413 U.S. 916, 93 S.Ct. 3048, 37 L.Ed.2d 1038 (1973). We then determined that "the factual premise upon which we based our original decision ha[d] been so materially changed both by lapse of time and the specific and voluntary actions taken by the School Board and the students themselves that our further consideration under the present record would serve no useful purpose." 492 F.2d 1189 (10th Cir.1974). We remanded to the district court for such further proceedings as might be necessary to bring the school district in conformity with the Keyes mandate. Our original decision overturning the district court's finding of no constitutional violation remains the law of this circuit
 
 
 [35]
 See Morgan, 831 F.2d at 328-29 (racial neutrality is "unreliable talisman"); Diaz, 733 F.2d at 664 (adherence to neighborhood plan not determinative on question of segregative intent); Adams v. United States, 620 F.2d 1277, 1285-86 (8th Cir.1980) (en banc) (adoption of neighborhood school plan did not fulfill duty to desegregate); cf. Pitts, 755 F.2d at 1426 (mere adoption of desegregation plan insufficient to render a dual system unitary)
 
 
 [36]
 See Columbus Bd. of Educ., 443 U.S. 449, 462 & nn. 9-11, 99 S.Ct. 2941, 2949 & nn. 9-11, 61 L.Ed.2d 666 (1979); Swann, 402 U.S. at 28, 91 S.Ct. at 1282; Diaz, 733 F.2d at 667-71; Tulsa County, 429 F.2d at 1256-57
 
 
 [37]
 See Swann, 402 U.S. at 21, 28, 91 S.Ct. at 1278, 1282; Adams, 620 F.2d at 1286
 
 
 [38]
 See also Columbus, 443 U.S. at 459-60, 99 S.Ct. at 2947-48 ("In Swann, it should be recalled, an initial desegregation plan had been entered in 1965 and had been affirmed on appeal. But the case was reopened, and in 1969 the school board was required to come forth with a more effective plan"); United States v. Lawrence County School Dist., 799 F.2d 1031, 1043 (5th Cir.1986) ("the adoption of the plan does not exhaust the power of the court to direct elimination of vestiges of segregation that remain or become apparent only after the plan has been put into place"); Pitts, 755 F.2d at 1426
 
 
 [39]
 See Adams, 620 F.2d at 1288-91 (intact busing, school site selection, block busing, transfer policy, and segregated faculty assignments); Higgins v. Board of Educ., 508 F.2d 779, 787 (6th Cir.1974) (listing segregative techniques); Tulsa County, 429 F.2d at 1257 (transfer policy)
 
 
 [40]
 See Ross, 699 F.2d at 222, 227; Price, 694 F.2d at 351-53; cf. Diaz, 733 F.2d at 672-73 (criticizing school district for implementing none of desegregation proposals made by citizens' committee)
 
 
 [41]
 See Columbus, 443 U.S. at 463 n. 12, 99 S.Ct. at 2949 n. 12 (Board refused to seek advice on desegregation or implement recommendations); Morgan, 831 F.2d at 321 (noting cooperation with court orders); Diaz, 733 F.2d at 671-74 (manipulation of committee studying segregation; statements suggesting failure of bond issue would lead to forced busing); Ross, 699 F.2d at 222-23 (school district appointed community task force to develop magnet plan, opposed efforts to disrupt integration plans, and promoted interdistrict transfer)
 
 
 [42]
 See Davis, 402 U.S. at 37, 91 S.Ct. at 1292; Morgan, 831 F.2d at 322-25; Ross, 699 F.2d at 224-25
 
 
 [43]
 See Morgan, 831 F.2d at 324; Ross, 699 F.2d at 225
 
 
 [44]
 See Morgan, 831 F.2d at 322-25; Riddick, 784 F.2d at 532-34; Calhoun, 522 F.2d 717
 
 
 [45]
 See Ross, 699 F.2d at 224 (further remedial efforts would be unreasonable and inadequate); Calhoun v. Cook, 525 F.2d 1203, 1203 (5th Cir.1975) (per curiam) ("It would blink reality ... to hold the Atlanta School System to be nonunitary because further integration is theoretically possible and we expressly decline to do so.")
 
 
 [46]
 For example, the district court stated:
 "Although, on its face, the construction of schools, particularly on the west side of the district, appears to have promoted racial separation, the court does not believe that the district's school construction policy was intended to maintain or promote segregation."
 
 
 [671]
 F.Supp. at 1300 (emphasis added)
 
 
 [47]
 The dissent has fallen into the same error, as we have discussed supra at 862-63 & n. 27. The dissent also asserts that we should have remanded to let the district court make appropriate findings in accordance with the presumption and burden-shifting principles we believe apply. Dissent at 890. "But fact findings made under an erroneous view of the law or in the absence of a defined legal standard are not binding on appeal." Oil, Chemical & Atomic Workers v. Amoco Oil Co., 885 F.2d 697, 710 (10th Cir.1989) (Baldock, J., dissenting and urging reversal of trial court's fact findings on grounds it applied erroneous view of legal standard)
 
 
 [48]
 See, e.g., 671 F.Supp. at 1298-99 ("the use of space additions was consistent with a race-neutral neighborhood policy.... [I]t has not been shown that space additions were intentionally used to promote segregation...."); id. at 1300 ("The court believes the siting of Topeka West High School was a race-neutral decision."); id. at 1301 ("The district has consistently applied race-neutral, neighborhood school principles to the demarcation of attendance zones."); id. at 1309 ("The court does not believe the district's conduct over thirty years indicates a desire to perpetuate segregation by foregoing opportunities to desegregate schools.")
 
 
 [49]
 The dissent recognizes this holding in Swann, dissent at 913, but emphasizes that Swann was a remedial case. As we have previously pointed out, one of the dissent's major errors is its treatment of this case as if plaintiffs were required to establish an initial case of de jure segregation. This is a remedy case. The question presented is whether the school board has remedied the de jure segregation that existed in 1954. One thing is abundantly clear: Creating neighborhood schools in 1954 did not integrate the Topeka schools. See supra at 856 (Three of the four previously all-black schools remained all-black or virtually so under the new neighborhood school policy.); see also Adams, 620 F.2d at 1281 (St. Louis post-Brown neighborhood school plan did not change segregated nature of the system. "Those pre-Brown white schools located in the black neighborhoods ... turned virtually all black immediately after the plan was implemented.")
 
 
 [50]
 The dissent argues that it is the district court's job, not ours, to decide which party's experts are more believable. We, of course, agree. In reaching our conclusion that the district court was clearly erroneous in its determination that the Topeka school system has become unitary, we did not rely on the experts' opinions but rather on the undisputed statistics about the racial makeup of the various schools and their faculty/staffs, and the basically uncontroverted evidence about what the school board did, or failed to do, to meet its affirmative duty to dismantle the segregated system
 
 
 [51]
 We are similarly convinced that the dissent's review of the record is colored by its erroneous understanding of the burdens of proof and the role of intent. See supra at 862-63 & n. 27
 
 
 [52]
 The dissent is favorably impressed that only three of 34 Topeka schools currently have majority-minority populations. Dissent at 950. The dissent is similarly impressed that of the eight schools that plaintiffs identified at trial as racially identifiable minority, white students make up 49.3% of the total student population at these schools. Dissent at 936. We are not so favorably impressed. In a school system with a 26% minority student population, we think the number of schools in Topeka that approach or are over the 50% minority mark constitute persuasive evidence that the school system has not met its duty to desegregate
 
 
 [53]
 Plaintiffs do not contest the district court's finding that the Topeka school system is unitary with respect to facilities, extracurricular activities, curriculum, transportation, and equality of education. See Brown, 671 F.Supp. at 1307-08. There are currently no optional attendance zones, and the district's transfer policy is a majority-to-minority program. See id. at 1298
 Plaintiffs commissioned a public opinion survey in order to determine whether Topekans perceive some schools as black/minority and others as white, whether they perceive some schools as providing an inferior education, and whether there is a correspondence between the two. While the results of the survey provide some support for plaintiffs' contentions, the survey was extensively criticized as unreliable by several of the school district's experts. The district court discussed additional flaws and concluded that the survey was not strong evidence of the existence of segregation. 671 F.Supp. at 1305-06. We see no error in that conclusion. We therefore disregard the survey results.
 
 
 [54]
 The dissent attacks the use of a ±15% deviation from the district average of minority students to assess the racial identifiability of the schools, while at the same time conceding that "[t]he trial judge seems to have analyzed the plaintiffs' case in part with a ±15% standard," dissent at 921. In Swann, the Court accepted the district-wide average of 71% white/29% black, with no deviation, as an acceptable starting point for the district court in shaping a remedy. 402 U.S. at 24-25, 91 S.Ct. at 1280-81. Where, as here, the school district has been held liable for imposing an unconstitutional segregated school system, we believe it perfectly reasonable to use a ±15% deviation in assessing whether the school system ever achieved unitariness
 
 
 [55]
 The school district also offered two indices as a measure of desegregation in Topeka's schools. Rec., vol. XIII, at 2574-80. The dissimilarity index measures how dissimilar schools are compared to the district's mean. Rec., vol. IV, at 558. The exposure index is a measure of the potential for interracial contact. The indices are measures of system-wide desegregation, however; they say nothing about the racial balance in individual schools. Rec., vol. IV, at 554-57; rec., vol. XIII, at 2581. The dissent places great reliance on these indices, pointing out that they have shown significant improvement since 1954. Dissent at 923-25. Defendants' expert Dr. Armour agreed, however, that the indices are only summary measures, rec., vol. XIII, at 2623-24, and conceded that it is possible to have a school system with a good exposure index that nonetheless contains an all-black school, id. at 2653-54. Therefore, even if a school system has relatively good rates on these indices, it is still necessary to look at the racial statistics at individual schools to get a true picture
 
 
 [56]
 The range used by plaintiffs was very narrow, and it was extremely difficult for any school to fall within it. In 1985, for example, only four of the twenty-six elementary schools were not racially identifiable under plaintiffs' standard. While it is appropriate to use a harsher standard for analyzing faculty assignments than student assignments, since the school district may assign faculty as it sees fit, plaintiffs' standard is simply too difficult to meet in this case. We note, moreover, that the school district is limited to some extent in its ability to assign faculty because different teachers are certified in different fields. This is particularly true at the secondary level
 
 
 [57]
 
 Minority Faculty/Staff In
 Topeka's Elementary Schools, 1985"86
School Total Minority Per Cent
--------------------------------------------------------
Avondale East 31 . 4 10 . 45 33.3
Avondale West 25 . 8 1 . 0 3.9
Belvoir 25 . 95 3 . 85 14.8
Bishop 23 . 8 . 4 1.7
Crestview 31 . 65 3 . 4 10.7
Gage 21 . 0 1 . 0 4.8
Highland Park Central 34 . 6 3 . 9 11.3
Highland Park North 28 . 6 5 . 5 19.2
Highland Park South 29 . 2 5 . 4 18.5
Hudson 19 . 75 3 . 8 19.2
Lafayette 32 . 6 5 . 65 17.3
Linn 17 . 8 . 3 1.7
Lowman Hill 25 . 6 6 . 5 25.4
Lundgren 21 . 55 2 . 8 13.0
McCarter 27 . 4 3 . 0 10.9
McClure 25 . 1 0 . 0 0.0
McEachron 23 . 5 1 . 0 4.3
Potwin 14 . 15 2 . 0 14.1
Quincy 32 . 35 1 . 0 3.1
Quinton Heights 20 . 4 4 . 4 21.6
Randolph 27 . 0 1 . 0 3.7
Shaner 21 . 9 2 . 0 9.1
State Street 22 . 9 1 . 3 5.7
Stout 20 . 6 2 . 0 9.7
Sumner 23 . 3 1 . 85 7.9
Whitson 35 . 35 1 . 0 2.8
Average minority faculty/staff: 11.2%.
Rec., ex. vol. IV, at 261.
 
 
 [58]
 
 Minority Faculty/Staff In
 Topeka's Secondary Schools, 1985"86
School Total Minority Per Cent
------------------------------------------------------
Chase 40 . 5 7 . 45 18.4
Eisenhower 65 . 25 12 . 1 18.5
French 42 . 6 2 . 4 5.6
Jardine 39 . 65 3 . 8 9.6
Landon 31 . 1 3 . 0 9.6
Robinson 49 . 35 12 . 2 24.7
Highland Park 118 . 25 13 . 65 11.5
Topeka 150 . 1 25 . 5 17.0
Topeka West 120 . 0 3 . 0 2.5
Average minority faculty/staff: 12.65%. Rec., ex. vol. IV, at 262.
 
 
 [59]
 The racially identifiable schools in 1985-86 under the +15% standard were as follows:
 1985"86
 Elementary Schools (26) Min W Total % Min
Belvoir 146 90 236 61.9
Highland Park North 179 130 309 57.9
Lafayette 217 165 382 56.8
Quinton Heights 129 132 261 49.4
Hudson 108 124 232 46.6 7 schools
Avondale East 128 162 290 44.1 ident. minority
Lowman Hill 155 215 370 41.9 by enrollment
Bishop 36 306 342 10.5
McEachron 30 261 291 10.3
Whitson 38 334 372 10.2
Gage 25 240 265 9.4
McCarter 35 347 382 9.2 8 schools
Crestview 32 326 358 8.9 ident. white
Potwin 18 215 233 7.7 by enrollment
*957_ McClure 23 296 319 7.2
 Rec., ex. supp. vol. 13, pl. ex. 155 D.
 1985"86
 Secondary Schools (9) Min W Total % Min
 Eisenhower 218 230 448 48.7 1 school ident.
 minority by
 enrollment
Landon 21 205 226 9.3 3 schools
Topeka West ident. white
High School 120 1391 1511 7.9 by enrollment
French 16 241 257 6.2
Id. pl. ex. 155 G.
 When the schools in these tables are looked at in notes 57 and 58 supra, one sees that all but one of the racially identifiable minority elementary and junior high schools have minority faculty/staff percentages ranging from 17.3% to 33.3%. Six of the schools identified as racially identifiable white have minority faculty/staff percentages ranging from 0.0% to 5.6%.
 
 
 [60]
 For two of these schools, Gage and Potwin, the district court specifically found that they have been predominantly white schools since the Supreme Court's decision in this case, and remain predominantly white schools adjacent to schools with higher-than-average minority student population. 671 F.Supp. at 1303
 
 
 [61]
 We do not consider this part of our opinion necessarily in conflict with the district court's conclusion that there is no illegal segregation in Topeka, because the court did not separately consider the issue of current segregation apart from the question of causation. As we previously pointed out, the district court did find the existence of racial disparities in school enrollment and staff/faculty assignment. See supra at 867, 869. Our disagreement with the district court is chiefly on the significance of these findings in a school district with Topeka's history, and bearing the weight of a presumption against it which the district court failed to accord
 
 
 [62]
 Thus, one of the school district's experts, after reluctantly admitting that Lowman Hill elementary school's attendance boundaries were drawn in the 1950s with the effect of encompassing the only two areas of black population in that part of Topeka, and that the school was long surrounded by other schools with few to no black students, objected that "the boundaries of those school districts [were] in place." Rec., vol. XI, at 2345
 
 
 [63]
 See Dayton II, 443 U.S. at 539 n. 11, 99 S.Ct. at 2980 n. 11 ("[F]aculty segregation disappeared completely only after efforts of the Department of Health, Education, and Welfare."); Columbus, 443 U.S. at 461 & n. 8, 99 S.Ct. at 2948 & n. 8 (practices of assigning black teachers to schools with substantial black populations and creating optional attendance zones to permit white students to avoid predominantly black schools ceased respectively only after Ohio Civil Rights Commission complaint and the instant lawsuit); Tasby, 713 F.2d at 93 (" '[T]he District has never voluntarily moved to desegregate the Dallas school system; every step toward desegregation has been due to court action.' ")
 
 
 [64]
 In 1955, 3 elementary schools were 99 + % black and 14 elementary schools were 90 + % white for a total of 17 out of the 23 elementary schools. In 1966, 1 elementary school was 90 + % minority and 19 elementary schools were 90 + % white, for a total of 20 out of the 35 elementary schools. Rec., ex. vol IV, at 39-40, 54-56. Pages 30-181 of volume IV of the exhibits consist of student enrollments for individual schools from 1950 to 1985. We henceforth refer to this part of the record as Student Tables
 
 
 [65]
 In 1955, about half of Topeka's black students attended three schools that were 99+% black. In 1966, approximately the same percentage of minority students attended one 90+% minority school and three 50-80% minority schools. Student Tables, 1955, 1966
 
 
 [66]
 Rec., vol. XI, at 2326
 
 
 [67]
 Student Tables, 1966, 1974. Lyman elementary school was deannexed during this period
 
 
 [68]
 In 1966, Belvoir elementary school had 59.7% minority students and Lafayette elementary school had 54.5% minority students. By 1974, Belvoir had 67.1% minority students and Lafayette had 68.9%. At the secondary level, Crane junior high rose from 34.45% minority in 1966 to 52.9% in 1974, while East Topeka junior high remained more than 60% minority. Student Tables, 1966, 1974
 
 
 [69]
 Rec., vol. V, at 12-14
 
 
 [70]
 Rec., vol. XII, at 2485-91; rec., ex. vol. V, at 245-47
 
 
 [71]
 Topeka's dissimilarity index for elementary schools dropped from 62.1 in 1955 to 51.6 in 1975, a drop of approximately 10 points. In 1981 the index stood at 40.8. Topeka's relative exposure index for elementary schools fell from 47.7 in 1955 to 27.1 in 1975, and further to 17.2 in 1981. These drops indicate that the school system as a whole was becoming less segregated. Rec., ex. vol. II, at 156-57
 
 
 [72]
 Student Tables, 1975, 1981; compare rec., ex. vol. I, at 48-B (1974 map) with id. at 49-A (1979 map; no change to Bishop, Avondale West, or Lundgren)
 
 
 [73]
 Student Tables, 1985 (McEachron and Whitson)
 
 
 [74]
 Rec., vol. XII, at 2473-75
 
 
 [75]
 Plaintiffs point to the school board's refusal to adopt two desegregative reorganization plans proposed in 1984 by the Topeka school administration as evidence that the district is not presently committed to desegregation. These plans were violently opposed by minorities and whites alike because they would have destroyed the neighborhood school system, and we do not believe that the failure to adopt them reflects a current lack of commitment to desegregation. Nevertheless, the proposal of plans described as completely unworkable by a then-member of the Board does not satisfy the district's duty to desegregate its schools
 
 
 [76]
 Two elementary schools with more than 80% minority students were closed (Monroe 1975, Parkdale 1978) and the target minority percentages approved by HEW in 1976 have either been met or improved on. Compare rec., ex. vol. V, at 37 (projected enrollments of elementary schools under plan designed to satisfy HEW) with Student Tables, 1985. It should be noted that HEW did not approve the projected enrollments of more than 70% minority for Lafayette and Belvoir under the plan cited above. Rec., ex. vol. II, at 173. In the last five years, minority enrollments have increased in the primarily white schools, bringing them towards or over 10% minority, while the percentage of minority students at disproportionately minority schools has remained steady or dropped slightly. Student Tables, 1980-1985. The difference between schools that are more heavily minority and those that are primarily white have thus been narrowing
 
 
 [77]
 Cf. Stout v. Jefferson County Bd. of Educ., 537 F.2d 800 (5th Cir.1976) (mountain range and dangerous roads)
 
 
 [78]
 Cf. Morgan v. Nucci, 831 F.2d 313, 320 (1st Cir.1987) (racially identifiable schools in heavily black areas or cut off by harbor); Ross v. Houston Indep. School Dist., 699 F.2d 218, 224 (5th Cir.1983) (segregated schools located at opposite ends of large urban school district)
 
 
 [79]
 We do not mean to suggest that the school district has not faced opposition on other grounds. Both the reorganization of the late 1970s and two plans proposed in 1984 for further reorganization were met by community resistance. Rec., vol. XIII, at 2437-38
 
 
 [80]
 Cf. Tasby v. Wright, 713 F.2d 90, 93 (5th Cir.1983); Ross, 699 F.2d at 222
 
 
 [81]
 Rec., vol. XII, at 2418 (Board member 1957-1965: no discussions on segregative or desegregative effects of actions); rec., vol. XII, at 2440-41 (Board member 1977-1985: Board voted for open enrollment plan although warned it might have segregative effect); rec., vol. XII, at 2491 (Board member 1973-1977: Board resisted HEW efforts because it considered system unitary then)
 
 
 [82]
 Rec., vol. XII, at 2423
 
 
 [83]
 Brown II, 349 U.S. at 301, 75 S.Ct. at 757; Green, 391 U.S. at 437-38, 88 S.Ct. at 1693-94
 
 
 [84]
 According to Dr. Foster, the school district administrator in charge of personnel for 1984 stated in a deposition that he had "no knowledge of an assignment policy regarding assignment of minority personnel." Rec., vol. V, at 632. The school district does not deny that there was no policy directed expressly at assignment. Instead, it claims that its 1963 policy against discrimination in recruitment was broad enough to cover assignment. Rec., vol. X, at 1517; rec., vol. XII, at 2428-29; rec., vol. XII, at 2692-99; rec., ex. vol. II, at 58-59; rec., ex. vol. IV, at 217-19
 
 
 [85]
 Clay closed in 1975. At the time, Clay had approximately 25% minority students while Lowman Hill had approximately 45%. Rec., vol. III, at 282-83. Student Tables, 1975. Polk closed in 1979, and Central Park in 1980. Rec., vol. III, at 290-92
 
 
 [86]
 Student Tables, 1966-1985
 
 
 [87]
 Student Tables, 1966-1985
 
 
 [88]
 Rec., vol. III, at 249-51, 254-55. The area assigned to Quinton Heights when Van Buren closed was apparently empty of people at the time. The school district had already extended Quinton Heights into Van Buren's attendance area before Van Buren was closed, however. Rec., vol. III, at 251-53
 
 
 [89]
 Rec., vol. I, at 48
 
 
 [90]
 Rec., vol. III, at 291-92, rec., vol. X, at 1536, rec., ex. vol. V, at 227
 
 
 [91]
 Rec., ex. vol. I, at 48
 
 
 [92]
 The schools are Bishop, Crestview, Gage, McCarter, McClure, McEachron, Potwin, and Whitson
 
 
 [93]
 Bishop was 10.5% minority, McEachron was 10.3% minority, and Whitson was 10.2% minority
 
 
 [94]
 See, e.g., Morgan v. Nucci, 831 F.2d at 323 ("little more can be done to integrate these schools given the available numbers of white students"); Ross v. Houston Indep. Sch. Dist., 699 F.2d at 229 (district court concluded that further measures would be impractical)
 
 
 [95]
 See, e.g., United States v. Lawrence County School Dist., 799 F.2d at 1047 ("greater balance of students by race achievable")
 
 
 [96]
 Cf. Morgan v. Nucci, 831 F.2d 313 (1st Cir.1987) (harbour and concentration of black population in certain districts); Stout v. Jefferson County Bd. of Educ., 537 F.2d 800 (5th Cir.1976) (mountain range and dangerous roads)
 
 
 [97]
 In this regard, the district court questioned defendants' expert Dr. Armour about these possibilities. The questions and answers are instructive:
 "THE COURT: ....
 "Let me ask you a layman's question here. Say we have a school that has a 55 percent minority or 60 percent minority, and we want to change that situation, and try to get it down below 50 percent minority. Has there been any experience in anything that you have run into where they have gone into what you might call a voluntary busing program where you would ask the people in that community voluntarily to come forward, and allow their children to go to another area to try to redress the racial--have you had any experience on that, or do you know of any experiences on that, or is that fanciful to think that that might happen?
 THE WITNESS: Not at all. In fact that can be done. It can be done without the mandatory assignment, and has been done in many school districts, in fact with schools a lot more imbalanced than 55 percent minority.
 What you try to do in those cases is two-fold. One, you have an M to M program usually with transportation provided. You really encourage and do a lot of publicity and a lot of encouragement of the minority transfers out of that school, so that helps by reducing the minority population because they will frequently--minority students will frequently, given the incentives, transfer out of that school to a predominantly white school in a different part of the district.
 Other [sic] thing you do in a school like that generally that is successful is you put a special program in a magnet, call them a magnet program. White parents or white students will generally not transfer out of a predominantly white area neighborhood school into a school that is predominantly minority without an academic incentive, usually because they unlike some of the minority parents they feel their school is doing a fine job. So you will need to offer an attractive program. We have learned that computer science magnets, business, health professions. Depending upon the grade level, there are programs that are very attractive to white parents, and will actually induce them to transfer into that school.
 The combination of those two can frequently bring a school into the composition that you want."
 Rec., vol. XII, at 2638-39 (emphasis added).
 
 
 [98]
 Rec., vol. VI, at 794-801
 
 
 [99]
 The faculty/staff analysis was performed for 1981, the only year for which there is faculty-alone data. Dr. Foster concluded that the movement of 25 faculty/staff, or approximately 3% of total faculty/staff, would satisfy plaintiffs' formula. This 25 includes the movement both out of and into schools. Rec., vol. V, at 663-64; rec., vol. VI, at 764-67, 773-74
 
 
 [100]
 Section 601 reads:
 "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."
 42 U.S.C. § 2000d (1982).
 
 
 [101]
 The state had been dismissed as a party to the action in 1979. Brief of Appellee John Carlin at 3
 
 
 [102]
 See Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (affirming remedy based in part on state liability); Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (state provided funds for transporting white students but not for desegregative busing, enacted laws designed to delay desegregation plan and maintain segregation, rescinded city's voluntary desegregation plan, and approved school sites and construction with segregative results); Liddell v. State of Missouri, 731 F.2d 1294, 1298 (8th Cir.) (state constitution mandated segregation until 1976 and state took no action to desegegate schools after Brown I ), cert denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984); Los Angeles Branch NAACP v. Los Angeles Unified School Dist., 714 F.2d 946, 948 n. 2 (9th Cir.1983) (listing state policies and acts that helped to maintain segregation), cert. denied, 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984). Furthermore, in both Milliken and Los Angeles Branch NAACP there was clear state law giving the state, as opposed to local school authorities, a prominant role. See Milliken, 418 U.S. at 726 n. 5, 94 S.Ct. at 3118 n. 5 (Michigan constitution assigns "the whole subject" of education to the state); Los Angeles Branch NAACP, 714 F.2d at 949 (listing California cases detailing responsibility of state organs to aid in desegregation)
 
 
 [103]
 Reply Brief for Plaintiffs-Appellants, plaintiff's exhibits 45, 47
 
 
 [104]
 See, e.g., rec., ex. vol. II, at 190-235
 
 
 [1]
 Mr. Lamson is a demographic consultant, whose principal source of income is fee applications from desegregation cases. Rec. ex. vol. V at 4; vol. II at 372. Mr. Lamson does not appear to have pursued any formal study in the field of demographics; indeed, his resume candidly reports that he has no degrees, advanced or undergraduate. Rec. supp. vol. XII at 4. Despite Mr. Lamson's previous service in this field as outlined by this court, Court's Opinion at 854 n. 1, the district court was free to accept or reject his conclusions
 While the district court acknowledged that segregation may continue of its own inertia, id. (quoting Brown v. Board of Educ., 671 F.Supp. 1290, 1296 (D.Kan.1987)), the district court specifically found that segregation had not so continued in this school district, rather "the effects of de jure segregation have been substantially countered." Brown, 671 F.Supp. at 1296.
 
 
 [2]
 The record on appeal in this case generally will be identified as Rec. vol. # or supp. vol. #, indicating pleadings or transcript. Selected exhibits, which were paginated and bound by the parties in five volumes, will be identified as Rec. ex. vol. #
 
 
 [3]
 The difference between de jure and de facto segregation has been described as follows:
 De jure ("by law") segregation is racial separation which is the product of some purposeful act by governmental authorities. De facto ("by the facts") segregation occurs because of housing and migration patterns and is unconnected to any purposeful governmental action to racially segregate schools.
 
 
 [2]
 R. Rotunda, J. Nowak & J. Young, Treatise on Constitutional Law § 18.9 at 413 (1986); see also Keyes v. School Dist. No. 1, 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 17-18, 91 S.Ct. 1267, 1276-77, 28 L.Ed.2d 554 (1971). De jure segregation violates the equal protection clause, but "if a school district becomes unintentionally (de facto) segregated, there is no constitutional violation." R. Rotunda, J. Nowak & J. Young, supra, at 413
 
 
 [4]
 At the time of the district court hearing in Dayton II, 44.6% of the students were black, 47 out of 68 schools were virtually one race (22 black and 25 white). Dayton II, 443 U.S. at 529-30, n. 1, 99 S.Ct. at 2974-75 n. 1. This pattern of one-race schools in a system that was almost evenly composed of white and black students was present in 1951-52, 1963-64 and 1971-72. Id. at 537, 99 S.Ct. at 2979
 
 
 [5]
 In allowing the current plaintiffs to intervene in this action, the trial judge correctly discussed the presumption and burden shifting principles potentially applicable to this case. Brown v. Board of Educ., 84 F.R.D. 383, 399-400, 401-02 (D.Kan.1979)
 
 
 [6]
 Trial of this matter lasted from October 6 to October 31, 1986, and consisted of the testimony of 37 witnesses, including 11 experts, and hundreds of exhibits. A 3,000 page trial transcript in 18 volumes was filed at the district court
 
 
 [7]
 The court relies on United States v. Board of Educ. (Tulsa I), 429 F.2d 1253 (10th Cir.1970) (Lewis, C.J.) for the proposition that "when minorities are concentrated in certain areas of the city, neighborhood school plans may be wholly insufficient to fulfill the district's affirmative duty to eliminate the vestiges of segregation." Court's Opinion at 864. To the extent that the court implies that this circuit has premised constitutional liability on de facto segregation, the court is in error. In Tulsa I, the court required that neighborhood plans evolve "from racially neutral demographic and geographical considerations," and that the board adhere "solely to those stated considerations in implementing and updating the neighborhood policy." Id. at 1258. The Tulsa system failed both tests. The court first determined that enforcement of restrictive covenants and discriminatory housing practices were responsible for the concentration of blacks in north Tulsa. Tulsa I at 1255. In a clear attempt to circumvent Brown I and Brown II, the board drew boundaries for the 1955-56 school year which corresponded precisely with the previously segregated system. Id. at 1255-56. These "superimposed" attendance zones were designed to maintain racial segregation, and were hardly neutral. Moreover, the neighborhood system was inconsistent with its stated objectives. Id. at 1256, 1259
 In United States v. Board of Educ. (Tulsa II), 459 F.2d 720 (10th Cir.1972) (Lewis, C.J.), vacated, 413 U.S. 916, 93 S.Ct. 3048, 37 L.Ed.2d 1038 (1973), the court made it clear that it did not intend to change the rule in this circuit concerning neighborhood schools. The court cited Tulsa I and other Tenth Circuit cases for the following proposition:
 The law of this circuit has been consistently stated by the court to be that neighborhood school plans, when impartially maintained and administered, do not violate constitutional rights even though the result of such plans is racial imbalance.
 Id. at 724. Of course, Tulsa II was vacated for reconsideration in light of the Keyes presumption which held that "a finding of intentionally segregative school board actions in a meaningful portion of a school system ... creates a presumption that other segregated schooling within the system is not adventitious." Keyes, 413 U.S. at 208, 93 S.Ct. at 2697. Racial imbalance in a neighborhood school plan does not in and of itself support a constitutional violation. Indeed, the Court has consistently refused to consider whether racial imbalance inherent in a neighborhood school policy will support a constitutional violation in the absence of a finding of current de jure segregation in some part of the school system. Keyes, 413 U.S. at 212, 93 S.Ct. at 2699; Swann, 402 U.S. at 23, 91 S.Ct. at 1279.
 
 
 [8]
 The total enrollment for all USD 501 programs has declined over the recent years. Enrollment for the 1985-86 school year was 41.6% less than the peak enrollment in 1969-70
 Total Enrollment U.S.D. 501
 Year Students Year Students Year Students
1953"54 11,977 1971"72 24,183 1979"80 16,875
1954"55 12,517 1972"73 23,060 1980"81 16,408
 1973"74 21,751 1981"82 15,960
1966"67 24,631 1974"75 20,596 1982"83 15,670
1967"68 25,255 1975"76 20,242 1983"84 15,264
1968"69 25,737 1976"77 19,293 1984"85 15,106
1969"70 25,847 1977"78 18,383 1985"86 15,103
1970"71 25,002 1978"79 17,480
 Rec. ex. vol. IV at 34, 36, 57, 61, 65, 69, 73, 77, 81, 85, 89, 92, 96, 100, 104, 108, 112, 133, 145, 157, 169 & 181.
 
 
 [9]
 
 Racial Inventory of U.S.D. 501 Elementary Students
 School Year 1955"56
 School Black White Total % Black
Buchanan 88 0 88 100 . 0
Central Park 16 354 370 4 . 3
Clay 20 180 200 10 . 0
Crestview 0 687 687 0
Gage 0 645 645 0
Grant 75 296 371 20 . 2
Lafayette 47 314 361 13 . 0
Lincoln 73 438 511 14 . 3
Lowman Hill 46 242 288 15 . 9
Lundgren (Oakland) 0 436 436 0
Monroe 149 0 149 100 . 0
Parkdale 67 240 307 21 . 8
Polk 2 227 229 . 9
Potwin 0 441 441 0
Quincy 34 407 441 7 . 7
Quinton Heights 23 308 331 6 . 9
Randolph 2 543 545 . 4
State Street 27 504 531 5 . 1
Stout 0 263 263 0
Sumner 7 312 319 2 . 2
Van Buren 42 206 248 16 . 9
Washington 172 1 173 99 . 4
Whitson 8 716 724 1 . 1
 ------- ------- ------ ------------------
Total 898 7,760 8,658 10 . 4
 ------- ------- ------ ------------------
 ------- ------- ------ ------------------
 Rec. ex. vol. IV at 39"40.
 
 
 [10]
 
 Racial Inventory of U.S.D. Junior High Students
 School Year 1955"1956
 School Black White Total % Black
E. Topeka 136 313 449 30.3
Crane 75 292 367 20.4
Boswell 55 454 509 10.9
Curtis 35 235 270 12.9
Holliday 9 335 344 2.6
Roosevelt 9 491 500 1.7
Capper 1 407 408 0.2
---------- ---------- --------- --------- ---------
Total 320 2,527 2,847 11.2
 ---------- --------- --------- ---------
 ---------- --------- --------- ---------
 Rec. supp. vol. II at 186 (Lamson Report). This information also appears in supp. vol. XI at 186. Although Mr. Lamson's report appears in a pleading at supp. vol. II, I ordered supp. vol. XI, which is the report as admitted into evidence by the district court. Henceforth, I will refer to the report as contained in supp. vol. XI.
 
 
 [11]
 
 Racial Inventory of USD 501 Elementary Students
 School Year 1968"69
School Minority White Total % Minority
Avondale East 107 445 552 19.38
Avondale Southwest 14 457 471 2.97
Avondale West 7 568 575 1.22
Belvoir 294 224 518 56.76
Bishop 15 488 503 2.98
Central Park 65 298 363 17.91
Clay 46 180 226 20.35
Crestview 5 525 530 0.94
*957_ Gage 2 393 395 0.51
Grant 121 215 336 36.01
H.P. Central 140 533 673 20.80
H.P. North 145 368 513 28.27
H.P. South 37 570 607 6.10
Hudson 23 312 335 6.87
Lafayette 275 247 522 52.68
Linn 35 369 404 8.66
Lowman Hill 174 210 384 45.31
Lundgren 7 395 402 1.74
McCarter 3 548 551 0.54
McClure 3 493 496 0.60
McEachron 6 471 477 1.26
Monroe 172 58 230 74.78
Parkdale 377 38 415 90.84
Polk 30 174 204 14.71
Potwin 5 362 367 1.36
Quincy 61 313 374 16.31
Quinton Heights 103 192 295 34.92
Randolph 3 521 524 0.57
Rice 30 293 323 9.29
Sheldon 17 287 304 5.59
State Street 155 400 555 27.93
Stout 7 365 372 1.88
Sumner 38 248 286 13.29
Whitson 3 433 436 0.69
 -------- ------ ------ ----------
Total 2,525 11,993 14,518 17.39
 -------- ------ ------ ----------
 -------- ------ ------ ----------
 Rec. ex. vol. IV at 62"63.
 
 
 [12]
 
 Racial Inventory of USD 501 Junior High Students
 School Year 1968"69
School Minority White Total % Minority
Boswell 85 490 575 14.78
Capper 2 565 567 0.35
Crane 133 201 334 39.82
Curtis 83 169 252 32.94
East Topeka 339 222 561 60.43
Eisenhower 47 476 523 8.99
Highland Park 111 444 555 20.00
Holliday 89 324 413 21.55
Jardine 12 896 908 1.32
Landon 7 500 507 1.38
Roosevelt 27 445 472 5.72
 --------- -------- -------- ----------
Total 935 4,732 5,667 16.50
 --------- -------- -------- ----------
 --------- -------- -------- ----------
 Rec. ex. vol. IV at 64.
 
 
 [13]
 
 Racial Inventory of USD 501 Senior High Students
 School Year 1968"69
School Minority White Total % Minority
Highland Park 220 1,202 1,422 15.47
Topeka 584 1,480 2,064 28.29
Topeka West 10 1,552 1,562 0.64
 --------- -------- -------- ----------
Total 814 4,234 5,048 16.13
 --------- -------- -------- ----------
 --------- -------- -------- ----------
 Rec. ex. vol. IV at 65.
 
 
 [14]
 The initial data concerning the 1955-56 school year only contained information about black and white enrollment. As noted in the court's opinion at 12 n. 9, in years subsequent to 1966, the board began keeping data on whites and minorities more broadly defined. See rec. vol. IV at 432. Contrary to the court's assertion, however, it is far from clear that the "parties are in agreement that the difference between black and minority students is not significant." Id.; see rec. vol. IV at 562, 566 & 572. Minority students in 1985-86 number 3,919 (25.95%) of the 15,103 students. Of the minority amount, 2,784 (18.43%) are black; 758 (5.02%) are hispanic; 240 (1.59%) are American Indian; and 137 (.91%) are Asian American. Rec. ex. vol. IV at 181
 In Dowell v. Board of Educ., No. 88-1067, slip op. at 7, 7 n. 2, 22, 32, 44 (10th Cir. filed Oct. 6, 1989), this court declined to aggregate the number of minority students of different races for purposes of analyzing the racial composition of the Oklahoma City elementary schools. See id. dissent at 892-96 (Baldock, J., dissenting) (arguing that aggregation appropriate). The Supreme Court has indicated that minority groups should be treated together for the purpose of applying desegregation law. See Keyes, 413 U.S. at 195-98, 93 S.Ct. at 2690-92. Thus, the court's approach to aggregation in this case is consistent with Supreme Court authority, but inconsistent with our own precedent in Dowell.
 
 
 [15]
 The Adventure Center seeks to emulate adult society by combining students from five or six different schools from various parts of Topeka and assigning the students various jobs in a model economy. Rec. supp. vol. VII at 2109-10, 2144. In the Adventure Center, all students become productive members of society by holding various "salaried" jobs. Id. at 2110. Students in third grade spend two days a year at the Adventure Center; students in fifth grade spend two weeks, and all students participate. Id. at 2107
 
 
 [16]
 It is easy to criticize the performance of school board members, but far more difficult to be a school board member facing difficult choices. For example, in adopting the long-range facilities plan, Mr. Stratton said:
 It is very difficult to be able to satisfy all wishes of the patrons of the district. I think about all a Board Member can do is attempt to weigh the interests of each individual, not only the students or parents of a district but also other people that live in the city, taxpayers, perhaps those who are on limited incomes and try to arrive at a decision which is as acceptable as possible.
 Rec. ex. vol. II at 97. Mr. Stratton testified on behalf of the school board in this trial. Rec. vol. XII at 2482.
 
 
 [17]
 The court points out that "HEW did not approve the projected enrollments of more than 70% minority for Lafayette or Belvoir." Court's Opinion at 878 n. 76 (citing rec. ex. vol. II at 173) (letter from school board attorney to HEW summarizing proposed agreement between U.S.D. 501 and HEW). Under the plan, after the closure of Parkdale Elementary, Belvoir was expected to be 74.6% minority, while Lafayette was expected to be 70.7%. Rec. ex. vol. V at 37. The letter from the board's lawyer concerning the agreement between HEW and the board indicates that HEW was going to "express its concern that Lafayette and Belvoir Elementary Schools are expected to contain a disproportionate number of minority students" in a report to the district court. No such letter is contained in the record designated. Moreover, in 1985-86, Belvoir was 62.78% minority and Lafayette was 56.08% minority, well below the plan. Rec. ex. vol. IV at 170-71
 
 
 [18]
 
 Racial Inventory of USD 501 Students
 School Years 1985"1986 compared with 1981"82
 Elementary Schools 1985"86
 1985"86 1981"82
School Minority White Total % Minority % Minority
Avondale East 128 162 290 44.14 35.18
Avondale West 45 226 271 16.61 15.91
Belvoir 146 90 236 61.86 62.78
Bishop 36 306 342 10.53 10.18
Crestview 32 326 358 8.94 5.85
Gage 25 240 265 9.43 7.92
H.P. Central 140 259 399 35.09 35.58
H.P. North 179 130 309 57.93 60.90
H.P. South 110 283 393 27.99 29.98
Hudson 108 124 232 46.55 38.26
Lafayette 217 165 382 56.81 56.08
Linn 57 137 194 29.38 31.44
Lowman Hill 155 215 370 41.89 41.79
Lundgren 38 202 240 15.83 12.99
McCarter 35 347 382 9.16 9.20
McClure 23 296 319 7.21 3.23
McEachron 30 261 291 10.31 9.06
Potwin 18 215 233 7.73 5.16
Quincy 61 236 297 20.54 16.47
Quinton Heights 129 132 261 49.43 56.18
Randolph 64 368 432 14.81 10.87
Shaner 71 272 343 20.70 19.37
State Street 78 219 297 26.26 25.71
Stout 88 240 328 26.83 26.30
Sumner 90 196 286 31.47 36.36
Whitson 38 334 372 10.22 8.29
 -------- ----- ----- ---------- ----------
Elem. Total 2,141 5,981 8,122 26.36 25.22
 -------- ----- ----- ---------- ----------
 -------- ----- ----- ---------- ----------
 Middle Schools 1985"86
 1985"86 1981"82
School Minority White Total % Minority % Minority
Chase 105 209 314 33.44 34.15
Eisenhower 218 230 448 48.66 45.71
French 16 241 257 6.23 5.49
Jardine 57 273 330 17.27 12.41
Landon 21 205 226 9.29 6.29
Robinson 115 288 403 28.54 33.18
 -------- ----- ----- ---------- ----------
Middle School
Totals 532 1,446 1,978 26.90 25.05
 -------- ----- ----- ---------- ----------
 -------- ----- ----- ---------- ----------
 Senior High Schools 1985"86
 1985"86 1981"82
School Minority White Total % Minority % Minority
Highland Park
High 427 845 1,272 33.57 39.81
Topeka High 498 1,113 1,611 30.91 32.52
Topeka West 120 1,391 1,511 7.94 5.25
 -------- ----- ----- ---------- ----------
Senior High
Totals 1,045 3,349 4,394 23.78 25.92
 -------- ----- ----- ---------- ----------
 -------- ----- ----- ---------- ----------
 Rec. ex. vol. IV at 122"129, 170"177.
 
 
 [19]
 Three of the four relevant cases cited by the court involve situations in which courts have looked beyond the number of one-race schools or other numerical indications of racial identifiability in student assignment, and have concluded that, due to other factors, there was not necessarily a constitutional violation. In Morgan v. Nucci, 831 F.2d 313, 320 (1st Cir.1987), the court decided that out of 118 public schools in Boston, one 90+% school or thirteen 80+% schools (eight of which were 80+% black) would not preclude a finding of unitariness. In Price, 694 F.2d at 348, 350, the court decided that merely because a school had an enrollment less than 6.6% or greater than 17.6% black, it was not necessarily a racially identifiable school because racial identifiability is a question of fact, not of law. The court also recognized that the existence of "all-white or virtually all-white schools," in the various circumstances of ten previous Fifth Circuit cases, did not necessitate the finding of a constitutional violation. Id. at 365-66. In Carr v. Montgomery County Bd. of Educ., 377 F.Supp. 1123, 1141 (M.D.Ala.1974), aff'd, 511 F.2d 1374 (5th Cir.), cert. denied, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975), the district court decided that a ±15% variation from the system-wide average, which would result in schools less than 33.5% or more than 63.5% black being "racially identifiable," was "highly artificial." Id. Certain schools which were "racially identifiable" under the formula were nonetheless approved. Thus, the factors the court cites, "demography, geography, and the individual history of particular schools and areas of the city," Court's Opinion at 861, often have been used to narrow constitutional liability, not expand it
 This court also cites United States v. Lawrence County School Dist., 799 F.2d 1031 (5th Cir.1986), which appears to have decided as a matter of law that residential racial separation is generally a product of past segregated schools. See id. at 1043-44. This approach was criticized by Judge Higginbotham in his concurring and dissenting opinion in Lawrence. Id. at 1052-1060 (Higginbotham, J., concurring and dissenting).
 "Where numbers alone are insufficient to define racially identifiable schools," Court's Opinion at 861, there probably is not constitutional liability when it comes to student assignment. But, the court's opinion seems to say that, even in the absence of one-race schools or schools which are "racially identifiable" given some numerical standard, there still may be an unlawful condition of segregation given "demography, geography and the individual history of particular schools and areas of the city." Id.
 
 
 [20]
 "[A] finding of intentionally segregative school board actions in a meaningful portion of a school system ... creates a presumption that other segregated schooling within the system is not adventitious." Keyes, 413 U.S. at 208, 93 S.Ct. at 2697
 
 
 [21]
 As support for the notion that unconscious racism is prevalent, the court cites Lawrence, The Id, the Ego, and Equal Protection: Reckoning With Unconscious Racism, 39 Stan.L.Rev. 317, 327 (1987). Court's Opinion at 863 n. 28. In that article, the author concludes that "[t]he intent requirement is a centerpiece in an ideology of equal opportunity that legitimizes the continued existence of racially and economically discriminatory conditions and rationalizes the superordinate status of privileged whites." Lawrence. at 387. The author suggests that a "cultural meaning" test be incorporated into equal protection for the purpose of dealing with unconscious racism. Id. at 323-24, 355-81. Under the test, state action would be evaluated
 to determine whether it conveys a symbolic message to which the culture attaches racial significance. A finding that the culture thinks of an allegedly discriminatory governmental action in racial terms would also constitute a finding regarding the beliefs and motivations of the governmental actors: The actors are themselves part of the culture and presumably could not have acted without being influenced by racial considerations, even if they are unaware of their racist beliefs. Therefore, the court would apply strict scrutiny.
 Id. at 324; see also id. at 355-56. The author does discuss the lack of judicial restraint such a proposal involves, but is not dissuaded: "In short, it would not be a bad thing for judges to base constitutional decisions on their own sense of what values best reflect our cultural tradition, so long as the conflicting perspectives competing to define those values are made explicit." Id. at 386; see also id. at 381-87.
 
 
 [22]
 This court evidences some confusion concerning the meaning of a "current condition of segregation," when it tells us that "[t]he case law is decidedly unclear as to the precise meaning of the term." Court's Opinion at 859 (footnote omitted). In its explanatory footnote, this court does not cite Keyes, 413 U.S. at 205-06, 93 S.Ct. at 2695-96, from which the phrase originated. In Keyes, the Court explained that one of the elements of de jure segregation was "a current condition of segregation resulting from intentional state action." Id
 
 
 [23]
 It appears that the correct figure was 14.8%, as indicated by the numbers from the Annual Report of the County Superintendent of Shawnee County, 1952-53. Rec. vol. IV at 460
 
 
 [24]
 Dr. Armor recognized that the concept of racial identifiability is one of racial balance. Rec. vol. XIII at 2567. So did the district court. Brown, 671 F.Supp. at 1294-95. Dr. Armor did not think deviating from some given numerical standard was an appropriate measure for liability, because the concept was developed for remedial purposes, and although "nearly one-race" schools may prompt initial inquiry, one must look at the causes. Rec. vol. XIII at 2566-67. One must then determine whether school board action or demographic changes or both resulted in the current situation. Id. at 2571. Beyond that, use of the concept, even in the remedial phase of school desegregation, is becoming less prevalent because an attempt to attain racial balance in every school, say within a ±15% tolerance, requires techniques, such as pairing and clustering of schools, that are dependent on cross-district busing. Id. at 2567-68. Mandatory busing, in turn, often leads to white flight--existing students moving out of the district or enroll in private schools and potential students not moving into the district. Id. at 2568-69. Dr. Armor noted that "the white flight problem has been so severe in most central city school districts that were pursuing integration that what we have had is resegregation and school districts that become predominantly minority because of the loss of the white population." Id. at 2569. He also commented that the racial balance standard is difficult to apply to districts with very small minority composition. Id. at 2569-70. Finally, Dr. Armor testified that measures of racial balance, because they emphasize a certain distribution of students at each school, do not give sufficient weight to whether there is "a meaningful opportunity for contact among black and white students." Id. at 2570. "That kind of contact can be attained in a whole variety of different configurations other than a system that is strictly racially balanced." Id. at 2570-71
 
 
 [25]
 Plaintiffs' counsel attempted to impeach Dr. Armor with deposition testimony indicating that he would not address compliance with the affirmative duty, rec. vol. XIII at 2643-48. In his responses, Dr. Armor explained how he came to the conclusion, id. at 2642-43, and explained three times why his deposition answers were not inconsistent with the scope of his trial testimony. Id. at 2646-48. The district court chose to credit Dr. Armor's testimony. See Brown, 671 F.Supp. at 1298 (finding high levels of integration based on dissimilarity index and exposure index)
 
 
 [26]
 Both the elementary and "all schools" values of these indices present a picture of steady improvement over the years, reflecting the greater integration in the Topeka schools. See infra note 29. Significantly, the values of the these indices have continued to improve even after 1981, when Topeka's second desegregation plan was implemented completely
 
 
 [27]
 For discussion of the formulas for the dissimilarity index and exposure index, see F. Welch & A. Light, New Evidence on School Desegregation--U.S. Comm'n on Civil Rights Clearinghouse Pub. No. 92, 37-39, 48 n. 52 (1987); see also Dowell v. Board of Educ., 890 F.2d 1483, 1525 n. 16 (10th Cir.1989) (Baldock, J., dissenting)
 
 
 [28]
 Sometimes the indices are expressed as ranging from 0 to 1.0, other times, from 0 to 100. Rec. vol. XIII at 2582
 
 
 [29]
 
 Topeka Desegregation Indexes Based on Actual Enrollment Data Selected
 Years
 1955 1966 1968 1975 1981 1985
PERCENT MINORITY
Elementary 10.4 16.5 17.4 21.5 25.2 26.4
Junior High 0.0 15.3 16.5 20.2 25.1 26.9
High School 0.0 14.9 16.1 19.1 25.9 23.8
All Schools 10.4 15.9 16.9 20.6 25.4 25.7
DISSIMILARITY
Elementary 62.1 62.0 57.7 51.6 40.8 36.6
Junior High 0.0 53.2 52.0 39.8 39.1 32.1
High School 0.0 34.4 36.8 32.8 34.7 30.1
All Schools 62.1 55.1 52.4 43.8 38.8 33.6
RELATIVE EXPOSURE
Elementary 47.7 38.7 33.0 27.1 17.2 14.6
Junior High 0.0 26.1 24.4 18.8 12.9 11.2
High Schools 0.0 8.1 10.0 8.0 11.0 7.3
All Schools 47.7 30.9 26.7 20.8 14.7 12.1
 Rec. ex. vol. II at 156"57.
 
 
 [30]
 For the most part, this court has chosen to discount the final conclusion of Dr. Clark, the defendants' expert demographer. See Court's Opinion at 876. Dr. Clark analyzed the attendance boundary changes for the 11 elementary school attendance areas with the highest residential concentration of black residents (from 1963-64 through the 1985-86 school year). His findings certainly are relevant to this court's contention that various school board actions have resulted in segregative effects from which segregative intent could be inferred:
 The overall conclusion of this analysis of population growth, its geographic dispersal over time and the attendance boundary analysis is that the major force driving the system of change in the Topeka school system was the demographic process and not the changes in attendance areas. The changes in school enrollment were due to the changing growth rates of the white and black populations and to their geographic locations and not to the year to year attendance area shifts. Even the analysis of the optional zones in the earlier years had only minimal impact on the percent black in the attendance areas. Indeed focusing on the last dozen years the school district has made changes which have provided real evidence of desegregative or neutral impacts. Given the declining white population and the increasing black population, the imbalances which exist are the result of the demographic forces and not the result of boundary changes.
 Rec. ex. vol. I at 45; accord vol. XI at 2338-39. Although plaintiffs contended that the study, by beginning with 1963-64 boundaries, did not take into account any segregative effects remaining in those boundaries, the point of the study was to identify the role of demographic transition. Rec. vol. XI at 2359.
 
 
 [31]
 The court discusses this finding as part of larger discussion responding to an imaginary contention made at trial "that further desegregation is, in effect, not worth the trouble." Court's Opinion at 885. Defendants did elicit from Dr. Foster that the school district could be in statistical compliance with his faculty/staff standard by moving 26 certificated faculty in 1981-82, and in compliance with his ±15% standard for racial identifiability in student assignment for 1985-86 by moving 265 out of 8,122 (3.26%) elementary students to different schools and by moving 77 secondary students out of 6,372 (1.20%) to different schools. Rec. vol. VI at 773-74, 797-800. The point of this "illuminating exercise," Court's Opinion at 886, was to show that even under the plaintiffs' strict standard, statistical racial identifiability was slight, and it was a close question as to statistical racial identifiability, given less strict standards. Moreover, mere statistical racial identifiability does not mean that there is unlawful segregation, especially on these numbers. That is why it was important for the district court to look beyond statistical racial identifiability, before deciding whether those schools so identified were indicative of a current condition of segregation
 
 
 [32]
 
 Shawnee County, Kansas City of Topeka, Kansas
Year Total Persons Year Total Persons
1986 160,800 1986 118,580
1980 154,916 1980 118,690
Population Characteristics Population Characteristics
 1984 1980
Race Percent Race Percent
White 89.92 White 86.17
Black and Black 9.51
Other 10.08 Am. Indian
 Eskimo &
 Aleut 1.05
 Asian or Pac.
 Islander .53
 Hispanic 4.64
Source: U.S. Bureau of the Census, County and City Data Book"A Statistical
Abstract Supplement 185, 650 (1988).
 
 
 [33]
 
 Racial Inventory
 Employees
 Minority
 Professional Teaching Other Minority Total
Year Staff Employees Employees % Minority
1981"82 84 141 1,974 11.4
1982"83 108 116 1,933 11.6
1983"84 114 116 1,926 11.9
1984"85 120 121 1,938 12.4
1985"86 114 121 1,948 12.1
 Rec. ex. vol. IV at 266"68.
 
 
 [34]
 While the school system must observe its affirmative action policy, the students have no constitutional right to attend a school with any particular racial composition. Quarles v. Oxford Mun. Separate School Dist., 868 F.2d 750, 756 (5th Cir.1989); Oliver v. Kalamazoo Bd. of Educ., 706 F.2d 757, 762 (6th Cir.1983)
 
 
 [35]
 
 Elementary Minority Staff Percentage
 Minority Total
Year Staff Staff % Minority
1973"74 127 708 17.94
1974"75 116 933 12.43
1975"76 99 997 9.93
1976"77 94 . 6 589 . 7 16.04
1977"78 109 . 8 780 . 2 14.07
1978"79 92 . 1 745 . 6 12.35
1979"80 89 . 2 721 . 4 12.36
1980"81 90 . 5 706 . 5 12.81
1981"82 82 . 3 666 . 5 12.35
1982"83 76 . 10 678 . 65 11.21
1983"84 78 . 15 635 . 0 12.31
1984"85 75 . 40 662 . 10 11.39
 Rec. ex. vol. IV at 238, 240, 242, 244, 246, 248, 250, 252, 254, 255, 257, 259, 261.
 
 
 [36]
 Should be 234.----------
 
 
 [37]
 
 Elementary School Faculty/Staff Assignment
 1985"86
 Staff
Elementary School Minority Total Minority % White %
Avondale East 10.45 31.40 33.3 66.7
Avondale West 1.00 25.80 3.9 96.1
Belvoir 3.85 25.95 14.8 85.2
Bishop .40 23.80 1.7 98.3
Crestview 3.40 31.65 10.7 89.3
Gage 1.00 21.00 4.8 95.2
Highland Park Central 3.90 34.60 11.3 88.7
Highland Park North 5.50 28.60 19.2 80.8
Highland Park South 5.40 29.20 18.5 81.5
Hudson 3.80 19.75 19.2 80.8
Lafayette 5.65 32.60 17.3 82.7
Linn 0.30 17.80 1.7 98.3
Lowman Hill 6.50 25.60 25.4 74.6
Lundgren 2.80 21.55 13.0 87.0
McCarter 3.00 27.40 10.9 89.1
McClure 0.00 25.10 00.0 100.0
McEachron 1.00 23.50 4.3 95.7
Potwin 2.00 14.15 14.1 85.9
Quincy 1.00 32.35 3.1 96.9
Quinton Heights 4.40 20.40 21.6 78.4
Randolph 1.00 27.00 3.7 96.3
Shaner 2.00 21.90 9.1 90.9
State Street 1.30 22.90 5.7 94.3
Stout 2.00 20.60 9.7 90.3
Sumner 1.85 23.30 7.9 92.1
Whitson 1.00 35.35 2.8 97.2
 -------- ------ ---------- -------
 Total 74.50 663.25 11.23 88.77
 -------- ------ ---------- -------
 -------- ------ ---------- -------
 Rec. ex. vol. IV at 261.
 
 
 [38]
 
 Middle School and High School Faculty/Staff Assignment
 1985"86
 Staff
School Minority Total Minority % White %
Chase 7.45 40.50 18.4 81.6
Eisenhower 12.10 65.25 18.5 81.5
French 2.40 42.63 5.6 94.4
Jardine 3.80 39.65 9.6 90.4
Landon 3.00 31.10 9.6 90.4
Robinson 12.20 49.35 24.7 75.3
Highland Park H.S. 13.65 118.25 11.5 88.5
Topeka H.S. 25.50 150.10 17.0 83.0
Topeka West 3.00 120.00 2.5 7.5
 --------- --------- ---------- --------
Total 83.10 656.83 12.65 87.35
 --------- --------- ---------- --------
 --------- --------- ---------- --------
 Rec. ex. vol. IV at 262.
 
 
 [39]
 
 Minority Staffing Report
 Elementary Schools
 Includes Administrative and Certificated Staff
 1986"87
 Staff
Elementary School Minority Total Minority %
Avondale East 4.0 22.0 18.18
Avondale West 1.0 19.0 5.26
Belvoir 3.0 18.0 16.67
Bishop 1.0 18.0 5.56
Crestview 3.0 25.0 12.00
Gage 1.0 14.0 7.14
Highland Park Central 4.0 25.0 16.00
Highland Park North 4.0 22.0 18.18
Highland Park South 4.0 23.0 17.39
Hudson 2.0 13.0 15.38
Lafayette 4.0 27.0 14.81
Linn 1.0 12.0 8.33
Lowman Hill 3.0 23.0 13.04
Lundgren 1.0 16.0 6.25
McCarter 2.0 22.0 9.09
McClure 1.0 20.0 5.00
*957_ McEachron 1.0 19.0 5.26
Potwin 1.0 13.0 7.69
Quincy 1.0 23.0 4.35
Quinton Heights 2.0 16.0 12.50
Randolph 1.0 22.0 4.55
Shaner 2.0 17.0 11.76
State Street 1.0 19.0 5.26
Stout 2.0 19.0 10.53
Sumner 3.0 17.0 17.65
Whitson 2.0 26.0 7.69
 -------- ------- ----------
Total 55.0 510.0 10.78
 -------- ------- ----------
 -------- ------- ----------
 Rec. ex. vol. II at 160"61.
 
 
 [40]
 
 Minority Staffing Report
 Middle Schools
 Includes Administrative and Certificated Staff
 1986"87
 Staff
Middle School Minority Total Minority%
Chase 3.0 27.0 11.11
Eisenhower 7.0 45.0 15.56
French 5.0 36.0 13.89
Jardine 2.0 30.0 6.67
Robinson 6.0 36.0 16.67
 ----------- ----------- -----------
Total 23.0 174.0 13.22
 ----------- ----------- -----------
 ----------- ----------- -----------
 Rec. ex. vol. II at 160"61.
 
 
 [41]
 
 Minority Staffing Report
 High Schools
 Includes Administrative and Certificated Staff
 1986"87
 Staff
High School Minority Total Minority%
Highland Park H.S. 9.0 76 11.84%
Topeka H.S. 11.0 95.0 11.58
Topeka West H.S. 5.0 85.0 5.88
 ---------- --------- ---------
Total 25.0 256.0 9.77
 ---------- --------- ---------
 ---------- --------- ---------
 Rec. ex. vol. II at 160"61.
 
 
 [42]
 Dr. Herbert Walberg testified, based on his on-site visits and review of the school system that "it's an excellent system that is concentrating its resources on improving the children--improving the education and achievement of all the children in the system." Rec. supp. vol. VII at 2042-43. He found that: 1) "effective schools' techniques were apparent in the schools," 2) uniform curriculum guides were in use throughout the district, 3) students are tested regularly and there are high expectations placed on students, 4) the Adventure Center, see supra note 15, was "one of the most impressive educational experiences [he had] seen in public schools" and it gives white and black students exposure to one another, 4) there is "a great deal of constructive parental involvement," 5) schools are safe, orderly and well-maintained, 6) there is "an award-winning Head Start program and many multi-cultural and ethnic programs," and 7) the preceding items account for "the district's outstanding achievement test scores which have been high and rising for the past several years." Rec. supp. vol. VII at 2033-35
 
 
 FN18
 Given modern urban demography and geography, one-race schools may well have evolved for reasons beyond school board control. See Calhoun v. Cook, 522 F.2d 717, 719 (5th Cir.1975). Thus, where a school system consists of de facto one-race schools, rather than de jure, the system is not unconstitutional
 
 
 [43]
 
 Racial Inventory"Belvoir Elementary
 1952"1985
Year Minority White Total % Minority
1952 66 379 445 14.8
1960 82 276 358 22.7
1966"67 255 172 427 59.72
1967"68 276 210 486 56.79
1968"69 294 224 518 56.76
1969"70 274 176 450 60.88
1970"71 232 131 363 63.91
1971"72 187 124 311 60.51
1972"73 228 135 363 62.81
1973"74 218 102 320 68.12
1974"75 198 97 295 67.12
*957_ 1975"76 168 67 235 71.49
1976"77 190 45 235 80.85
1977"78 163 48 211 77.25
1978"79 159 57 216 73.61
1979"80 150 52 202 74.26
1980"81 152 49 201 75.62
1981"82 167 99 266 62.78
1982"83 156 107 263 59.32
1983"84 121 82 203 59.61
1984"85 112 81 193 58.03
1985"86 146 90 236 61.86
 Rec. vol. IV at 460, supp. vol. XI at 149, 152; ex. vol. IV at 54, 58, 62, 66, 70, 74, 78, 82, 86, 90, 93, 97, 101, 105, 109, 122, 134, 146, 158 & 170.
 
 
 [44]
 
 1969"70 33 306 339 9.73
1970"71 68 322 390 17.44
1971"72 83 268 351 23.71
1972"73 80 223 303 26.40
1973"74 83 211 294 28.23
1974"75 79 202 281 28.11
1975"76 99 175 274 36.13
1976"77 88 176 264 33.33
1977"78 86 154 240 35.83
1978"79 71 148 219 32.42
1979"80 80 155 235 34.04
1980"81 78 155 233 33.48
1981"82 88 142 230 38.26
1982"83 88 142 230 38.26
1983"84 105 124 229 45.85
1984"85 105 132 237 44.30
1985"86 108 124 232 46.55
 Rec. ex. vol. IV at 54, 58, 62, 66, 70, 74, 78, 82, 86, 90, 93, 97, 101, 105, 109, 123, 135, 147, 159 & 171.
 
 
 [45]
 
 Racial Inventory"Highland Park North Elementary
 1952"1985
Year Minority White Total % Minority
1952 18 1,158 1,176 1.5
1960 47 500 547 8.5
1966"67 119 432 551 21.60
1967"68 157 371 528 29.73
1968"69 145 368 513 28.27
1969"70 180 350 530 33.96
1970"71 143 319 462 30.95
1971"72 159 282 441 36.05
1972"73 152 245 397 38.29
1973"74 135 211 346 39.01
1974"75 142 194 336 42.26
1975"76 146 201 347 42.07
1976"77 140 169 309 45.31
1977"78 127 142 269 47.21
1978"79 170 121 291 58.42
1979"80 169 103 272 62.13
1980"81 149 111 260 57.31
1981"82 190 122 312 60.90
1982"83 197 128 325 60.62
1983"84 198 121 319 62.07
1984"85 174 125 299 58.19
1985"86 179 130 309 57.93
 Rec. supp. vol. XI at 149, 152; ex. vol. IV at 54, 58, 62, 66, 70, 74, 78, 82, 86, 90, 93, 97, 101, 105, 109, 123, 135, 147, 159, & 171.
 
 
 [46]
 
 Racial Inventory"Lafayette Elementary
 1953"1985
 Non"Black
Year Minority Black White Total % Minority
1953 0 0 382 382 0
1954 0 0 332 332 0
1955 0 47 314 361 13.0
1956 0 50 315 365 13.7
1966"67 136 125 218 479 54.49
1967"68 133 140 188 461 59.22
1968"69 131 144 247 522 52.68
1969"70 157 152 244 553 55.88
1970"71 162 170 249 581 57.14
1971"72 134 186 261 581 55.07
1972"73 108 177 167 452 63.05
1973"74 91 190 163 444 63.28
1974"75 102 179 127 408 68.87
1975"76 67 221 140 428 67.29
1976"77 36 117 86 239 64.02
1977"78 36 124 97 257 62.26
1978"79 48 170 110 328 66.46
1979"80 47 131 108 286 62.24
1980"81 40 143 131 314 58.28
1981"82 60 166 177 403 56.08
1982"83 58 180 163 401 59.35
1983"84 59 187 194 440 55.91
1984"85 60 161 172 393 56.23
1985"86 59 158 165 382 56.81
 Rec. supp. vol. XI at 56, 57, 58, 59; ex vol. IV at 54, 58, 62, 66, 70, 74, 78, 82, 86, 90, 93, 97, 101, 105, 109, 123, 135, 147, 159 & 171; see also ex. vol. IV at 37-38 (estimating 8.4% minority percentage in 1955 which district court relied upon).
 
 
 [47]
 
 Racial Inventory"Quinton Heights Elementary
 1953"1985
Year Minority White Total % Minority
1953 0 187 187 0
1954 10 288 298 3.4
1955 23 308 331 6.9
1956 26 329 355 7.3
1966"67 114 199 313 36.42
1967"68 102 184 286 35.66
1968"69 103 192 295 34.92
1969"70 113 161 274 41.24
1970"71 133 157 290 45.86
1971"72 108 188 296 36.48
1972"73 93 161 254 36.61
1973"74 92 160 252 36.51
1974"75 84 143 227 37.00
1975"76 77 120 197 39.09
1976"77 78 126 204 38.24
1977"78 62 120 182 34.07
1978"79 67 105 172 38.95
1979"80 111 110 221 50.23
1980"81 119 115 234 50.85
1981"82 150 117 267 56.18
1982"83 138 127 265 52.08
1983"84 151 125 276 54.71
1984"85 149 140 289 51.56
1985"86 129 132 261 49.43
 Rec. supp. vol. XI at 56, 57, 58, 59; ex. vol. IV at 55, 59, 63, 67, 71, 75, 79, 83, 87, 90, 94, 97, 101, 105, 109, 125, 137, 149, 161 & 173; see also ex. vol. IV at 37-38 (estimating 2.8% minority percentage in 1955 which district court relied upon).
 
 
 [48]
 In footnote 88, Court's Opinion at 883, the court tells us about these two northward expansions of the boundary of Quinton Heights. Regarding the second expansion, we are told: "The area assigned to Quinton Heights when Van Buren closed was apparently empty of people at the time." Id. I don't think so. If that statement were true, there would have been no students to send to Quinton Heights when Van Buren closed in 1964. The discussion in the transcript concerning the uninhabited area pertains to only a part of the area which was added--the fairgrounds. See rec. vol. III at 252-253 (1962 northward expansion took in 3 areas; central third is the fairgrounds without permanent residents, eastern third is east of the fairgrounds and 0-100% black, and western third is west of the fairgrounds and 0-89.9% black), id. at 1255 (remainder of fairgrounds added to Quinton Heights' attendance area in 1964, as well as part of the residential areas of Van Buren and Monroe)
 
 
 [49]
 The court tells us that Lowman Hill "remains the school whose attendance boundaries include the only significant group of minority population in the northwestern quarter of the school district," and also discusses Lowman Hill as containing "the only two significant areas of minority population in that part of Topeka." Court's Opinion at 880, 884 (emphasis added). As support for its finding, the court refers to the same map discussed above which indicates percent black population by block. Id. at 884 n. 91. Again the court's statement is too broad, we really have no way of knowing the concentration of other minority groups (e.g. hispanic) in the Lowman Hill area
 
 
 [50]
 In footnote 62, Court's Opinion at 874, the court claims that defendants' expert Dr. Clark admitted that the Lowman Hill boundaries were drawn with the effect of encompassing the black population in northwestern central Topeka, and that he essentially threw up his hands claiming that the boundaries already "were " in place. If this was true, it might provide some support for this court's finding that the Lowman Hill boundaries were drawn with the intent or effect of segregating the black elementary students in northwestern central Topeka. The transcript of Dr. Clark's testimony does not support that account, however. Dr. Clark explained why his work concerning schools with larger concentrations of minority students (including Lowman Hill) depended upon a more detailed analysis than a visual inspection of attendance areas would permit. Concerning Lowman Hill, the following exchange occurred:
 Mr. Hansen: But this is an example where on visual analysis the boundaries were drawn in such a way--from visual analysis the boundary [sic] were drawn in such a way as to incorporate virtually all the black people in that part of town into one school in that part of town. Isn't that right?
 Dr. Clark: No, I don't think they were drawn to incorporate all the black people in that part of town. There are areas of yellow [indicating lesser concentrations of black residents] that are outside that. But the boundaries of those school districts are in place; and yes, they have substantial numbers of black people. As I said earlier in the direct testimony, I took all those areas which were substantially black, and under racial transition for more detailed analysis.
 Rec. vol. XI at 2345 (emphasis added). Taken in context and without the benefit of the court's creative editing, e.g. changing "are" to "were," the above is hardly the admission that the court would cast it to be. But this court's approach to Dr. Clark's testimony has not been one of balance. See, e.g., Court's Opinion at 875 (out of 8 potentially segregative cases concerning boundary changes, Dr. Clark concludes that all are "overall desegregative or generated by demographic trends," rec. ex. vol. I at 43, yet this court discusses the one case concerning a now-closed school which could be considered partly demographic and partly segregative).
 
 
 [51]
 
 Racial Inventory"Lowman Hill Elementary
 1953"1985
Year Minority White Total % Minority
1953 0 292 292 0
1954 0 274 274 0
1955 46 242 288 16.0
1956 53 251 304 17.4
1966"67 199 202 401 49.63
1967"68 184 245 429 42.89
1968"69 174 210 384 45.31
1969"70 186 219 405 45.93
1970"71 157 222 379 41.42
1971"72 164 198 362 45.30
1972"73 140 193 333 42.04
1973"74 133 151 284 46.83
1974"75 127 143 270 47.04
1975"76 137 167 304 45.07
1976"77 143 155 298 47.99
1977"78 117 159 276 42.39
1978"79 99 144 243 40.74
1979"80 113 149 262 43.13
1980"81 151 196 347 43.52
1981"82 145 202 347 41.79
1982"83 120 207 327 36.70
1983"84 134 203 337 39.76
1984"85 127 214 341 37.24
1985"86 155 215 370 41.89
 Rec. supp. vol 11 at 56, 57, 58, 59; ex. vol. IV at 54, 58, 62, 66, 70, 74, 78, 82, 86, 90, 93, 97, 101, 105, 109, 124, 136, 148, 160 & 172.
 
 
 [52]
 Concerning Gage (9.4% minority) and Potwin (7.7% minority), this court tells us that "the district court specifically found that they have been predominantly white schools since the Supreme Court's decision in this case, and remain predominantly white schools adjacent to schools with higher-than-average minority student population." Court's Opinion at 873 n. 60 (citing Brown, 671 F.Supp. at 1303). While the district court apparently considered Gage and Potwin "schools with low minority percentages," I simply cannot find, on the page cited by the court, any finding that these schools "remain predominantly white schools adjacent to schools with higher-than-average minority student population." Court's Opinion at 873 n. 60. Lest the wrong impression be given, that Gage and Potwin are totally surrounded by schools with higher-than-average minority concentrations, perhaps creating an inference of segregative intent including non-compliance with the board's affirmative duty, it is necessary to view the racial composition of those schools in relation to schools with neighboring attendance areas. Regarding Gage:
 School Direction from Gage 1985"86 Minority%
Gage 9.43
Lowman
Hill SE 41.89
Randolph SE 14.81
Whitson SW 10.22
McCarter SW 9.16
Potwin NE 7.73
 Rec. ex. vol. I at 49B, ex. vol. IV at 170, 172-74. Thus, only Lowman Hill has a higher-than-average minority concentration (avg. minority concentration 26.36%).
 Regarding Potwin:
 School Direction from Potwin 1985"86 Minority%
Potwin 7.73
Sumner SE 36.36
Lowman
Hill SW 41.89
Gage SW 9.43
Quincy NE 20.54
 Rec. ex. vol. I at 49B, ex. vol. IV at 170, 172-74. Thus, only Sumner and Lowman Hill have higher than average minority concentrations.
 The district court noted that schools with low minority percentages located in the western part of the district are expected to increase in minority enrollment if current trends continue. Brown, 671 F.Supp. at 1303-04.
 
 
 [53]
 For some reason, perhaps to lessen the appearance of its factual overinvolvement, the court constantly describes (and refines) the contentions of the plaintiffs (while ignoring those of the defendants) and then makes its factual findings, affirming the plaintiffs' contentions. See Court's Opinion at 878-79, 881-82, 883; see also id. at 874-75
 
 
 [54]
 
 Racial Inventory"Topeka West High School
 1966"1985
Year Minority White Total % Minority
1966"67 5 1,241 1,246 0.40
1967"68 7 1,414 1,421 0.49
1968"69 10 1,552 1,562 0.64
1969"70 10 1,626 1,636 0.61
*957_ 1970"71 9 1,580 1,589 .57
1971"72 9 1,567 1,576 .57
1972"73 18 1,522 1,540 1.17
1973"74 19 1,485 1,504 1.26
1974"75 35 1,421 1,456 2.40
1975"76 31 1,399 1,430 2.17
1976"77 31 1,355 1,386 2.24
1977"78 39 1,299 1,338 2.91
1978"79 57 1,286 1,343 4.24
1979"80 63 1,248 1,311 4.81
1980"81 70 1,505 1,575 4.44
1981"82 77 1,391 1,468 5.25
1982"83 95 1,388 1,483 6.41
1983"84 97 1,363 1,460 6.64
1984"85 112 1,388 1,500 7.47
1985"86 120 1,391 1,511 7.94
 Rec. ex. vol. IV at 57, 61, 65, 69, 73, 77, 81, 85, 89, 91, 95, 99, 103, 107, 111, 128, 140, 153 & 164 & 176.
 
 
 [55]
 The court's choice of words is unfortunate because the clear implication of the court's reference to "schools devoted to educating white children," is that Topeka was unconcerned with educating minority children. The court's implication is not supported by the record
 
 
 [56]
 Perhaps because there was no evidence concerning "vigorous official encouragement of desegregative transfers" this court views the majority to minority plan as "minimally effective" and as "a slightly desegregative transfer plan that potentially could be significant." Court's Opinion at 865, 885, 885 n. 97, 878. Nonetheless, the Supreme Court has endorsed such plans, see Swann, 402 U.S. at 26-27, 91 S.Ct. at 1281-82, and it is unclear what feature of the plan this court objects to, particularly considering the lack of evidence on this point at trial. See Court's Opinion at 884 ("The feasibility of further measures was not a focus of this case, and there was little evidence on this question.")
 
 
 [57]
 Mr. Douglas was asked the following question on direct concerning the goal of eliminating majority-minority schools in the Topeka system:
 Mr. McAtee: The fact that that goal has not yet been achieved or does not exist today in this district, Mr. Douglas, is that an indication to you that actions of this Board of Education present and past or inactions of the Board of Education present and past have been undertaken with an intent to achieve a segregative effect?
 Mr. Douglas: I certainly do not believe that and I have no knowledge of any such actions or inactions by the board. I certainly believe at this particular point in time that this district is not in noncompliance or is outside the law and I don't really feel that the district needs the ACLU or anyone else to mandate any directives as to what should be done in this district and that includes, if I may say so respectfully, this court. I think that the board has clearly exhibited, at least I know for the eight years that I was there and in looking at and listening to what had happened previously, it certainly is indicative to me that the board has faced up to the problem and one of the kinds of things that they feel that they could do. I don't think that anything is perfect. I'm certainly not perfect, but I don't think I want to throw me away or I'm not going to go have myself made over because I'm not perfect. I hope that I have a little time to continue to improve myself and that's the same way that I see the district and with all of the problems that are facing education today, there's an old adage that I think is really appropriate for this particular situation. It goes, while standing knee deep in alligators, it is sometimes difficult to remember that your original reason for being there was to drain the swamp, and if you serve on a Board of Education today with all the myriad of problems that comes before you, I think it's commendable that this board has taken as a priority, at least the board that I was on, took as a priority the lowering of minority percentages and the monitoring of those situations that could cause those problems.
 Rec. vol. XII at 2455-56.
 
 
 [58]
 Although the court is impressed with magnet schools to attract white students, see Court's Opinion at 885 n. 97, and voluntary transfers to improve racial balance, it is most unlikely that these techniques can produce the type of racial balance so essential to the court's decision. See F. Welch & A. Light, supra note 27, at 23-25, 57 (smallest decrease in dissimilarity index associated with magnet programs); see also J. Hochschild, The New American Dilemma-Liberal Democracy and School Desegregation 70-79 (1984); L. Hughes, W. Gordon & L. Hillman, Desegregating America's Schools 17-20 (1980)
 
 
 [59]
 Accordingly, I would affirm the district court's judgment insofar as denying relief under Title VI. I concur in this court's judgment insofar as it affirms the dismissal of the Governor and the state board of education defendants from this action. See Court's Opinion at 887 ("We affirm both of these rulings.")